**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

AROR ARK O'DIAH,

                                        Plaintiff,

        v.                                                           No. 08-CV-941
                                                                        (TJM/DRH)

BRIAN FISCHER; MICHAEL CORCORAN;
MALCOLM R. CULLY; RONALD W. MOSCICKI;
STEPHEN GUTER; C.O. RAMSAY; D.
RICHARDSON; J. PEPIN; J. HAHN; MR. & Lt.
SHAW; SCOTT C. CARLSEN; ANDREW CUOMO,
Attorney General for the State of New York; K.
THOMAS, Correctional Officer, Cayuga
Correctional Facility; and D. SWIERK, Mail Room
Clerk, Lakeview Shock Incarceration Facility,

                                        Defendants[1].

_____

**APPEARANCES:**                                    **OF COUNSEL:**

AROR ARK O'DIAH
Plaintiff Pro Se
07-A-2463
Attica Correctional Facility
Post Office Box 149
Attica, New York 14011

HON. ERIC T. SCHNEIDERMAN                       ROGER W. KINSEY, ESQ.
Attorney General for the                        Assistant Attorney General
   State of New York
Attorney for Defendants
The Capitol
Albany, New York 12224-0341

**DAVID R. HOMER**
**U.S. MAGISTRATE JUDGE**

_____

        [1] Eleven other defendants were previously terminated or had the claims against
them transferred to other districts.  See Dkt. Nos. 51, 61.

**REPORT-RECOMMENDATION AND ORDER**[2]

Plaintiff pro se Aror O'Diah ("O'Diah"), an inmate in the custody of the New York State

Department of Correctional and Community Supervision ("DOCCS"), brings this action

pursuant to 42 U.S.C. § 1983 alleging that defendants, New York's prior Attorney General

and thirteen DOCCS officials and employees,[3] violated his constitutional rights under the

First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments.  Am. Compl. (Dkt. No. 55).

O'Diah also asserts claims under 42 U.S.C. §§ 1985 and 1986, Title II of the Americans

with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., and various state law provisions.

Dkt. No. 70, ¶¶ 45-49. Presently pending is the moving defendants' motion to dismiss the

amended complaint pursuant to Fed. R. Civ. P. 12(b)(6).  Dkt. No. 66.  O'Diah opposes the

motion.[4]  Dkt. No. 70.  For the following reasons it is recommended that defendants' motion

be granted in part and denied in part.

## I. Background

The facts are related herein in the light most favorable to O'Diah as the non-moving

party.  See subsection II(A) infra.

---

[2]This matter was referred to the undersigned for report and recommendation
pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

[3]See note 1 supra.

[4] O'Diah's opposition includes new claims against new defendants.  Dkt. No. 70, ¶¶
5-6, 26, 31, 38.  These claims and defendants are not subjects of the present motion.

**A. June 2007**

On June 5 and July 27, 2007, the Queens County Court denied O'Diah's state court motions challenging his conviction and sentencing.  Am. Compl. ¶ 29.  O'Diah appealed the denials, but the appeals were not processed or docketed.  Id.  O'Diah alleges that defendant Corcoran caused he appeals not to be processed  properly .  Id.

**B. October 2007 through December 2007**[5]

On October 24, 2007, via defendants Ramsay and Corcoran, O'Diah applied for special access to use the law library for extended hours.  Am. Compl. ¶ 43.  The application was granted from October 24 through November 24, 2008 so that O'Diah could complete pending legal work. Id. ¶ 44.  O'Diah was under the impression that he had the ability to terminate this authorization whenever he desired.  Id.  ¶ 45.  In early November, O'Diah asked Ramsay to remove his name from the call out sheets as he no longer needed the special access to the library because his legal work was completed.  Id. ¶ 46.  Ramsay agreed to remove O'Diah's name from the list and also instructed him on how to renew the application if he required additional library time in the future.  Id.

On November 11, 2007, O'Diah received a call to visit the library, which was confusing as O'Diah had previously had a conversation with Ramsay in which Ramsay indicated that he would remove O'Diah from the call out list.  Am. Compl. ¶ 47.  On November 12, O'Diah

_____

[5]O'Diah claims that in May 2007, he was infected with bacterial and in September 2007 that while he required antibiotics for the bacterial infection, he was instead diagnosed with cancer, epilepsy, and tuberculosis.  Am. Comp. ¶¶ 7-8.  However, O'Diah has failed to link these actions to any specific defendants.  Thus, he has failed to allege that anyone was personally involved and claims related to these events should be dismissed.

received a misbehavior report for failing to use the special access pass on November 11th.

Id. ¶ 48.  On or about November 21, 2007, Ramsay, who was allegedly coerced by Mawhir, testified that he did not remember having a conversation with O'Diah about him no longer needing to use the library pass.  Id. ¶ 50.  Ramsay, Mawhir, Corcoran and Carlsen allegedly conspired to have O'Diah found guilty of the disciplinary charge.  Id. ¶ 51.  Additionally, that day, Mawhir also conspired with other inmates to have them instigate an altercation with O'Diah so that he could be given additional disciplinary charges because O'Diah had filed grievances against Corcoran and Carlsen.  Id. ¶ 49.

After that date, Ramsay, Mawhir and Corcoran encouraged other inmates to instigate fights with O'Diah and pour cold water on his body and personal effects.  Am. Compl. ¶ 51.  Due to the tension these defendants created, O'Diah refused to go into the recreation yard for fear of his personal safety.  Id. ¶ 53.  O'Diah lodged complaints with Mawhir and Ramsay, but they were ignored and he was told that he was getting what he deserved after filing grievances against the state and its employees.  Id. ¶ 52.


### C. March 2008

On March 7, 2008, O'Diah was denied his legal mail, even though he had received prior authorization from defendant Thomas and made subsequent arrangements with an advocate to have him pick up the documents from the prison.  Am. Compl. ¶ 54.  Thomas had accessed O'Diah's property that day, but influenced by Mawhir, refused to deliver the legal property to O'Diah so that he could provide it to his legal advocate.  Id. ¶ 55.  The inability of O'Diah's legal advocate to receive his legal papers represented a denial of access to the courts.  Id. ¶ 56.

Also on March 7, Thomas issued O'Diah a false misbehavior report for O'Diah's failure to obey a direct order.  Am. Compl. ¶ 57.  This issuance of this charge was influenced by Mawhir and Corcoran.  Id.  On March 8, O'Diah received the misbehavior report and was sent to keeplock.[6]  Id.  ¶ 58.  While keeplocked, O'Diah was unable to file a motion to the court in one of his federal cases in the Eastern District of New York and the case was dismissed for a failure to prosecute.  Id.

On March 19, 2008, defendant Guter arrived at O'Diah's cell with new medication for him to take with which O'Diah was unfamiliar.  Am. Compl. ¶ 59.[7]  O'Diah requested the information insert for the drug, which would contain the drug's name, purpose and reported side effects, but Guter refused.  Id. ¶ 60.  O'Diah refused to take the medication, so Guter summoned Thomas and the two, at the direction of Mawhir, forced O'Diah to take the unknown medication.  Id.  ¶ 61.  After taking the medication O'Diah experienced serious intestinal issues including bowel movements, stomach pain, bleeding, and inflammation of his rectum.  Id.  This occurred despite the facility's directive that inmates retained the right to refuse medication.  Id.  ¶ 62.  O'Diah contends that this medication was forced upon him

---

[6]Keeplock is a form of disciplinary confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities."  Green v. Bauvi, 46 F.3d 189, 192 (2d Cir. 1995); N.Y. Comp. Codes R. & Regs. tit. 7, § 301.6.

[7] O'Diah's amended complaint contains generalized complaints that all defendants tried to provide him with the wrong medication in May, July and September of 2007 and also took away his personal food, forcing him to eat the food from the correctional facility which irritated his stomach.  Am. Compl. ¶ 28.  As O'Diah failed to indicate which defendants were involved in these alleged Eighth Amendment violations, they will not be further discussed.  However, as O'Diah did specify dates and defendants at a later time who allegedly violated similar rights with similar actions, those actions, and only those actions, will be addressed.

due to his national origin.[8]  Id.

On March 19, Guter also issued a misbehavior report against O'Diah for refusing to take the unknown medication.  Am. Compl. ¶ 64.  Sometime thereafter, non party Rocker conducted a disciplinary hearing and determined that O'Diah was within his rights to refuse to ingest the medication.  Id.  ¶ 65.  While Rocker initially stated that he would have dismissed the charge, he ended up sentencing O'Diah to ninety days keeplock due to Corcoran's influence over him.  Id. ¶ 66.  Rocker then reversed himself and suspended O'Diah's sentence.  Id.

### D.  May - June 2008

On May 9, 2008, O'Diah could not perform the work required for his work placement because the exposure to cigarette smoke, butts, and ashes aggravated his preexisting medical conditions.  Am. Compl. ¶ 68.[9]  O'Diah suffered from dizziness, headaches, shoulder and back pain, and high blood pressure.  Id.  O'Diah contends that defendants Corcoran, Carlsen, Fischer, Cuomo, and Cully were all aware of his medical conditions and disregarded them when they placed him in the work program.  Id.

On May 10, 2008, while working at his placement, O'Diah suffered from irregular and

---

[8] In O'Diah's opposition, he claims that he was targeted, kidnaped and had his constitutional rights violated because of his African origin.  Dkt. No. 70, ¶¶ 34, 36.

[9] O'Diah also contends that he was forced to work in a position exacerbating his medical conditions due to exposure to cigarettes sometime after January 26, 2007.  Am. Compl. ¶ 7.  Whether these refer to the same events is unclear as he did not name specific defendants, dates, or facts.  Additionally, O'Diah claims that the root cause of his pre-existing medical conditions was his degenerative disc disease in his back.  Dkt. No. 70, ¶ 4.

elevated blood pressure, headaches, and increased pain as a result of having to clean up the cigarettes. Am. Compl. ¶ 69. On May 17, O'Diah received emergency treatment and was informed that his blood pressure was elevated and irregular, so he was placed on a "rest" until June 6 and advised that he should be examined by the physician when he came on duty the following week. Id. ¶ 71. Medical staff attended to O'Diah daily, though he still suffered from headaches and dizziness. Id. On May 19, 2008, O'Diah experienced a severe headache and dizziness, informed the corrections officer supervising him that he was not feeling well, and requested a change in his work placement. Id. ¶ 70. He was instructed to seek a medical excuse instead. Id. While pursuing that request, O'Diah claims to have been told by someone in the front office that Cully had placed him in that position as a sanction. Id.

On May 20, 2008, O'Diah was given a choice between two work programs, though he did not prefer either position because of his health conditions. Am. Compl. ¶ 72. O'Diah chose one of the placements, and was then told by an unidentified sergeant that he was going to the other per the authorization of defendants Cully, Carlsen, Corcoran, Fischer and Cuomo. Id. Later the sergeant was questioned about denying O'Diah's choice for work programs. Id. O'Diah believes his preferences were ignored because he was oppressed. Id. The placement results in an aggravation of O'Diah's pre-existing medical conditions of severe headaches, dizziness, and depression. Id.

On June 2, 2008, O'Diah was summoned by medical and told the physician that he was unable to work around excessive amounts of cigarette smoke or cigarette butts and ashes and requested a work excuse. Am. Compl. ¶ 74. Cully allegedly told the physician that supervisors prohibited him from giving work excuses. Id. O'Diah believes that these

7

instructions ultimately came from Fischer and Cuomo and that he was being treated differently due to his "national origin identification." Id. That same day O'Diah returned to his work assignment where he again began cleaning up the cigarettes, butts, and ashes and began feeling dizzy and developing a headache. Id. ¶ 75. One of the corrections officers ordered O'Diah back to his cell to rest, and further advised him to file a grievance and again request a work program reassignment. Id.

On June 3, 2008, O'Diah remained very ill, suffering from dizziness and headaches. Am. Compl. ¶ 76. He wrote a grievance, which was submitted to defendant Pepin in person and mailed to defendants Fischer, Cuomo, the Inmate Grievance Clerk and the Attorney General's Office. Id. O'Diah requested reassignment but was again ordered back to his original work placement. Id. Upon returning, Pepin observed O'Diah being unable to complete his work, so Pepin sent O'Diah to return to his dorm after visiting the infirmary. Id. ¶ 77. While walking to the infirmary, O'Diah was stopped by an unnamed sergeant who berated him and insisted that he was O'Diah's master. Id. The sergeant brought O'Diah to an empty room and left him there, unattended, for hours while O'Diah believed that he was suffering from a stroke. Id.

On June 3, 2008, defendants Richardson and Pepin, via instructions from Cully, issued O'Diah a misbehavior report for threatening them to reassign him to a different work station. Am. Compl. ¶ 78. On June 5, 2008, Richardson conducted the hearing during which O'Diah was denied due process because Richardson allegedly made statements evidencing a bias against O'Diah. Id. ¶ 78, 83 (specifically, Richardson allegedly stated that he was aware that O'Diah was a difficult inmate and continually filed grievances). O'Diah was found guilty and sentenced to thirty days segregated confinement. Id. O'Diah also

contends that the sentence which Rocker had reversed, from months prior, was reinstated. Id. ¶ 83.  There is no evidence as to when this was reinstated or for how long, but O'Diah repeats it throughout the course of the complaint.  On the same day, O'Diah was also searched, stripped naked, and paraded around while he remained shackled.  Id. ¶¶ 33, 79. No defendants were identified as participating in that event.

On or about June 5, 2008, an Order to Show Cause was filed by the Cayuga County Court for one of the Article 78[10] cases which O'Diah had filed regarding his work placement. Am. Compl. ¶ 80.  O'Diah's paperwork was searched and seized which precluded his access to the courts and denied him due process.  Id. ¶¶ 31, 80-81.


### E. June 2008

On June 10, 2008, O'Diah was transferred to Lakeview Shock Center.  Am. Compl. ¶ 84.  The week before, the Cayuga County Court had issued an Order to Show Cause about O'Diah's Article 78 case regarding his work placement.  Id. ¶ 30.  The return date for the order was June 26.  Id.  Prior to his transfer, he had submitted a disbursement form for postage to be attached to his legal mail in response to the Order to Show Cause previously issued by the Cayuga County Court.  Id. ¶ 84.  Also prior to his transfer, O'Diah's cell mate had provided him with postage for his legal mail, since his prior disbursement had not been processed.  Id. ¶ 85.  O'Diah then delivered four envelopes to defendant Hahn to then give to the mail room clerk, defendant Swierk.  Id. ¶ 86.

On June 11, 2008, defendants Hahn, Shaw, Swierk, Moscicki, Corcoran, Carlsen,

---

[10]N.Y.C.P.L.R. art. 78 establishes the procedure for judicial review of the actions and inactions of state and local government agencies and officials.

Fischer and Cuomo searched and seized the stamped envelopes.  Am. Compl. ¶¶ 30, 87.

Hahn then issued O'Diah a misbehavior report for receiving unauthorized postage stamps

from his cell mate.  Id. ¶ 87.  O'Diah also attempted to mail these responses again, on June

26, by giving them again to Hahn, but he was unsuccessful due to the conspiracy between

Hahn, Shaw Swierk, Moscicki, Corcoran, Carlsen, Fischer and Cuomo.  Id. ¶ 89.  Since

these responses were not mailed, it resulted in the dismissal of the Article 78 case because

Cuomo, Fischer, Corcoran, and Carlsen moved for dismissal based on O'Diah's failure to

respond.  Id. ¶¶ 87-88, 90.

    O'Diah then demanded the return of the funds he applied to be disbursed for his

postage prior to his transfer.  Am. Compl. ¶ 91.  Moscicki and Cully denied that there was

ever funds available with payment.  Id.  O'Diah filed a grievance which resulted in a

disposition, on June 10, 2008, that he was owed a refund.  Id.  On June 17, 2008, Shaw

and Hahn issued another false misbehavior report about O'Diah exchanging stamps with

his cell mate.  Id. ¶ 92.  Both Shaw and Hahn, in conjunction with Moscicki, Corcoran,

Carlsen, Fischer, Pepin, Richardson, and Cuomo engaged in a conspiracy to deny O'Diah

his rights, resulting in another thirty days of segregation pursuant to the misbehavior report.

Id. ¶ 93.

    O'Diah contends that on August 8, 2008, Swierk was instructed by the above referenced

defendants to charge O'Diah again with correspondence violations.  Am. Compl. ¶ 94.  The

hearing occurred on August 13 and O'Diah was found not guilty of the charges.  Id.


### F. Retaliatory Transfers

On May 9, 2008, Corcoran, Carlsen, Cully, Fischer, Cuomo and his subordinates, the

Attorney General's office and the state all conspired to arrange for a retaliatory transfer for O'Diah to Livingston where he would be housed in keeplock for the ninety days which Rocker had previously suspended.  Am. Compl. ¶ 67.  After the disciplinary hearing on August 13, 2008, O'Diah was again transferred to Wyoming and the Gowanda Correctional Facilities.  Id. ¶ 94.  These facilities were further from where O'Diah's family lived, making it more difficult for them to visit him.  Id.

### G. Conspiracies

O'Diah maintains that he was kidnaped into DOCCS custody pursuant to a conspiracy between all defendants, court and law enforcement personnel, and the state.  Am. Compl. ¶ 115.  O'Diah had evidenced planted against him so that he would be criminally convicted and sent to prison.[11]  Id. ¶ 40.  Moreover, throughout the entire time O'Diah was incarcerated he was subjected to harassment.  Id. ¶ 36.

### II. Discussion

O'Diah contends that his First Amendment rights were violated because his access to the courts was impeded and false misbehavior reports were issued against him in retaliation.  O'Diah also contends that his Eighth Amendment rights were violated when he was forced to work in a placement which exposed him to cigarettes and aggravated his prior

---

[11] In O'Diah's opposition he specifies that he was denied multiple rights such as the right to represent himself, receive alternate counsel, testify, call key eye witnesses, and introduce key evidence.  Dkt. No. 70, ¶ 39.  As these are not complaints about his conditions of confinement, but rather the proceedings leading to his conviction, the proper vehicle for addressing said claims is a habeas corpus petition and not a § 1983 claim.

medical condition and he was forced to take an unknown medication.  O'Diah also contends

that some of his disciplinary hearings did not afford due process, that he was discriminated

against, and that he did not receive proper reimbursement for his stamps, all in violation of

the Fourteenth Amendment.  O'Diah also makes allegations that he was discriminated

against based on his disability and that all defendants conspired against him.  O'Diah also

asserts that he was unlawfully convicted and has remained illegally detained in

contravention of his constitutional rights.

Defendants contend that O'Diah's complaint must be dismissed because it fails to meet

the plausibility standards.  Defendants also argue that O'Diah's retaliation and conspiracy

claims are meritless, he has failed sufficiently to state numerous causes of action, certain

defendants were not personally involved in his constitutional violations, and defendants are

entitled to qualified immunity.

### A. Legal Standard[12]

Rule 12(b)(6) authorizes dismissal of a complaint that states no actionable claim.  When

considering a motion to dismiss, "a court must accept the allegations contained in the

complaint as true, and draw all reasonable inferences in favor of the non-movant."

Sheppard v. Beerman, 18 F.3d 147, 150 (2d Cir. 1994).  However, this "tenet . . . is

inapplicable to legal conclusions[; thus, t]hreadbare recitals of the elements of a cause of

_____

[12] O'Diah attached additional paperwork to his opposition.  However, consideration
of a motion to dismiss "is limited to the facts asserted within the four corners of the
complaint, the documents attached to the complaint as exhibits, and any documents
incorporated in the complaint by reference."  McCarthy v. Dun & Bradstreet Corp., 482
F.3d 184, 191 (2d Cir. 2007).  As the documents were neither attached nor incorporated
into the complaint, they have not been considered on this motion.

action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 129 S.

Ct. 1937, 1949 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 554, 555 (2007)

(holding that "entitlement to relief requires more than labels and conclusions, and a

formulaic recitation of the elements of a cause of action . . . [as] courts are not bound to

accept as true a legal conclusion couched as a factual allegation.")).

Accordingly, to defeat a motion to dismiss, a claim must include "facial plausibility . . .

that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged."  Iqbal, 129 S. Ct. at 1949 (citing Twombly, 550 U.S. at 556 (explaining

that the plausibility test "does not impose a probability requirement . . . it simply calls for

enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal

[conduct].")); see also Arar v. Ashcroft, 585 F.3d 559, 569 (2d Cir. 2009) (holding that, "[o]n

a motion to dismiss, courts require enough facts to state a claim to relief that is plausible . .

. .") (citations omitted).  Determining whether plausibility exists is "a content specific task

that requires the reviewing court to draw on its judicial experience and common sense."

Iqbal, 129 S. Ct. at 1950-51.

When, as here, a party seeks judgment against a pro se litigant, a court must afford the

non-movant special solicitude.  See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471,

477 (2d Cir. 2006).  As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled
> to "special solicitude," . . . that a pro se litigant's submissions must be
> construed "liberally,". . . and that such submissions must be read to raise the
> strongest arguments that they 'suggest. . . . .  At the same time, our cases
> have also indicated that we cannot read into pro se submissions claims that
> are not "consistent" with the pro se litigant's allegations, . . or arguments that
> the submissions themselves do not "suggest, . . ." that we should not "excuse
> frivolous or vexatious filings by pro se litigants" . . . and that pro se status
> "does not exempt a party from compliance with relevant rules of procedural

and substantive law . . . ."

Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant #1, 537

F.3d 185, 191-92 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded

district courts that 'when [a] plaintiff proceeds *pro se*, . . . a court is obliged to construe his

pleadings liberally.'" (citations omitted)).


## B. Personal Involvement

"'[P]ersonal involvement of defendants in alleged constitutional deprivations is a

prerequisite to an award of damages under § 1983.'"  Wright v. Smith, 21 F.3d 496, 501 (2d

Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)).  Thus,

supervisory officials may not be held liable merely because they held a position of authority.

Id.; Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996).  However, supervisory personnel may

be considered "personally involved" if:

>     (1) [T]he defendant participated directly in the alleged constitutional violation;
>
>     (2) the defendant, after being informed of the violation through a report or
>     appeal, failed to remedy the wrong;
>
>     (3) the defendant created a policy or custom under which unconstitutional
>     practices occurred, or allowed the continuance of such a policy or custom;
>
>     (4) the defendant was grossly negligent in supervising subordinates who
>     committed the wrongful acts; or
>
>     (5) the defendant exhibited deliberate indifference to the rights of inmates by
>     failing to act on information indicating that unconstitutional acts were
>     occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Williams v. Smith, 781 F.2d 319,

14

323-24 (2d Cir. 1986)).[13]

O'Diah continually claims that Fischer, Governor Cuomo, Corcoran, Carlsen, Cully, and Moscicki were persistently involved in his alleged constitutional violations.  With the exceptions of Cully's involvement in O'Diah's alleged First and Eighth Amendment violations and Moscicki's involvement in O'Diah's alleged First Amendment violations, such contentions fail.  The gravamen of O'Diah's complaints against these defendants is that they were in a position of power and, thus, always involved with anything occurring in conjunction with O'Diah's incarceration.  However, attempts to establish personal involvement based upon the supervisory role these defendants occupied is inappropriate.  Wright, 21 F.3d at 501 (holding that a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement).

Moreover, while O'Diah does not specifically articulate to whom he sent grievances and when, receiving grievances, without more, is insufficient to establish personal involvement as there exists no allegation that the proposed defendants took any action.  See Bodie v. Morgenthau, 342 F. Supp. 2d 193, 203 (S.D.N.Y. 2004) (citations omitted) (finding personal involvement only where a supervisory official received, reviewed, and responded to a prisoner's complaint); Johnson v. Wright, 234 F. Supp. 2d 352, 363 (S.D.N.Y. 2002) ("[I]f

---

[13] Various courts in the Second Circuit have considered how, if at all, the Iqbal decision affected the five Colon factors which were traditionally used to determine personal involvement.  See McCarroll v. Fed. Bureau of Prisons, No. 08-CV-1343 (DNH/GHL), 2010 WL 4609379, at *4 (N.D.N.Y. Sept. 30, 2010) (noting that although the Second Circuit has not yet addressed Iqbal's impact on the five Colon factors, several district courts have done so); Kleehammer v. Monore County, 743 F. Supp. 2d 175 (W.D.N.Y. 2010) (holding that "[o]nly the first and part of the third Colon categories pass Iqbal's muster . . . ."); D'Olimpio v. Crisafi, 718 F. Supp. 2d 340, 347 (S.D.N.Y. 2010) (disagreeing that Iqbal eliminated Colon's personal involvement standard).

mere receipt of a letter or similar complaint were enough, without more, to constitute personal involvement, it would result in liability merely for being a supervisor, which is contrary to the black-letter law that § 1983 does not impose respondeat superior liability.") (citations omitted).  Odiah's allegations are insufficient to establish, except where otherwise noted in Section II(C)(1) – (2), (D)(1) infra, that these defendants were involved or aware of any alleged constitutional violations.

Furthermore, the amended complaint does not contend that these defendants created unconstitutional policies or were grossly negligent in supervising subordinates.  As such, O'Diah has failed to establish their personal involvement and defendants' motion on this ground should be granted as to these defendants.

## C. First Amendment

### 1. Retaliation

O'Diah contends that multiple defendants retaliated against him throughout his tenure in DOCCS.  To state an actionable claim for retaliation, a plaintiff must first allege that the plaintiff's conduct was constitutionally protected and that this protected conduct was a substantial factor that caused the adverse action against plaintiff.  Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996).  "Types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives."  Barclay v. New York, 477 F. Supp. 2d 546, 588 (N.D.N.Y. 2007) (citations omitted).

> There is no bright line to define the outer limits beyond which a
> temporal relationship is too attenuated to establish a causal
> relationship, so courts judge the permissible inferences that can be
> drawn from temporal proximity in the context of particular cases.
> However, courts have found that six and eight month gaps
> between the protected conduct and adverse action were sufficient,
> while in other circumstances three months was considered too
> long.

Burton v. Lynch, 664 F. Supp. 2d 349, 367 (S.D.N.Y. 2009) (internal quotation marks and

citations omitted).

However, courts must view retaliation claims with care and skepticism to avoid judicial

intrusion into matters of prison administration.  Jackson v. Onondaga County, 549 F. Supp.

2d 204, 214-15 (N.D.N.Y. 2008).  Therefore, conclusory allegations alone are insufficient.

Id. at 214 (citing Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir. 1983) (explaining that

"claim[s] supported by specific and detailed factual allegations . . . ought usually be pursued

with full discovery.")).

O'Diah's allegations are as follows: (1) Mawhir conspired and incited the other inmates

to attack O'Diah so that he could write false misbehavior reports in retaliation for O'Diah

filing grievances; (2) Mawhir and Ramsay conspired with inmates to have them throw water

on O'Diah for filing grievances; (3) Pepin and Richardson issued O'Diah a false misbehavior

report contending he had threatened them after O'Diah filed a grievance and sought

transfer from his allegedly dangerous work placement; (4) Shaw and Hahn issued O'Diah a

false misbehavior report seven days after O'Diah's grievance was resolved providing him

with a refund for postage he had previously paid; and (5) Swierk issued O'Diah a false

misbehavior report alleging a correspondence violation.  Also, liberally construing O'Diah's

complaint he has alleged that Cully refused to allow him to participate in another work

17

program, denying any requests for work program reassignments, in retaliation for his filing of grievances.

O'Diah has failed to allege a plausible retaliation claim with respect to Mawhir and Ramsay.   In order "[t]o show retaliation [in these circumstances, O'Diah] was required to present evidence that his constitutionally protected conduct in filing past grievances was a substantial or motivating factor for a prison official's adverse action." Cole v. Fischer, 416 Fed. Appx. 111, 113 (2d Cir. 2011) (citing Bennett v. Goord, 343 F.3d 133, 137 (2d Cir. 2003).  First, the allegations against these defendants are conclusory.  Second, O'Diah does not allege when he filed grievances, who he filed them against or how long after the grievances were filed that the alleged retaliation occurred.  Accordingly, even construing the facts in the light most favorable to O'Diah he has failed to demonstrate that filing grievances was a substantial factor in the alleged retaliation.

Conversely, O'Diah has sufficiently alleged retaliation claims against (1) Cully for mandating that he remain in a dangerous work condition after complaining to medical staff and filing a grievance; (2) Pepin and Richardson for writing him a false misbehavior report in retaliation for complaining about his work placement in June 2008; (3) Hahn and Shaw for issuing him a false misbehavior report in retaliation for submitting a grievance and receiving a reimbursement of money; and (5) Swierk for issuing him a false misbehavior report in retaliation for submitting a grievance about reimbursement.  It is undisputed that filing grievances is a constitutionally protected activity.  See e.g. Varela v. Demmon, 491 F. Supp. 2d 442, 452 (S.D.N.Y. 2007) ("[T]he making of a grievance is itself the constitutionally protected speech.  The subject matter of the grievance – including whether it alleges the violation of any constitutional right – is thus irrelevant.") (citations omitted).

While "[a]ll exposure to [environmental tobacco smoke] ETS is not unconstitutional; [unwilling] . . . exposure to an unreasonably high level of ETS is cognizable as a constitutional violation." Taylor v. Conway, No. 06-CV-1329 (SRU), 2008 WL 4371928, at *4 (D. Conn. Sept. 23, 2008) (citing Helling v. McKinney, 509 U.S. 25, 35-36 (1993)) (attached to Report-Recommendation as Ex. A).  O'Diah authored a grievance and provided it to Pepin complaining about his work placement and unconstitutional exposure to ETS just prior to receiving an allegedly false misbehavior report.  O'Diah contends that Pepin and Richardson were then ordered to issue this misbehavior report at Cully's instruction, which would seem implausible except for O'Diah's earlier contentions that Cully specifically advised that O'Diah was not permitted to receive a work reassignment order from the medical staff, despite his physical ailments.  O'Diah's Eighth Amendment claim regarding the ETS has been deemed sufficient to withstand the present motion.  The current standing of that claim, in conjunction with the temporal proximity of the filing of the grievance with the issuance of the misbehavior report, along with the fact that the same defendant that received the grievance also authored the misbehavior report serves as a plausible set of facts to establish that the grievance was a substantial cause in Pepin taking the adverse action.

Similarly, the circumstances surrounding the misbehavior report issued by Hahn and Shaw in June 2008 and Swirek seven weeks later in August 2008 also establish a plausible set of facts for believing that O'Diah's prior filed grievance was the reason for the adverse action.  O'Diah filed a grievance seven days before receiving his misbehavior report from Hahn and Shaw and approximately two months before receiving his misbehavior report from Swirek.  Additionally, the grievance that O'Diah filed was resolved in his favor, so

O'Diah was granted a reimbursement of funds.  Lastly, at the disciplinary hearing for the misbehavior report issued by Swierk, O'Diah was found not guilty of any correspondence violations.  Given both the grievance and disciplinary hearings findings in O'Diah's favor and temporal proximity between the filing of the grievance, its disposition, and the subsequent filing of the misbehavior reports, dismissal is inappropriate.

Accordingly, defendants' motion on this ground should be denied on these claims.

### 2. False Misbehavior Reports

In this case, O'Diah contends that he had multiple false misbehavior reports lodged against him throughout his incarceration.  An inmate has a right not to be deprived of a liberty interest without due process.  However, a "prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest." Freeman v. Rideout, 808 F.2d 949, 951 (2d Cir. 1986)).  "There must be more, such as retaliation against the prisoner for exercising a constitutional right." Boddie v. Schnieder, 105 F .3d 857, 862 (2d Cir.1997) (citing Franco v. Kelly, 854 F.2d 584, 588-90 (2d Cir. 1988)).

In this case, O'Diah contends that he received false misbehavior reports for (1) failing to use his law library pass in November 2007; (2) failing to obey a direct order in March 2008; (3) refusing to take his medication in March 2008; (4) threatening defendants to put him in a new work placement in June 2008; and (5) correspondence violations in June and August, 2008 by Shaw and Hahn and Swierk respectfully.  However, O'Diah has only alleged a retaliation claim against defendants Pepin, Richardson, Swierk, Shaw, and Hahn in

conjunction with the misbehavior report issued for alleged threats and a correspondence violations, authored in June and August, 2008.  As previously discussed, regarding the other five alleged false misbehavior reports, even assuming that O'Diah's grievances was the basis for his retaliation claim, he has failed to sufficiently to allege that the grievance was the motivation for the adverse action.  Because O'Diah has failed to state a claim for retaliation, any allegations related to the alleged filing of false misbehavior reports is also inappropriate.  However, with respect to the misbehavior report issued by Pepin, Richardson, Hahn, Swierk, and Shaw, O'Diah has sufficiently pled facts sufficient to state a plausible retaliation claim.   Accordingly, defendants' motion on that ground should be denied.


### 3. Retaliatory Transfer

   "A prisoner has no liberty interest in remaining at a particular correctional facility, but prison authorities may not transfer an inmate in retaliation for the exercise of constitutionally protected rights . . . ."  Davis v. Kelly, 160 F.3d 917, 920 (2d Cir. 1998) (citations omitted).[14] In order to survive dismissal, an inmate must show "that he engaged in constitutionally protected conduct and . . . that conduct was a substantial or motivating factor for the adverse actions taken by prison officials."  Bennett v. Goord, 343 F.3d 133, 137 (2d Cir. 2003) (citations omitted).  However, "conclusory or general allegations are insufficient to state a claim for conspiracy under § 1983."  Walker v. Jastremski, 430 F.3d 560, 564 n.5

---

   [14] As previously stated, an inmate has no liberty interest in being housed at the facility of his or her choice.  Davis, 160 F.3d at 920.  Therefore, to the extent that O'Diah claims that his transfers took him further away from his preferred facilities which were closer to his family, such claims are not cognizable under § 1983.

(2d Cir. 2005) (citations omitted).

Here O'Diah has failed to allege that his transfers were retaliatory in anything more than general, conclusory terms.  O'Diah claims that his transfers were retaliatory but fails to identify in what constitutionally protected conduct he was engaged which provoked the retaliatory response, when that conduct occurred, and how close it was to the time of the transfers.  Moreover, O'Diah has failed to present facts showing that his alleged protected conduct was known by the various supervisory defendants or that it served as a motivating factor for his transfers.

Accordingly, defendants' motion on this claim should be granted.


### 4. Access to Courts[15]

"Interference with legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution."  Davis v. Goord, 320 F.3d 346, 351 (2d Cir. 2003).  In order to state a claim for denial of access to the courts, including those premised on interference with legal mail, a plaintiff must allege "that a defendant caused 'actual injury,' i.e. took or was responsible for actions that 'hindered [a plaintiff's] efforts to pursue a legal claim.'"  Id. (citing Monsky v. Moraghan, 127 F.3d 243, 247 (2d Cir. 1997) (quoting Lewis v. Casey, 518 U.S. 343, 351 (1996)).  Such injury must affect "a nonfrivolous legal claim [which] had been frustrated or

---

[15] O'Diah also alleges that the defendants discussed infra were acting under the influence of Corcoran, Carlsen and Fischer.  These are all supervisory defendants for whom dismissal has been recommended supra for a lack of personal involvement and infra for a failure to plead conspiracies.  Accordingly, the contentions regarding said defendants will not be discussed further here.

was being impeded due to the actions of prison officials." Warburton v. Underwood, 2 F.

Supp. 2d 306, 312 (W.D.N.Y. 1998) (citations omitted); Shine v. Hofman, 548 F. Supp. 2d

112, 117-18 (D. Vt. 2008) (explaining that actual injury "is not satisfied by just any type of

frustrated legal claim because the Constitution guarantees only the tools that inmates need

in order to attack their sentences . . . and . . . challenge the conditions of their

confinement.") (internal quotation marks and citations omitted).  Accordingly, without

identification of the underlying action which was prejudiced, actual injury, and by extension

a First Amendment violation, cannot be established.  See Christopher v. Harbury, 536 U.S.

403, 415 (2002) ("[T]he underlying cause of action . . . is an element that must be described

in the complaint, just as much as allegations must describe the official acts frustrating the

litigation.").

   O'Diah first alleges that in June 2007, Corcoran impeded his access to the courts.

However, O'Diah has failed to plead with any specificity what Corcoran did to preclude his

access or what hindrance resulted to O'Diah's pending legal claim.  Accordingly,

defendants' motion as to this claim should be granted.

   O'Diah next claims that in March 2008, Thomas seized his paperwork, including his legal

mail, the same day he issued a false misbehavior report and sent O'Diah to keeplock.

O'Diah claims that while keeplocked, he was unable to provide his legal paperwork to his

legal assistant when he arrived to pick it up at the facility and also was unable to file a

response to his case in the Eastern District of New York which was allegedly dismissed for

a failure to prosecute.  Viewing the facts in the light most favorable to O'Diah, there is

nothing to indicate that the federal case pending in the Eastern District was frivolous or

meritless.  Accordingly, Thomas' actions in blocking delivery of O'Diah's legal papers to be

the court resulted in an actual injury as his arguably meritorious case was dismissed. Therefore, defendants' motion as to this claim on this ground should be denied.

Lastly, O'Diah contends that he provided Hahn, Shaw, Swierk and Moscicki his legal mail at various times in June of 2008, but that they intentionally failed to send the mail out. Subsequently, O'Diah's Article 78 case filed in Cayuga County was dismissed.  As with the Eastern District case, nothing in the record indicates that O'Diah's court case was meritless or frivolous.  Therefore, the dismissal, caused by defendants' failure to mail out O'Diah's response to the court, constituted an actual injury.  Accordingly, defendants' motion as to this claim on this ground should be denied.

### D. Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment."  U.S. Const. amend. VIII.  "The Constitution does not mandate comfortable prisons but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment."  Farmer v. Brennan, 511 U.S. 825, 832 (1884). As with other Eighth Amendment claims, a "plaintiff must satisfy both an objective . . . and subjective test."  Jolly v. Coughlin, 76 F.3d 468,  480 (2d Cir. 1996) (citations omitted). Thus, "a prisoner may prevail only where he proves both an objective element – that the prison officials' transgression was sufficiently serious– and a subjective element – that the officials acted, or omitted to act, with a sufficiently culpable state of mind . . . ."  Phelps v. Kapnolas, 308 F.3d 180, 185 (2d Cir. 2002) (internal quotation marks and citations omitted).

The objective prong can be satisfied by

> conditions of confinement . . . [which] in combination [constitute an
> Eighth Amendment violation] when each would not do so alone . . .
> [such as] when the conditions have a mutually enforcing effect that
> produces the deprivation of a single, identifiable human need such
> as food, warmth, or exercise – for example, a low cell temperature
> at night combined with a failure to issue blankets.

Davidson v. Murray, 371 F. Supp. 2d 361, 370 (W.D.N.Y. 2005) (citations omitted).

However, "[n]othing so amorphous as overall conditions can rise to the level of cruel and

unusual punishment when no specific deprivation of a single human need exists." Id. (citing

Wilson v. Seiter, 501 U.S. 294, 304-05 (1991)).  The subjective prong requires "a prison

official [to] have a sufficiently culpable state of mind . . ., of deliberate indifference to inmate

health or safety"  Farmer, 511 U.S. at 834 (citations omitted).


### 1. Exposure to Environmental Tobacco Smoke ("ETS")

While "[a]ll exposure to ETS is not unconstitutional; [unwilling] . . . exposure to an

unreasonably high level of ETS is cognizable as a constitutional violation." Taylor v.

Conway, No. 06-CV-1329 (SRU), 2008 WL 4371928, at *4 (D. Conn. Sept. 23, 2008) (citing

Helling v. McKinney, 509 U.S. 25, 35-36 (1993)) (attached to Report Recommendation as

Ex. A).  "Courts have held that inmates were exposed to unreasonable ETS levels when

they were forced to share a cell with a heavy smoker."  Id. (citing cases).  Specifically,

inmates satisfy the objective prong of the Eighth Amendment test by arguing that they are

personally being exposed to unreasonably high levels of ETS which is not only actually

causing inmates potential harm and a serious likelihood of injury, but is seen by society as a

risk so grave that it offends standards of contemporary decency.  Helling, 509 U.S. at 35-

25

36.  Additionally, to demonstrate the subjective standard the court must assess "the prison authorities' current attitudes and conduct," towards the environment, evaluating whether "prison authorities are ignoring the possible dangers posed by exposure to ETS." Id. at 36-37.

In this case, it would appear that O'Diah's employment in a work area, arguably considerably larger than a cell, would expose him to a much less concentrated amount of ETS, thus making his claim meritless.  However, viewing the complaint in the light most favorable to O'Diah, he has satisfied the objective prong of the analysis.  O'Diah was inundated with cigarette smoke and its byproducts from having constantly to clean cigarette butts and ashes.  This led to physical ailments, such as dizziness and elevated blood pressure, which required O'Diah to be sent back from work on multiple occasions.[16] Accordingly, these circumstances caused O'Diah potential and actualized harm which was offensive to the risks society chooses to tolerate.

Moreover, O'Diah has satisfied the subjective prong by alleging that Cully specifically precluded him from receiving a work program reassignment.[17]  However, to the extent that O'Diah claims that Pepin also was deliberately indifferent to his needs, such claims are belied by O'Diah's own recitation of the facts.  O'Diah contends that it was Pepin that excused him from his work placement and instructed him to report directly to the infirmary

_____

[16] To the extent that O'Diah claims an unidentified sergeant was deliberately indifferent to his care during his escort to the infirmary in June 2008, such claims are moot as O'Diah has failed to identify or name the individual as a defendant.

[17] O'Diah also claims that other supervisory defendants were aware of his medical condition and had some hand in requiring him to remain in his work placement.  However, these vague and conclusory allegations are insufficient to establish personal involvement, as discussed supra.

26

for medical treatment.  Such actions do not state a plausible claim of indifference.

Accordingly, defendants' motion on this ground should be denied as to Cully and granted as to Pepin.


### 2. Other Conditions of Confinement

O'Diah claims that Ramsay, Mawhir and Corcoran encouraged inmates to pour cold water onto O'Diah and his property.  These actions led him to avoid the recreation yard.  These allegations, while inappropriate, do not rise to satisfy either prong of the Eighth Amendment analysis.  These alleged occurrences, which were not enumerated or described in any further detail, do not result in the deprivation of a single human need.  Additionally, O'Diah's decision not to engage in certain activities cannot be imputed to other defendants.  Accordingly, defendants' motion should be granted as to these clams.

O'Diah also claims that an unidentified officer paraded him around the yard shackled and naked.  However, O'Diah has failed to name this individual as a defendant and further discussion about the potential constitutional violations which occurred is moot.  Accordingly, defendants' motion should also be granted as to this claim.


### 3. Forced Medication

O'Diah alleges that Thomas and Guter, acting at Mawhir's direction, forced O'Diah to take an unknown medication.  O'Diah was not provided with the medication's identifying information, the reason for its administration, or the anticipated side effects.  The Supreme Court has recognized a constitutional right not to be medicated involuntarily, allowing it in

rare instances, with respect to anti-psychotic drugs "solely for trial competence purposes in certain cases."  Sell v. United States, 539 U.S. 166, 179 (2003).  There is no indication in the record that the administration of the medication was for these purposes.  Therefore O'Diah had a right to refuse to take such medication.  After ingesting the medication, O'Diah suffered severe intestinal complications.  Accordingly, such allegations suffice to satisfy the plausibility standard that O'Diah's constitutional rights were violated.  Accordingly, defendants' motion on this ground should be denied.

### E. Fourteenth Amendment

### 1. Equal Protection

The Fourteenth Amendment's Equal Protection Clause mandates equal treatment under the law.  Essential to that protection is the guarantee that similarly situated persons be treated equally.  City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985); Phillips v. Girdich, 408 F.3d 124, 129 (2d Cir. 2005) ("To prove a violation of the Equal Protection Clause . . . a plaintiff must demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination.").

> [T]he Equal Protection Clause bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.

Vegas v. Artus, 610 F. Supp. 2d 185, 209 (N.D.N.Y. 2009) (internal quotation marks and citations omitted).

In this case, O'Diah has offered only a few statements implicating equal protection,

though they fail to establish how he was treated differently than other inmates.  There are

no contentions, and the record does not show, that O'Diah was treated differently by staff

than other inmates.  All O'Diah offers are a few, vague, conclusory allegations that he was

oppressed and discriminated based upon his national origin.  These allegations, without

more, are insufficient.  See, e.g., John Gil Const., Inc. v. Riverso, 99 F. Supp. 2d 345, 353

(S.D.N.Y. 2000) ("[A]ssertions of selective enforcement and racial animus [that] are wholly

conclusory and unaccompanied by any supporting factual allegations . . . are insufficient to

state a claim under either the Equal Protection Clause or 42 U.S.C. § 1983.") (citations

omitted).  Accordingly, defendants' motion should be granted on this ground.


### 2. Confiscation of Property

O'Diah makes multiple, general complaints about unlawful confiscation of his property.

An inmate has a right not to be deprived of property without due process.  However, federal

courts do not provide redress for the deprivation of property if there is an adequate state

court remedy which the plaintiff can pursue.  Hudson v. Palmer, 468 U.S. 517, 533 (1984).

"An Article 78 proceeding permits a petitioner to submit affidavits and other written

evidence, and where a material issue of fact is raised, have a trial of the disputed issue,

including constitutional claims."  Locurto v. Safir, 264 F.3d 154, 174 (2d Cir. 2001) (citations

omitted); see also N.Y. C.P.L.R. §§ 7803, 7804; Campo v. New York City Employees' Ret.

Sys., 843 F.2d 96, 101 (2d Cir. 1988) ("Article 78 . . . provides a summary proceeding which

can be used to review administrative decisions.").  State law also provides that "[a]ny claim

for damages arising out of any act done . . . within the scope of . . . employment and in the

discharge of the duties of any officer or employee of the department [of corrections] shall be

29

brought and maintained in the court of claims as a claim against the state."  N.Y. Corr. Law § 24(2).

In this case, O'Diah contends that there was an unconstitutional deprivation when his personal property was allegedly confiscated.  Such claims fail as a matter of law for several reasons.  First, the Article 78 procedure exists and affords an adequate state court remedy.  Second, because O'Diah is suing for damages, he must pursue his claims here against New York State in the New York Court of Claims pursuant to Corrections Law § 24.  Thus, the correct venue to litigate these claims is in state court.

Accordingly, defendants' motion should be granted as to this claim.


### 3. Disciplinary Dispositions

To the extent O'Diah contends he was denied due process during his disciplinary hearings, such contentions are meritless for multiple reasons.  First, such claims run afoul of the "favorable termination" rule of <u>Heck v. Humphrey</u>, 512 U.S. 477, 487-87 (1994).  That rule provides that if a determination favorable to the plaintiff in a § 1983 action "would necessarily imply the invalidity of his conviction or sentence," a plaintiff must prove that the conviction or sentence has been reversed on direct appeal or declared invalid in order to recover damages under § 1983.  This rule applies to challenges to procedures used in prison disciplinary proceedings.  <u>Edwards v. Balisok</u>, 520 U.S. 641 (1997).  There is no evidence that O'Diah's disciplinary determinations were ever vacated.  Thus, the <u>Heck</u> rule applies and any challenges to those determinations are barred.

Additionally, as a threshold matter, an inmate asserting a violation of his or her right to due process must establish the existence of a protected interest in life, liberty, or property.

See Perry v. McDonald, 280 F.3d 159, 173 (2d Cir. 2001). To establish a protected liberty interest, a prisoner must satisfy the standard set forth in Sandin v. Conner, 515 U.S. 472, 483-84 (1995). This standard requires a prisoner to establish that the deprivation was atypical and significant in relation to ordinary prison life. Id. at 484; Jenkins v. Haubert, 179 F.3d 19, 28 (2d Cir.1999); Frazier v. Coughlin, 81 F.3d 313, 317 (2d Cir.1996). The fact that an inmate has been disciplined with a segregated confinement alone is insufficient to establish an atypical and significant deprivation.  The Second Circuit has articulated a two-part test whereby the length of time a prisoner was placed in segregation as well as "the conditions of the prisoner's segregated confinement relative to the conditions of the general prison population" are to be considered.  Vasquez v. Coughlin, 2 F. Supp. 2d 255, 259 (N.D.N.Y.1998).  The Second Circuit has noted that where the period of segregated confinement exceeds thirty days, "refined fact-finding" is required to resolve defendants' claims under Sandin.  Colon v. Howard, 215 F.3d 227, 230 (2d Cir. 2000).

To the extent that O'Diah claims any of his disciplinary hearings denied him due process, all of his dispositions were for thirty days.  O'Diah does not complain about the conditions of his confinement while serving his sentences but only that the findings of guilt occurred.  Given that no confinement exceeded thirty days, no further fact finding is required.

Therefore, defendants' as to these claims should be granted on these grounds.

## F. Failure to State a Claim

An action commenced pursuant to 42 U.S.C. § 1983 requires proof of the "deprivation of any right[], privilege[], or immunit[y] secured by the Constitution" or laws of the federal

government.  42 U.S.C. § 1983.  Thus, no action lies under § 1983 unless a plaintiff has

asserted the violation of a federal right.  See Middlesex County Sewerage Auth. v. Nat'l Sea

Clammers Ass'n, 453 U.S. 1, 19 (1981).


## 1. Harassment

O'Diah contends that he was constantly harassed during his incarceration at DOCCS

facilities.  However verbal threats and harassment, alone, are insufficient to state a

constitutional claim.  See Purcell v. Coughlin, 790 F.2d 263, 265 (2d Cir. 1996) ("The claim

that a prison guard called Purcell names also did not allege any appreciable injury and was

properly dismissed."); Shabazz v. Pico, 994 F. Supp. 460, 474 (S.D.N.Y. 1998) ("[V]erbal

harassment or profanity alone, unaccompanied by any injury no matter how inappropriate,

unprofessional, or reprehensible it might seem does not constitute the violation of any

federally protected right and therefore is not actionable under . . . § 1983."). [18]  Accordingly,

defendants' motion should be granted as to all such claims.


## 2. Defective Grievance Procedures

"Prisoners, including pretrial detainees, have a constitutional right of access to the

courts . . . ."  Bourden v. Loughren, 386 F.3d 88, 92 (2d Cir. 2004) (internal quotation marks

omitted) (citing Bounds v. Smith, 430 U.S. 817, 821-22 (1977) (citations omitted) (holding

---

[18] To the extent that such contentions can be construed to allege that O'Diah should
be compensated for defendants' failure to comply with DOCS policies and protocols for
investigating grievances, such contentions are also meritless.  Bolden v. Alston, 810 F.2d
353, 358 (2d Cir. 1987) ("State procedural requirements do not establish federal
constitutional rights.  At most, any violation of state procedural requirements would create
liability under state law . . . . ").

that all prisoners have a well-established Constitutional right to "adequate, effective, and meaningful" access to courts).  "[I]nmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does not give rise to a cognizable § 1983 claim."  Shell v. Brzezniak, 365 F. Supp. 2d 362, 370 (W.D.N.Y. 2005) (citations omitted).  However, "[i]f prison officials ignore a grievance that raises constitutional claims, an inmate can directly petition the government for redress of that claim."  Id. (citations omitted).

In this case, to the extent that O'Diah has proffered generalized complaints about the grievance process as a whole, such claims are insufficient to establish a constitutional violation.  Accordingly, defendants' motion on this ground should be granted as to all such claims.

## G. Qualified Immunity

Defendants claim that even if O'Diah's constitutional claims are substantiated, they are entitled to qualified immunity.  Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Aiken v. Nixon, 236 F. Supp. 2d 211, 229-30 (N.D.N.Y. 2002) (McAvoy, J.), aff'd, 80 Fed.Appx. 146 (2d Cir. Nov. 10, 2003).  However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified . . . immunity might still be available . . . if it was objectively reasonable for the public official to believe that his acts did not violate those rights."  Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991); Magnotti v.

Kuntz, 918 F.2d 364, 367 (2d Cir. 1990) (internal citations omitted)).

A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation.  Saucier v. Katz, 533 U.S. 194, 201 (2001).  Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation.  Aiken, 236 F. Supp. 2d at 230.  Here, the second prong of the inquiry must be discussed with regard to O'Diah's First Amendment access to court and retaliation claims as well as his Eighth Amendment medical indifference claims.  As to all other claims, the second prong of the qualified immunity analysis need not be addressed because, as discussed above, even viewing the allegations in the light most favorable to O'Diah, he has failed sufficiently to allege constitutional violations.

There is no question that it was well settled on June 7, 2008 that the (1) First Amendment provided inmates with access to the courts and freedom from retaliation, including in the form of a false misbehavior report (Bounds v. Smith, 430 U.S. 817, 824 (1977) ("[O]ur decisions have consistently required States to shoulder affirmative obligations to assure all prisoners meaningful access to the courts); Davis v. Goord, 320 F.3d 346, 352-53 (2d Cir. 2003) (evaluating retaliation claim because "the filing of grievances is a constitutionally protected activity.") and (2) Eighth Amendment required that inmates are to be provided "with . . . reasonable safety [as i]t is cruel and unusual punishment to hold convicted criminals in unsafe conditions," (Helling, 509 U.S. 33 (internal quotation marks and citations omitted)) whether that pertain to their medical care or conditions of confinement.  Thus, accepting all of O'Diah's allegations as true, qualified immunity cannot be granted to (1) Thomas, Hahn, Shaw, Swierk or Moscicki for interfering

34

with O'Diah's right of access to the courts; (2) Cully for O'Diah's dangerous exposure to
ETS at his work placement; (3) Thomas, Guter or Mawhir for forcing O'Diah to take
unidentified medication; (4) Pepin, Richardson, Cully, Hahn, Shaw and Swierk for retaliating
against O'Diah; and (5) Pepin, Richardson, Hahn, Shaw, and Swierk for filing false
misbehavior forms.  However, defendants' motion should be granted in the alternative on
this ground as to all other defendants for all other claims.

### H. Conspiracy[19]

In order to support a claim for conspiracy pursuant to § 1985, there must be "(1) an
agreement . . . ; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act
done in furtherance of that goal causing damages." Ciambriello v. County of Nassau, 292
F.3d 307, 324-25 (2d Cir. 2002); Cusamano v. Sobek, 604 F. Supp. 2d  416, 468 (N.D.N.Y.
2009).  An agreement must be alleged with specificity as bare allegations of a conspiracy
supported only by allegations of conduct easily explained as individual action is insufficient.
See  Iqbal v. Hasty, 490 F.3d 143,177 (2d Cir. 2007); see also Gyadu v. Hartford Ins. Co.,
197 F.3d 590, 591 (2d Cir.1999).  Thus, plaintiffs must "make an effort to provide some
details of time and place and the alleged effects of the conspiracy . . . [including] facts to
demonstrate that the defendants entered into an agreement, express or tacit, to achieve the
unlawful end." Warren v. Fischl, 33 F. Supp. 2d 171, 177 (E.D.N.Y. 1999) (citations
omitted).  While exact specifics are not required, "the pleadings must present facts tending

---

[19] Defendants also assert that any conspiracy claims are effectively barred by the
intracorporate conspiracy doctrine.  However, because it is recommended herein that
defendants' motion as to the conspiracy claim be granted on other grounds, the
intracorporate conspiracy doctrine need not be addressed.

to show agreement and concerted action." Anilao v. Spota, 774 F. Supp. 2d 457, 512-13 (E.D.N.Y. 2011) (citations omitted).  Conclusory, vague, and general allegations are insufficient to support a conspiracy claim. Ciambriello, 292 F.3d at 325.

O'Diah alleges that (1) Mawhir, Ramsay, Corcoran and Carlsen all conspired to procure his conviction on disciplinary charges, incite other inmates to assault O'Diah, and issue additional misbehavior reports subsequent to the assaults; (2) Mawhir, Corcoran and Thomas all conspired before issuing the March 2008 misbehavior report; (3) Corcoran, Carlsen, Fischer, Cuomo, and Cully all conspired to put O'Diah in a work placement program which exposed him to dangerous levels of ETS despite prior knowledge of his health conditions; and (4) Shaw, Hahn, Moscicki, Corcoran, Carlsen, Fischer, Pepin, and Cuomo conspired to deny O'Diah of his rights by assisting in the conviction on disciplinary charges he received from his misbehavior report in June 2008.  However, none of these alleged conspiracy claims is sufficient to withstand the current motion.

Some of O'Diah's underlying claims of constitutional violations have survived the present motion.  However, it appears that in addition to the underlying conspiracy claims, O'Diah also alleges a conspiracy between the acting defendants and all of the supervisory defendants employed by DOCCS.  These claims are conclusory and fail to establish how, when or why defendants from various correctional facilities and different levels of management colluded and formed these alleged schemes.  While specifics are unnecessary, O'Diah fails to provide any plausible information which would lend credence to his claims of an explicit or implicit agreement between any or all of these defendants.

Accordingly, defendants' motion as to the claims of conspiracies should be granted.

## I. ADA Claims

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of . . . a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The ADA "applies to inmates in state prisons." Beckford v. Portuondo, 151 F. Supp. 2d 204, 220 (N.D.N.Y. 2001) (citations omitted). To state a claim under the ADA, an inmate must demonstrate that

> (1) he or she is a "qualified individual with a disability"; (2) he or she is being excluded from participation in, or being denied the benefits of some service, program, or activity by reason of his or her disability; and (3) [the facility that] provides the service, program or activity is a public entity.

Clarkson v. Coughlin, 898 F. Supp. 1019, 1037 (S.D.N.Y. 1995); 42 U.S.C. § 12132.

As to the first element, a person is an individual with a qualified disability if "(A) a physical or mental impairment . . . substantially limits one or more of the major life activities of such individual, (B) [there is] a record of such an impairment, or (C) [the individual is] being regarded as having such an impairment." 42 U.S.C. § 12102(2)(A)-(C).

> To determine if an individual meets any of the above criteria, courts apply a three part test . . . First, a plaintiff must show that [he or] she suffers from a physical or mental impairment. Second, the plaintiff must establish that the activity [he or] she alleges to be impaired constitutes a "major life activity." Third, the plaintiff must show that [his or] her impairment "substantially limits" the major life activity previously identified.

Smith v. Masterson, 538 F. Supp. 2d 653, 657 (S.D.N.Y. 2008) (internal citations omitted).

The Second Circuit has held that it is important to

> distinguish[] between (I) making reasonable accommodations to assure access to an existing program and (ii) providing additional or different substantive benefits . . . [since] the disability statutes do not require that substantively different services be provided to the

37

> disabled, no matter how great their need for services may be.
> They require only that covered entities make "reasonable
> accommodations" to enable "meaningful access" to such services
> as may be provided, whether such services are adequate or not.

Wright v. Giuliani, 230 F.3d 543, 548 (2d Cir. 2000) (citations omitted).

In this case, O'Diah has failed sufficiently to allege that he is suffering from any sort of

impairment or disability.  O'Diah makes conclusory assertions that the ADA is applicable to

his case, yet fails to advance from facts detailing what impairment he suffers, how it has

impacted him and prevented him from engaging in major life activities, or identifying which

major life activities are affected.  Additionally, O'Diah has failed to indicate which

reasonable accommodations, programs, or services he was denied.

Accordingly, defendants' motion as to the ADA claims on this ground should be granted.


### J. Sections 1985 & 1986

"Section 1985 prohibits conspiracies to interfere with civil rights."  Davila v. Secure

Pharmacy Plus, 329 F. Supp. 2d 311, 316 (D. Conn. 2004). To state a claim for relief under

§ 1985(3), a plaintiff must show:

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly,
> any person or class of persons of the equal protection of the laws, or of equal
> privileges and immunities under the laws; and (3) an act in furtherance of the
> conspiracy; (4) whereby a person is either injured in his person or property or
> deprived of any right of a citizen of the United States.

United Bd. of Carpenters & Joiners of Am., Local 610 v. Scott, 463 U.S. 825, 828-29

(1983).  Additionally, a plaintiff "must demonstrate that the defendant . . . acted with class-

based invidiously discriminatory animus."  Webster v. Fischer, 694 F. Supp. 2d 163, 196

(N.D.N.Y. 2010) (citations omitted).

Here, O'Diah does not allege any facts giving rise to a conspiracy.  First, O'Diah vaguely asserts conclusory statements relating to an alleged conspiracy among defendants.  This is insufficient.  See generally Thomas v. Roach, 165 F.3d 137, 147 (2d Cir. 1999) (granting summary judgment for a § 1985(3) claim where the "assertions were conclusory and vague, and did not establish the existence of an agreement among defendants to deprive [plaintiff] of his constitutional rights.").  Second, there has been alleged no facts relating to agreements, or even communications, between the  defendants, the purpose of their alleged conspiracy, or an intent by defendants to deprive O'Diah of his civil rights.  See Webb v. Goord, 340 F.3d 105, 110-11 (2d Cir. 2003) ("In order to maintain an action under Section 1985, a plaintiff must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end.") (internal quotation marks and citations omitted); see also Romer v. Morgenthau, 119 F. Supp. 2d 346, 364 (S.D.N.Y. 2000) (explaining that a plaintiff "cannot satisfy the conspiracy prong [if] his claims are too general and conclusory to sufficiently plead the meeting of the minds requirement.") (citations omitted).  Lastly, O'Diah also fails to allege or establish discriminatory animus other than conclusory allegations that he was oppressed and discriminated against because of his national origin.  Such statements are wholly insufficient.

Additionally, if any defendant "ha[d] knowledge that any of the wrongs . . . mentioned in section 1985 . . . [we]re about to be committed, and ha[d] power to prevent or aid in preventing the commission of the same, [and] neglect[ed] or refuse[d] so to do . . ., [he] shall be liable to the party injured."  42 U.S.C. § 1986.  However, "[a] claim under section 1986 . . . lies only if there is a viable conspiracy claim under section 1985."  Gagliardi v. Vill.

39

of Pawling, 18 F.3d 188, 194 (2d Cir.1994).  No such viable claim has been alleged here.

Accordingly, defendants' motion as to this claim should be granted.


**K. Pendent State Law Claims**

O'Diah's complaint also asserts that defendants violated various state laws, however

these claims fail as a matter of law.  New York Correction Law § 24 provides that

> 1. No civil action shall be brought in any court of the state, except
> by the attorney general on behalf of the state, against any officer or
> employee of the department, in his personal capacity, for damages
> arising out of any act done or the failure to perform any act within
> the scope of the employment and in the discharge of the duties by
> such officer or employee.

> 2. Any claim for damages arising out of any act done or the failure
> to perform any act within the scope of the employment and in the
> duties of any officer or employee of the department shall be
> brought and maintained in the court of claims as a claim against
> the state.

"Section 24 thus precludes claims against corrections officers brought against them in any

court in their personal capacities arising out of the discharge of their duties."  Crump v.

Ekpe, No. 07-CV-1331, 2010 WL 502762, at *18 (N.D.N.Y. Feb. 8, 2010) (citations omitted)

(Attached to this Report-Recommendation as Ex. B).  Because a federal court applying

pendent jurisdiction is forced to apply state substantive law to a state claim, this would

result in inmates being prohibited from advancing such pendent claims along with their

federal claims in federal court.  Baker v. Coughlin, 77 F.3d 12, 15 (2d Cir. 1996).

> In 2009, the United States Supreme Court held that § 24 is
> unconstitutional to the extent that it precludes inmates from
> pursuing § 1983 actions.  However, at least two judges in this
> District have observed that because Haywood's focus is on
> concerns about civil rights claims and the Supremacy Clause, the
> decision does not affect the question of whether this Court has

40

proper jurisdiction to hear a pendent state law claim.

Tafari v. McCarthy, 714 F. Supp. 2d 317, 384 (N.D.N.Y. 2010) (internal quotation marks and citations omitted).  Accordingly, this district has continued to dismiss state law pendent claims against defendants acting in their personal capacities, discharging their duties, pursuant to the preclusive effects of § 24.  See e.g., Crumpe, 2010 WL 502762, at *18.

When determining whether actions fall within the scope of the defendants employment, courts have considered:

> the connection between the time, place and occasion for the act; the history of the relationship between employer and employee as spelled out in actual practice; whether the act is one commonly done by any employee; the extent of the departure from normal methods of performance; and whether the specific act was one that the employer could reasonably have anticipated.

Degrafinreid v. Ricks, 452 F. Supp. 2d 328, 333 (S.D.N.Y. 2006) (citations omitted).  Thus, "an employee will be considered within the scope of his employment so long as he is discharging his duties no matter how irregularly, or with what disregard of instructions."  Id. (citations omitted).  Accordingly, even in cases where alleged excessive force was used in frisking or searching a cell, or where negligence was alleged in the provision of medical care, such actions are still defined to be within an employee's duties.  Id. (citations omitted); see also Crump, 2010 WL 502762, at *18 (listing DOCCS employee duties to include "determinations to administratively confine plaintiff to SHU, to issue a misbehavior report, the conduct of the disciplinary hearing, and the determination that plaintiff was guilty of the charges alleged," and explaining that while actions "exceeding the scope of the corrections officer's authority . . . ." may give rise to a constitutional violation, such actions are still precluded pursuant to § 24).

41

With respect to the defendants, all of their purported actions fell within their assigned duties.  These duties include filing and adjudicating misbehavior reports, supervising inmates at their work placements, receiving grievances and handling the mail, and providing medical care.  Thus, § 24 prohibits the advancement of any pendent state law claims. While these defendants actions, or inactions, may be cited as the alleged cause of a constitutional violation, their conduct was nevertheless protected by § 24.

Accordingly, defendants' motion on this ground as to such claims should be granted.


## III.  Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motion to dismiss the amended complaint (Dkt. No. 66) be:

    1.  **DENIED** as to O'Diah's claims of:

        A. Denial of access to courts against defendants Thomas, Hahn, Shaw, Swierk and Moscicki;

        B. Medical indifference against defendants Cully, Thomas, Guter, and Mawhir;

        C. Retaliation against defendants Pepin, Richardson, Cully, Hahn, Shaw and Swierk; and

        D. Filing of false misbehavior reports against defendants Pepin, Richardson, Hahn, Shaw and Swierk; and

    2.  **GRANTED** as to all other claims and all other moving defendants.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court "within fourteen

(14) days after being served with a copy of the . . . recommendation." N.Y.N.D.L.R. 72.1(c)

(citing 28 U.S.C. §636(b)(1)(B)-(C)).  **FAILURE TO OBJECT TO THIS REPORT WITHIN**

**TEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  Roldan v. Racette, 984 F.2d 85, 89

(2d Cir. 1993); Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989); 28 U.S.C. § 636(b)(1);

Fed. R. Civ. P. 72, 6(a), 6(e).


Dated:  February 28, 2012
         Albany, New York                    _David R. Homer_____

                                             United States Magistrate Judge

Westlaw.

○8cv941

Not Reported in F.Supp.2d, 2008 WL 4371928 (D.Conn.)
(Cite as: 2008 WL 4371928 (D.Conn.))

Only the Westlaw citation is currently available.

United States District Court,
D. Connecticut.
David P. TAYLOR, Plaintiff,
v.
Dr. Matt CONWAY, et al.,[FN1] Defendants.

> FN1. The named defendants are Dr. Matt
> Conway, Richard Alhage, Harry Soucy,
> Steve Petracca, Andrew Pace, Patricia
> Freeman, Jeffrey Adgers, Daniel Martin,
> A. Hannah and Jason Hogan. The defend-
> ants are named in their individual and offi-
> cial capacities. Defendants state that the
> court previously dismissed all claims for
> damages against them in their official ca-
> pacities. A review of the record reveals,
> however, that both previous motions to
> dismiss were denied in light of Taylor's
> amended complaint.

No. 3:06cv1329 (SRU).
Sept. 23, 2008.

David P. Taylor, MDCI, Suffield, CT, pro se.

Antoria D. Howard, Richard T. Biggar, Robert B.
Fiske, III, Antoria D. Howard, Attorney General's
Office, Hartford, CT, for Defendants.

### RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

STEFAN R. UNDERHILL, District Judge.

*1 Plaintiff David P. Taylor, an **inmate** cur-
rently confined at MacDougall-Walker Correctional
Institution, brings this civil rights action *pro se*. He
alleges that, while he was confined at Cheshire Cor-
rectional Institution, the defendants subjected him
to "a dangerous and hostile **work** environment" in
violation of the Eighth Amendment and subjected
him to retaliation in the form of verbal harassment
and dismissal from his job when he claimed that a

supervisor was **smoking** in the workplace. Am.
Compl. at 2. He seeks damages as well as declarat-
ory and injunctive relief. Defendants have filed a
motion for summary judgment. For the reasons that
follow, defendants' motion is granted.

### I. *Standard of Review*

The burden is on the party moving for sum-
mary judgment to establish that there are no genu-
ine issues of material fact in dispute and that it is
entitled to judgment as a matter of law. *See* Rule
56(c), Fed.R.Civ.P.; *Anderson v. Liberty Lobby,
Inc.,* 477 U.S. 242, 256 (1986). The moving party
may satisfy that burden by demonstrating the ab-
sence of evidence supporting the nonmoving party's
case. *See PepsiCo, Inc. v. Coca-Cola Co.,* 315 F.3d
101, 105 (2d Cir.2002) (per curiam). The court con-
strues the facts in the light most favorable to the
nonmoving party. *See Cioffi v. Averill Park Cent.
Sch. Dist. Bd. of Educ.,* 444 F.3d 158, 162 (2d Cir.),
*cert. denied,* 127 S.Ct. 382 (2006).

Where one party is proceeding *pro se,* the court
reads the *pro se* party's papers liberally and inter-
prets them to raise the strongest arguments sugges-
ted therein. *See Burgos v. Hopkins,* 14 F.3d 787,
790 (2d Cir.1994). Despite such liberal interpreta-
tion, however, a "bald assertion," unsupported by
evidence, cannot overcome a properly supported
motion for summary judgment. *Carey v. Crescenzi,*
923 F.2d 18, 21 (2d Cir.1991).

### II. *Facts* [FN2]

> FN2. The facts are taken from defendant's
> Local Rule 56(a)1 Statement of Undis-
> puted Facts [doc. # 70-2], plaintiff's Local
> Rule 56(a)2 Statement [doc. # 82-3] and
> the exhibits submitted by both parties.

### A. *Taylor's Work History*

The Department of Correction, through Correc-
tional Enterprises of Connecticut ("CEC"), affords
inmates at Cheshire, Osborn, MacDougall-Walker

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



EX. A

Page 2

Not Reported in F.Supp.2d, 2008 WL 4371928 (D.Conn.)
**(Cite as: 2008 WL 4371928 (D.Conn.))**

and York Correctional Institutions the opportunity to participate in a job program. Inmates apply for a work assignment and are paid a nominal amount for their participation. Inmates work at the discretion of the Department of Correction and CEC. They have no entitlement or legitimate expectation to a job assignment. Inmates working in a CEC assignment work five days per week, approximately six hours per day. Inmates may be removed from employment for failure to perform or for any chargeable infraction, regardless whether they are found guilty of the infraction. Department of Correction Administrative Directives 10.1 & 10.20.

Taylor is a trained engineer who has been in the custody of the Connecticut Department of Correction since March 1999. On June 28, 2003, Taylor was assigned to work in the Marker Shop at Cheshire Correctional Institution, which is operated by CEC. The Marker Shop is located in a stand-alone industrial building within the Cheshire Correctional Institution compound. The building, approximately 10,000 sq. ft. with 20' ceilings, has a ceiling fan for ventilation, many windows, three exterior doors and one large garage door.

**\*2** Taylor was added to the payroll of the Marker Shop on July 21, 2003. That same day, he signed a form acknowledging his understanding of the Marker Shop rules as well as training and safety requirements. One safety requirement was wearing safety glasses when using any machinery or tools.

On September 9, 2004, Taylor was removed from his job at the Marker Shop and transferred to another correctional facility. He returned to Cheshire Correctional Institution on November 29, 2004, and reapplied for his job with CEC. He returned to the Marker Shop on December 28, 2004. On February 8, 2005, Taylor signed a form acknowledging his understanding of the training and safety requirements of the Marker Shop and Plastic Shop. Again, one requirement was wearing safety glasses when using any machinery or tools.

On February 9, 2005, Soucy issued Taylor a

poor work report for not wearing safety glasses. Because it was Taylor's first offense, he was sent back to his housing unit without pay for that day. Taylor was cautioned that another offense would result in dismissal.

On September 2, 2005, prison officials removed Taylor from his position in the Marker Shop because of a change in his classification. On October 17, 2005, Taylor's classification was returned to outside clearance. Taylor reapplied and was reinstated to his position in the Marker Shop.

On December 15, 2005, Soucy removed Taylor from participation in the job program. Soucy reported that Taylor admitted damaging a piece of manufacturing equipment, trying to hide the damage and not notifying any CEC staff of the damage until the damage was discovered by Soucy. Taylor concedes that there were scratches and a small dent on the machine but denies that the machine was damaged. Taylor received a second poor **work** performance and a disciplinary report for destruction of property. After a hearing, Taylor was found not guilty of the disciplinary charge. Taylor then reapplied for participation in **inmate work program** and a return to his position in the Marker Shop. The request was denied. Taylor later was **transferred** to MacDougall-Walker Correctional Institution.

*B. Exposure to Environmental Tobacco **Smoke***
In 1996, the Department of Correction adopted a **smoke**-and drug-free policy. *See* Defs.' Local Rule 56(a)1 Statement, Ex. T, Department of Correction Administrative Directive 2.21. Pursuant to the policy, any correctional employee wishing to **smoke** a **cigarette** on his break, must do so in a designated **smoking** area. The unofficial designated **smoking** area for the Marker Shop is outside the building. Correctional staff in the Marker Shop must supervise **inmates**. Because of staffing constraints, they cannot easily be relieved from their posts to take a **smoking** break. Defendants state that staff assigned to the Marker Shop have been permitted to **smoke** just outside the shop with the large garage door open so they can view the **inmate**

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4371928 (D.Conn.)
**(Cite as: 2008 WL 4371928 (D.Conn.))**

workers.

Soucy, a supervisor in the Marker Shop, is a smoker. In 2005, Taylor complained to Alhage, the CEC manager, about Soucy's supervision. Taylor stated that Soucy was overly critical of Taylor and his **work** skills. Taylor requested a **transfer** to another CEC **work** area. Alhage denied the request because Taylor's skills were best suited to the Marker Shop and there was no guarantee that Soucy would not supervise Taylor in the future at a different job. Alhage states that Taylor did not complain about environmental tobacco smoke ("ETS") at that time. Taylor contends that he complained to several individuals about Soucy smoking in the Marker Shop on February 9, 2005. Taylor was exposed to ETS in the Marker Shop on approximately 255 days.[FN3]

> FN3. Defendants state that Taylor worked in the Marker Shop for 255 days. Taylor states that he worked there 544 days. Assuming that Taylor worked five days per week for the periods from July 21, 2003 through September 9, 2004, December 28, 2004 through September 2, 2005, and October 17, 2005 through December 15, 2005, he would have worked, at most, 422 days. If Taylor's contention, that he was re-employed in the Marker Shop immediately after his return to Cheshire Correctional Institution on November 29, 2004, is correct, he worked in the Marker Shop, at most, 443 days. The relevant time period, however, is not how many days Taylor worked in the Marker Shop, but how many days he was exposed to ETS.

> Taylor states in his affidavit that Soucy was not assigned to the Marker Shop when Taylor began working there. Pl.'s Aff., Doc. # 82-2, ¶ 38. He states that he received good work reports before Soucy was his supervisor and provides an August 21, 2004 work report signed by Alan Brown. Nothing in the record in-

dicates that Soucy was Taylor's supervisor before that date. Taylor claims that only Soucy smoked in the Marker Shop. Thus, Taylor's ETS exposure began in late August 2004, and lasted approximately for the 255 days calculated by defendants.

**\*3** Following his dismissal from the Marker Shop, Taylor wrote letters to the Commissioner of the Connecticut Department of Motor Vehicles; Director of CEC; and the Connecticut Department of Public Safety, Division of Fire Emergency and Building Services. In all three letters, Taylor complained of unsafe working conditions in the Marker Shop. Investigations taken in response to those letters revealed no safety or code violations.

On July 17, 2006, Taylor underwent a dual chest x-ray. The results were normal. On September 27, 2006, a second dual chest x-ray revealed a mild hyperaeration of both lung fields. The doctor noted a possibility of right upper lobe pneumonia and recommended clinical correlation and follow-up. On November 3, 2006, Taylor requested a continine test for his complaints of PPD, hyperaeration, pneumonia and ETS. He told medical staff that he had worked in the oil industry and always had perfect health.

A November 6, 2006 chest x-ray revealed that both lung fields were mildly emphysematous, but showed no evidence of active infiltrate or vascular congestion. The impression was mild chronic obstructive pulmonary disease ("COPD") and completely resolved right upper lobe pneumonia infiltrate. The COPD diagnosis was confirmed on March 15, 2007. Department of Correction physician Dr. Blanchette states that COPD develops slowly with symptoms appearing many years after exposure to ETS or other severe environmental contaminants. Thus, he opines that Taylor's COPD could not have been caused by any ETS exposure in the Marker Shop.

III. *Discussion*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4371928 (D.Conn.)
(Cite as: 2008 WL 4371928 (D.Conn.))

Page 4

Taylor asserts two claims in his amended complaint. First, he experienced a dangerous work environment because he was exposed to ETS as a result of Soucy smoking in the Marker Shop. Second, Soucy retaliated against him for complaining about the ETS exposure and other defendants failed to intercede to correct the retaliatory acts .FN4

> FN4. In opposition to the motion for summary judgment, Taylor argues that the hostile and dangerous work environment also was the result of other conditions in the Marker Shop that he raised in various letters of complaint sent after his dismissal. Taylor restricts his Eighth Amendment claim in the amended complaint to ETS exposure. He cannot amend his complaint in a memorandum. *See Wright v. Ernst & Young LLP,* 152 F.3d 169, 178 (2d Cir.1998) (declining to address merits of claim that "does not appear anywhere in the amended complaint and did not enter the case until [the plaintiff] mentioned it for the first time in her opposition memoranda to the motion to dismiss"). Thus, no other Eighth Amendment conditions claims are included in this action.

A. *Eighth Amendment Conditions of Confinement Claim*

"It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Helling v. McKinney,* 509 U.S. 25, 31 (1993); *see also Rhodes v. Chapman,* 452 U.S. 337, 351 (1981). To state an Eighth Amendment claim, an inmate must allege facts demonstrating failure of prison officials to provide for inmates' "basic human needs-*e.g.,* food, clothing, shelter, medical care, and reasonable safety." *DeShaney v. Winnebago County Dept. of Social Servs.,* 489 U.S. 189, 200 (1989). A prisoner may assert a cause of action under the Eighth Amendment for deliberate indifference to a serious risk of future harm despite the absence of any symptoms

stemming from the subject conditions. *See Helling,* 509 U.S. at 32-34 (rejecting argument that exposure to ETS cannot constitute violation of the Eighth Amendment where prisoner did not display medical problems resulting therefrom and discussing cases where plaintiffs successfully asserted Eighth Amendment claims despite absence of current symptoms).

*\*4* An inmate may prevail on an Eighth Amendment claim if he can establish objective and subjective elements. *Phelps v. Kapnolas,* 308 F.3d 180, 185 (2d Cir.2002) (quoting *Farmer v. Brennan,* 511 U.S. 825, 834 (1994)). The objective element is satisfied where the inmate shows that the deprivation he alleges is sufficiently serious, *i.e.,* that his confinement under the alleged conditions violates contemporary standards of decency. In the context of an ETS claim, the Supreme Court has held that to satisfy the objective prong, plaintiff must demonstrate exposure to "unreasonably high levels" of ETS that would damage his future health and that the risk "is so grave that it violated contemporary standards of decency to expose anyone unwillingly to such a risk." *Helling,* 509 U.S. at 35, 36. The subjective element requires the inmate to show that correctional officials were aware of and disregarded a substantial risk of serious harm. *See Phelps* at 185-86. Defendants "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and ... must also draw that inference." *Farmer,* 511 U.S. at 837.

All exposure to ETS is not unconstitutional; only exposure to an unreasonably high level of ETS is cognizable as a constitutional violation. *See Helling,* 509 U.S. at 36. Courts have held that inmates were exposed to unreasonable ETS levels when they were forced to share a cell with a heavy smoker. *See, e.g., Helling,* 509 U.S. at 28, 36 (finding exposure to unreasonably high level of ETS where **inmate** housed in same cell with **inmate** who **smoked** five packs of **cigarettes** per day); *Atkinson v. Taylor,* 316 F.3d 257 (3d

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4371928 (D.Conn.)
**(Cite as: 2008 WL 4371928 (D.Conn.))**

Cir.2003) (denying summary judgment and finding exposure to unreasonably high level of ETS where **inmate** housed for seven months with "constant smoker"); *Davis v. New York,* 316 F.3d 93, 100 (2d Cir.2002) (denying summary judgment where **inmate** previously **required** to share cell with smoker, always housed in unit where majority of **inmates smoked** and constantly subjected to level of **smoke** in cell as if he were **smoking**). Where the **inmate** was not housed with a smoker, however, the courts have rejected claims of an unreasonable level of ETS. *See, e.g., Richardson v. Spurlock,* 260 F.3d 495, 498 (5th Cir.2001) (holding that sitting near some smokers sometimes is not an unreasonable exposure to ETS); *Zaire v.. Artuz,* No. 99 Civ. 9817(LTS), 2003 WL 230868, at *1, *5 (S.D.N.Y. Feb. 3, 2003) (holding that inmate's exposure to ETS in common areas but not in his cell over five month period did not constitute unconstitutional exposure to ETS); *LaCroix v. Williams,* No. 97-CV-0790, 2000 WL 1375737, at *2-3 (W.D.N.Y. Sept. 21, 2000) (holding that inmate suffered no serious injury when he merely alleged residence in a smoking dormitory and there was no objective medical evidence showing that his symptoms were caused by exposure to ETS).

Defendants contend that Taylor was not exposed to an unreasonably high level of ETS. Taylor provides no objective evidence of the level of ETS to which he was exposed. He was not assigned to a cell with a smoker and does not allege that he was subjected to ETS while in his cell. Taylor was exposed to one smoker, Soucy, while at his work assignment in a 10, 000 sq. ft. industrial building with a ventilation fan and exterior doors and windows. He does not allege that Soucy smoked constantly or regularly in the immediate vicinity of Taylor's work station. The incidents Taylor describes involve significantly less exposure to ETS than was present in cases denying summary judgment on ETS claims.

*5 Taylor argues that society no longer tolerates any unwilling exposure to ETS and directs the court to *The Health Consequences of Involuntary Exposure to Tobacco Smoke, A Report of the Surgeon General,* Dep't of Health & Human Servs. (2006) (hereinafter *"The Surgeon General's Report"),* which concludes that there is no risk-free level of exposure to ETS.[FN5] *Id.* at 11. He argues that *The Surgeon General's Report* and the enactment of statutes prohibiting smoking in state buildings support his position.

> FN5. The report also concludes that evidence is insufficient to infer a causal relationship between ETS exposure and the risk of COPD. *The Surgeon General's Report* at 16. Thus, the report fails to support Taylor's assumption that his COPD was caused by the exposure to ETS in the Marker Shop.

Although the Connecticut legislature has prohibited smoking in state buildings, it created several exceptions. One exception is Connecticut correctional facilities. Conn. Gen.Stat. § 19a342 (b)(2). Thus, society continues to tolerate smoking in correctional facilities. In addition, to state a cognizable constitutional claim, the exposure must be unwilling. In January 2006, after Taylor was found not guilty of the disciplinary charge which led to his dismissal from the Marker Shop, he wrote to Alhage asking to return there. *See* Pl.'s Mem. Ex. H at 1. That letter, written nearly one year after Taylor alleges that he first complained about ETS exposure, demonstrates his willingness to continue that exposure. Taylor fails to demonstrate the existence of a genuine issue of material fact on the objective element of the deliberate indifference test, *i.e.,* that he was unwillingly exposed to an unreasonably high level of ETS. Because Taylor fails to meet his burden on the objective element of the test, the court need not consider the subjective element. Defendants' motion for summary judgment is granted with respect to the Eighth Amendment claim.

*B. First Amendment Retaliation Claim*
Prison officials may not retaliate against inmates for exercising their constitutional rights. To state a retaliation claim, Taylor must show that his

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

**Not Reported in F.Supp.2d, 2008 WL 4371928 (D.Conn.)**
**(Cite as: 2008 WL 4371928 (D.Conn.))**

actions were protected by the Constitution or federal law and that his protected conduct was a "substantial or motivating factor" in the alleged retaliatory conduct. *Friedl v. City of New York,* 210 F.3d 79, 85 (2d Cir.2000). Because claims of retaliation are easily fabricated, the courts consider such claims with skepticism and require that they be supported by specific facts; conclusory statements are not sufficient. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.2003).

To support a claim of retaliation, the allegedly retaliatory conduct must deter a similarly situated inmate of ordinary resolve from exercising his constitutional rights. It is not necessary that the plaintiff himself be deterred. *See Gill v. Pidlypchak,* 389 F.3d 379, 381 (2d Cir.2004). Any lesser conduct is *de minimis* and cannot support a retaliation claim. In addition, prisoners are required to tolerate more serious conduct in order to state a retaliation claim. Insulting language or disrespectful comments directed at an inmate are not sufficient to state a claim for retaliation. *See Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003).

*6 Temporal proximity of an allegedly retaliatory disciplinary report to an inmate's grievance or complaint can be circumstantial evidence of retaliation. *See Gayle v. Gonyea,* 313 F.3d 677, 683 (2d Cir.2002). In addition, the Second Circuit has held that evidence is sufficient to defeat summary judgment when there is both a short time between protected activity and the retaliatory conduct and direct involvement by the defendant. *See Morales v. Mackalm,* 278 F.3d 126, 131 (2d Cir.2002) (short time between protected activity and retaliation coupled with defendants' involvement in the decision to transfer is sufficient to support inference of retaliatory motive). If, however, defendants are able to show that Taylor would have received the poor work report or been terminated from his job even in the absence of the protected conduct, they may evade liability. *See Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003). Defendants can meet that burden by showing that there is no dispute that

Taylor committed the charged acts. *See Gayle,* 313 F.3d at 682.

Taylor states that he first complained about Soucy smoking in the Marker Shop on February 9, 2005. The poor work report for not wearing safety glasses was issued the same day. Pl.'s Aff., ¶¶ 35-36 & Defs.' Local Rule 56(a)1 Statement, Ex. M. Taylor states that he was performing precision engineering work without safety glasses. Although Taylor contends that the poor work report was the result of the complaints about Soucy, he concedes that he was not wearing safety glasses. Taylor contends that he was not using any tools or machinery that required safety classes. On the previous day, however, Taylor signed a form acknowledging his understanding that he must wear safety glasses when operating *all* machinery and tools. *See Defs.'* Local Rule 56(a)1 Statement, Ex. L. Thus, Taylor was well aware of the **requirement**.

Taylor alleges that other **inmates** would have received a verbal warning rather than a written poor **work** evaluation. Am. Compl. at 3. He provides no evidence to support that allegation. Defendants have provided evidence that Taylor would have received the poor **work** report even absent his complaints about Soucy's **smoking** [FN6] and Taylor has not met his burden in opposition to the motion for summary judgment of presenting facts sufficient to raise a genuine issue of material fact.

> FN6. Taylor also contends that the poor **work** evaluation was for violating a temporary **requirement** that anyone in a designated area must wear safety glasses. The **work** evaluation does not reference any such policy and Taylor has provided no objective evidence that such a policy existed. Taylor's unsupported statements are insufficient to support a claim of retaliation at the summary judgment stage.

Administrative Directive 10. 1, Section 5(G), provides that any inmate may be removed from a work assignment if he commits a chargeable infrac-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4371928 (D.Conn.)
**(Cite as: 2008 WL 4371928 (D.Conn.))**

tion, even if he later is found not guilty of the charge. *See* Defs.' Local Rule 5(a)1 Statement, Ex. C. Taylor was dismissed from the Marker Shop after receiving a disciplinary report for destruction of state property. He was accused of damaging the surface grinder and not reporting the damage. *See* Defs.' Local Rule 56(a)1 Statement Ex. R. The disciplinary charge was dismissed because: supervisors gave conflicting testimony regarding whether the damage rendered the surface grinder inoperable, the damage was caused accidentally, and Taylor had been dismissed from his job in the Marker Shop. *See* Defs.' Local Rule 56(a)1 Statement Ex. S. Taylor states that he was unaware that he was supposed to report minor accidental damage. *See* Pl.'s Aff., ¶ 56. Thus, he concedes that he caused the damage and did not notify any supervisor until the damage was discovered. Defendants have provided evidence showing that Taylor committed the actions underlying the disciplinary report and would have been dismissed regardless whether he had complained about Soucy's **smoking**.

*7 Taylor was **transferred** from Cheshire Correctional Institution to MacDougall-Walker Correctional Institution in February 2006, approximately one month after he was cleared of the disciplinary charge. The Director of Offender Classification and Population Management is responsible for all **inmate transfers**. Department of Correction Administrative Directive 9. 1, Section 4, www.ct.gov/doc/LIB/doc/PDF/AD/ad0901.pdf (last visited May 12, 2008). Taylor alleges only that Soucy retaliated against him and that other defendants failed to prevent the retaliation. The Director of Offender Classification and Population Management is not a defendant in this case. Absent any evidence that Soucy had the authority to order Taylor's transfer, that claim necessarily fails.

Defendants have provided evidence that the allegedly retaliatory actions would have been taken absent Taylor's complaints that Soucy smoked in the Marker Shop. Taylor fails to meet his burden in opposition to the motion for summary judgment of

demonstrating the existence of a genuine issue of material fact on the retaliation claims. Accordingly, defendants' motion for summary judgment is granted with respect to all retaliation claims.

*IV. Conclusion*
Defendant's motion for summary judgment **[doc. # 70]** is **GRANTED.** The Clerk is directed to enter judgment in favor of the defendant and close this case.

**SO ORDERED.**

D.Conn.,2008.
Taylor v. Conway
Not Reported in F.Supp.2d, 2008 WL 4371928 (D.Conn.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

08cv941

Not Reported in F.Supp.2d, 2010 WL 502762 (N.D.N.Y.)
(Cite as: 2010 WL 502762 (N.D.N.Y.))

Page 1

Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
N.D. New York.
Robert CRUMP, Plaintiff,
v.
Ekpe D. EKPE, et al., Defendants.

No. 9:07-CV-1331 (LEK/DEP).
Feb. 8, 2010.

Robert Crump, Middletown, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of New York, Susan C. Von Reusner, Esq., Asst. Attorney General, of Counsel, Albany, NY, for Defendants.

## *DECISION AND ORDER*

LAWRENCE E. KAHN, District Judge.

**\*1** This matter comes before the Court following a Report-Recommendation filed on January 19, 2010, by the Honorable David E. Peebles, United States Magistrate Judge, pursuant to 28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern District of New York. Report-Rec. (Dkt. No. 30).

Within ten days, excluding weekends and holidays, after a party has been served with a copy of a Magistrate Judge's Report-Recommendation, the party "may serve and file specific, written objections to the proposed findings and recommendations," FED. R. CIV. P. 72(b), in compliance with L.R. 72.1. No objections have been raised in the allotted time with respect to Judge Peebles' Report-Recommendation. Furthermore, after examining the record, the Court has determined that the Report-Recommendation is not subject to attack for plain error or manifest injustice.

Accordingly, it is hereby

**ORDERED,** that the Report-Recommendation (Dkt. No. 30) is **APPROVED** and **ADOPTED** in its **ENTIRETY;** and it is further

**ORDERED,** that Defendants' Motion for summary judgment (Dkt. No. 28) be **GRANTED,** and that Plaintiffs complaint in this action be **DISMISSED** in all respects; and it is further

**ORDERED,** that the Clerk serve a copy of this Order on all parties.

**IT IS SO ORDERED.**

## *REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

Plaintiff Robert Crump, a prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this action pursuant to 42 U.S.C. § 1983 complaining of the deprivation of his civil rights arising out of events that occurred while he was imprisoned, additionally asserting various pendent state common law claims and asking that the court exercise supplemental jurisdiction over those causes of action. Plaintiff's complaint, which is comprehensive, comprised of one hundred and fifty six paragraphs and including thirty separate causes of action, centers upon a series of events including two separate, brief periods of disciplinary special housing unit ("SHU") confinement and what he characterizes as ongoing harassment on the part of various corrections officers. Plaintiff's complaint seeks recovery of compensatory and punitive damages totaling $86.4 million.

Currently pending before the court is a motion brought by the defendants for summary judgment dismissing the plaintiff's complaint. In their motion, defendants argue that plaintiff's claims should be dismissed for a variety of reasons, including procedurally based upon plaintiff's failure to exhaust his administrative remedies with respect to certain

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

EX. B

Not Reported in F.Supp.2d, 2010 WL 502762 (N.D.N.Y.)
**(Cite as: 2010 WL 502762 (N.D.N.Y.))**

claims, and substantively because he has failed to state viable due process and retaliation claims, adding that his damage claims are barred by the Eleventh Amendment as well as New York Correction Law § 24 and the doctrine of qualified immunity. Having carefully considered the record now before the court, I recommend that defendants' motion, which plaintiff has not opposed, be granted, and that his complaint be dismissed in its entirety.

I. *BACKGROUND*[FN1]

> FN1. In light of the procedural posture of the case the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in favor of the plaintiff. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003). It should be noted, however, that many if not most of plaintiff's allegations are sharply contested by the defendants.

**\*2** At the times relevant to the complaint, plaintiff was a prison inmate entrusted to the custody of the New York State Department of Correctional Services ("DOCS") and was designated to Riverview Correctional Facility ("Riverview"), located in Ogdensburg, New York.[FN2] *See* Complaint (Dkt. No. 1) ¶ 33. Plaintiff's complaint arises out of two separate incidents that occurred while he was confined to Riverview, the first resulting in his confinement for three days in the facility SHU and the second leading to thirty days of keeplock confinement which, he claims, evolved in retaliation for his having filed a grievance complaining about the procedure for inmate assignments to messhall duty.[FN3,FN4]

> FN2. Plaintiff was released on parole on January 11, 2008. *See* Dkt. No. 5; *see also,* Reusner Aff. Exh. B (Dkt. No. 28-10).

> FN3. A Special Housing unit is defined by regulations promulgated by the DOCS as "single- or double-occupancy cells

grouped so as to provide separation from the general population [which] may be used to house inmates confined to such units pursuant to Part 301 ...." 7 N.Y.C.R.R. § 300.2(b). Inmates may be admitted to SHU for various reasons, not limited to disciplinary action. 7 N.Y.C.R.R. § 301.1 Inmates in SHU are not completely restricted. *Husbands v. McClellan,* 990 F.Supp. 214, 217 (W.D.N.Y.1998); *see also* 7 N.Y.C.R.R. pt. 304. They are allowed two showers per week and one hour of outdoor exercise per day. *Id.* They are entitled to unlimited legal visits and one non-legal visit per week. *Id.* SHU inmates have access to counselors and sick call. *Id.* Additionally, they can participate in cell study programs and can receive books from the library. *Id.*

FN4. Keeplock is a form of confinement restricting an inmate to his or her cell, separating the inmate from others, and depriving him or her of participation in normal prison activities. *Gittens v. LeFevre,* 891 F.2d 38, 39 (2d Cir.1989); *Warburton v. Goord,* 14 F.Supp.2d 289, 293 (W.D.N.Y.1998) (citing *Gittens* ); *Tinsley v. Greene,* No. 95-CV-1765, 1997 WL 160124, at \*2 n. 2 (N.D.N.Y. Mar. 31, 1997) (Pooler, D.J. & Homer, M.J.) (citing, *inter alia, Green v. Bauvi,* 46 F.3d 189, 192 (2d Cir.1995)). Inmate conditions while keeplocked are substantially the same as in the general population. *Lee v. Coughlin,* 26 F.Supp.2d 615, 628 (S.D.N.Y.1998). While on keeplock confinement an inmate is confined to his or her general population cell for twenty-three hours a day, with one hour for exercise. *Id.* Keeplocked inmates can leave their cells for showers, visits, medical exams, and counseling, and can have cell study, books, and periodicals, *Id.* The primary difference between keeplock and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 502762 (N.D.N.Y.)
**(Cite as: 2010 WL 502762 (N.D.N.Y.))**

the general population confinement conditions is that keeplocked inmates do not leave their cells for out-of-cell programs, and are usually allowed less time out of their cells on the weekends. *Id.* Keeplock is a less severe penalty than SHU; for example keeplocked inmates have access to their personal property, while SHU inmates do not. *Grant v. Riley,* No. 89 CIV. 0359, 1996 WL 727441, at *1 n. 1 (S.D.N.Y. Dec.17, 1996). In addition, keeplocked inmates are afforded more liberal visitation rights. *Id.*

According to the plaintiff, the genesis of his difficulties was a handwritten grievance filed with the Riverview Inmate Grievance Resolution Committee ("IGRC") on February 13, 2006. Complaint (Dkt. No. 1) ¶ 20. Labeling his grievance as "Inmates In Messhall w/o Medical Screening", Crump complained that inmates were being assigned to messhall program jobs without adequate physical examination or testing for communicable diseases, and that there were one or more inmates with hepatitis C working in the messhal. *Id.* Exhs. B & C; *see also* Affirmation of Susan C. von Reusner ("Reusner Aff.") (Dkt. No. 28-8) Exh. C (Dkt.28-11) p. 3. The IGRC subsequently investigated Crump's grievance, which was stamped received on February 13, 2006 and assigned grievance number RV-8195-06, and prepared a report noting that all inmates are screened upon arrival at Riverview, there is no requirement that inmates assigned to the messhall undergo any medical testing, "[b]oth HIV and hepatitis C are blood born/body fluid carried diseases", and universal precautions are to be used by all who work in those areas. *Id.* at p. 5. Notwithstanding these observations, the IGRC agreed that every inmate assigned to the messhall program should be medically cleared at the time of assignment. *Id.* at p. 4; *see also* Complaint (Dkt. No. 1) Exh. A.

On February 28, 2006, upon review of the IGRC's recommendation, defendant Ekpe D. Ekpe, the

superintendent at Riverview, denied Crump's grievance, finding that existing medical review procedures conducted upon an inmate's arrival at the facility and the sick-call process provide sufficient medical screening of inmates assigned to work in the messhall. Reusner Aff. Exh. C (Dkt. No. 28-11) p. 1. Plaintiff does not allege that he appealed the superintendent's determination, and it thus appears that he took no further action regarding this grievance.

Plaintiff maintains that on the morning of March 2, 2006, in retaliation for filing that grievance, Superintendent Ekpe and defendant Sergeant Reneiri appeared at the "F-1" Housing Unit, where plaintiff was then designated, called plaintiff to the officer's observatory station, and demanded that plaintiff follow them to the messhall and identify any inmate working there who was infected with HIV or hepatitis C. Complaint (Dkt. No. 1) ¶¶ 37-38. When plaintiff refused to comply and attempted to explain his grievance, the superintendent became angry, began yelling at plaintiff and berating him, and commanded that Sergeant Reneiri and Corrections Officer ("C.O.") Wilkens "get him out of here." *Id.* at ¶¶ 39-41.

*3 Plaintiff was taken to the facility SHU, where he was processed and strip searched, and confined for a period of seventy-two hours. Complaint (Dkt. No. 1) ¶¶ 42-47, 52; *see also* Declaration of Ekpe D. Ekpe ("Ekpe Decl.") (Dkt. No. 28-5) ¶ 8. Plaintiff asserts that while in the SHU he was interviewed by a facility supervisor, who told Crump that he had been sent to SHU "in order to make sure that he was not 'starting trouble in their jail' ". Complaint (Dkt. No. 1) ¶ 51. Defendants maintain that plaintiff's confinement to SHU was spawned by the superintendent's concern for safety and order at the facility pending an investigation of allegations that Crump was spreading rumors among the inmates that workers in the messhall were contagious and that the food they prepared was poisoned, contaminated, and otherwise unsafe to eat. Ekpe Decl. (Dkt. No. 28-5) ¶ 8. Although

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 502762 (N.D.N.Y.)
**(Cite as: 2010 WL 502762 (N.D.N.Y.))**

plaintiff asserts that his assignment to SHU was re-taliatory, he admittedly did not grieve his three-day SHU confinement. Declaration of Kristina Monnet ("Monnet Decl.") (Dkt.28-6) ¶ 8; *see also* Crump Deposition Transcript ("Crump Tr.") (Dkt. No. 28-24) pp. 13, 15, 24, 91-93.

When released from SHU confinement three days later, plaintiff collected the personal belong-ings that had been taken from him upon his transfer into the unit and discovered that a property invent-ory form, No. 1-64, had not been completed when they were confiscated. Complaint (Dkt. No. 1) ¶ 52. When he returned to the F-1 unit and the cubicle to which he had previously been assigned and un-packed his personal property, Crump found that many of his belongings were missing, damaged, or destroyed. *Id.* ¶¶ 52-54.

Following his release from SHU confinement, Crump claims to have suffered harassment and threats from unnamed corrections officers who were encouraging plaintiff to file a grievance or civil complaint against Superintendent Ekpe be-cause Ekpe "had no right to do what he did" to Crump. Crump Tr. (Dkt. No. 28-24) pp. 12-15, 18, 24; *see also* Complaint (Dkt. No. 1) ¶¶ 58-59. Ac-cording to plaintiff, the superintendent is the only "black African-American" at Riverview, and his subordinate corrections officers are trying to get him out of that facility so that they can control it. Crump Tr. (Dkt. No. 28-24) pp. 12-15. Because Crump was trying to maintain good behavior so that he would be released from the prison, he did not file a grievance or complaint against Ekpe. *Id.* As a result, plaintiff was subjected to continued harass-ment by corrections officers at the facility. *Id.*

On March 11, 2006 Crump was involved in an incident in which inmates were "horse playing" in the bathroom. Complaint (Dkt. No. 1) ¶¶ 60-63; *see also* Crump Tr. (Dkt. No. 28-24) pp. 23-24. Ac-cording to prison officials, while standing near the entrance to the bathroom plaintiff shouted out a warning to the inmates inside that a corrections of-ficer was approaching. Reusner Aff. Exh. G (Dkt.

No. 28-15). When defendant Sears, who responded to the incident, ordered Crump to produce his iden-tification, he became loud and belligerent, arguing that he had not done anything. *Id.* After he dis-obeyed several orders to return to his cube, C.O. Sears placed plaintiff on "full bed status" and com-pleted a misbehavior report citing Crump for three misconduct charges, including verbal interference, creating a disturbance, and disobeying a direct or-der. *Id.*

**\*4** A Tier II disciplinary hearing was conduc-ted by defendant Lieutenant McNally on March 15, 2006 to address the charges contained in the misbe-havior report.[FN5] *See* Reusner Aff. Ex. H (Dkt. No. 28-16). At the commencement of the hearing Crump was advised of and stated that he understood the charges against him, and he pleaded guilty to refusing a direct order, but denied having created a disturbance or having interfered with a corrections employee. *Id.* at pp. 1-2. During the hearing plaintiff testified and was permitted to call two in-mate witnesses, both of whom testified that Crump had been standing outside of the bathroom watch-ing television at the time of the horseplaying incid-ent but did not shout out that a corrections officer was coming. *See generally id.* At the close of the hearing, plaintiff stated that he had no procedural objections to the conduct of the hearing. *See* Re-usner Aff. Ex. H (Dkt. No. 28-16) at p. 7. Based upon the misbehavior report written by Corrections Officer Sears and his finding that the inmate wit-nesses lacked credibility, defendant McNally found the plaintiff guilty of all three charges and imposed a penalty of thirty days of keeplock confinement, with a concomitant loss of package, commissary and telephone privileges.[FN6] *Id.* Plaintiff appealed the disciplinary finding, and the superintendent af-firmed Lieutenant McNally's determination on March 27, 2006. Reusner Aff. Exh. J. (Dkt. No. 28-18).

> FN5. The DOCS conducts three types of inmate disciplinary hearings. Tier I hear-ings address the least serious infractions

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 502762 (N.D.N.Y.)
**(Cite as: 2010 WL 502762 (N.D.N.Y.))**

and can result in minor punishments, such as the loss of recreation privileges. Tier II hearings involve more serious infractions and can result in penalties which include confinement for a period of time in the SHU. Tier III hearings concern the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits. *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246, 142 L.Ed.2d 202 (1998).

FN6. The record is not entirely clear as to whether plaintiff was confined to SHU or keeplock for that thirty-day period. Plaintiff alleges in his complaint and testified at his deposition that he served the time in the facility SHU. Complaint (Dkt. No. 1) ¶ 66; *see also* Crump Tr. (Dkt. No. 28-24) pp. 25-26. The transcript of the disciplinary hearing, Dkt. No. 28-16, and disciplinary record, Dkt. No. 28-17, in contrast, reflect that plaintiff was confined to keeplock. In their statement of undisputed facts, filed in accordance with Local Rule 7.1(a)(3), submitted in support of their motion, defendants assert that plaintiff was sentenced to thirty days of keeplock confinement. Dkt. No. 28-2 at ¶ 28. Since it appears plaintiff was assigned to a cubicle while at Riverview, *see* Complaint (Dkt. No. 1) ¶ 53, rather than a cell, an arrangement which would more easily lend itself to a keeplock confinement, and drawing all inferences in plaintiff's favor, I have assumed that plaintiff served his thirty day keeplock confinement at the facility SHU.

While in keeplock, plaintiff sent a letter to Superintendent Epke, stamped received on March 22, 2006, complaining of unspecified threats and fear of reprisals from unidentified corrections officers. Reusner Aff. Ex. K. (Dkt. No. 28-19) Sergeant Willett, who is not a named defendant, was assigned to

investigate plaintiff's complaint to the superintendent. Complaint (Dkt. No. 1) ¶ 74. As part of his investigation, Sergeant Willett prepared a report of his interview of the plaintiff, dated April 5, 2006. Reusner Aff. Exh. L (Dkt. No. 28-20). In it, Sergeant Willet reported that Crump indicated he felt the need for "protection from the superintendent because the superintendent runs the place and all the correction officers are now head hunting him for every rule violation they can get." *Id.* Plaintiff denies making this statement, but claims that Willet changed plaintiff's story and insisted that Crump's complaints were not with the corrections officers, but with the superintendent for putting him in SHU confinement without reason. Complaint (Dkt. No. 1) ¶ 74. By memorandum dated April 19, 2006, Captain Kanaly advised plaintiff that his complaint of threats had been investigated, and it was determined that there was no threat to Crump's safety at Riverview. Reusner Aff. Exh. L (Dkt. No. 28-20) at p. 2 (unnumbered).

The following day plaintiff filed another grievance, this time identified by him as "Code 1-Forced Into Messhall." Reusner Aff. Exh. M (Dkt. No. 28-21). Plaintiff's grievance, designated as number RV-8291-06, complained of his mandatory assignment to messhall duty, unspecified harassment and threats, loss of personal property, and that he was "being targeted for tickets and being found guilty ... when another inmate has claimed in great respect and honesty that I Crump didn't do that charge but that he did it." *Id.* In response to that grievance Superintendent Ekpe 1) advised Crump to follow appropriate claims procedures with regard to alleged, missing items; 2) advised that it appeared there were no longer any disciplinary actions pending; 3) stated that effective May 8, 2006 plaintiff would be programed as a Phase II Program Aid and A-2 Porter; and 4) noted that a sergeant had been assigned to conduct an investigation regarding plaintiff's complaint, and that based upon the investigation it was determined that no further action was necessary and that plaintiff's complaints had been adequately addressed. Reusner Aff. Exh. N (Dkt. No.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 6

Not Reported in F.Supp.2d, 2010 WL 502762 (N.D.N.Y.)
(Cite as: 2010 WL 502762 (N.D.N.Y.))

28-22). On plaintiff's appeal to the DOCS Central Office Review Committee ("CORC"), by decision dated July 5, 2006 the CORC upheld the superintendent's determination, noting that Crump was then assigned as a program aide in the mornings and a porter in the evening, and also advising Crump that his disciplinary sanction could be appealed in accordance with the DOCS regulations as set forth in 7 N.Y.C.R.R. Part 5. *Id.* Exh. O (Dkt. No. 28-23).

II. *PROCEDURAL HISTORY*

*5 Plaintiff commenced this action on December 21, 2007. Dkt. No. 1. Named as defendants in plaintiff's complaint are Epke D. Epke, the superintendent of Riverview; Deputy Superintendent Hessel; Lieutenant McNally; Sergeant Reneiri; three John Doe corrections officers; and Corrections Officer Sears. *Id.* While plaintiff's claims appear to center upon his first grievance and the retaliation that he allegedly suffered as a direct result of its filing, his complaint includes thirty separate causes of action including for violations of his rights under the First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, alleging claims of retaliation, deprivation of liberty and property without due process, and cruel and unusual punishment, all relating to his confinement to SHU and keeplock. Additionally, plaintiff alleges common law claims of negligence as well as violations of the New York Correction Law and the DOCS regulations.

On April 3, 2009, following the completion of pretrial discovery in the case, defendants filed a motion for the entry of summary judgment dismissing plaintiff's claims as a matter of law. Dkt. No. 28. In their motion, defendants argue that plaintiff's claims should be dismissed on the grounds that 1) he failed to exhaust his administrative remedies with respect to claims relating to his seventy-two hour confinement in SHU; 2) he has failed to state viable due process and retaliation claims; and 3) recovery is barred by the Eleventh Amendment as well as New York Correction Law § 24 and the

doctrine of qualified immunity.[FN7] Despite passage of the deadline for doing so, plaintiff has failed to submit papers in opposition to defendants' motion, which is now ripe for determination and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

> FN7. Defendants also correctly assert that the claims against the unnamed John Doe defendants must be dismissed as a result of plaintiff's failure to identify and timely serve these defendants. Rule 4(m) of the Federal Rules of Civil Procedure authorizes dismissal where a summons and complaint is not served within 120 days after filing of the complaint, absent a showing of good cause. Fed.R.Civ.P. 4(m); *Shuster v. Nassau Cty.,* No. 96 Civ. 3635, 1999 WL 9847, at *1 (S.D.N.Y. Jan.11, 1999) (Rule 4(m) authorizes dismissal where no service within 120 days after filing of the complaint); *Romand v. Zimmerman,* 881 F.Supp. 806, 809 (N.D.N.Y.1995) (McAvoy, C.J.) (120-day period for service of a summons and complaint by a plaintiff under Fed.R.Civ.P. 4(m) applies to *pro se* plaintiffs as well as those represented by counsel); *see also, e.g., Michelson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 709 F.Supp. 1279, 1282 (S.D.N.Y.1989) (citation omitted) (court lacks jurisdiction until defendants properly served with summons and complaint). Inasmuch as plaintiff has failed to identify and take steps to obtain jurisdiction over the John Doe defendants, I recommend dismissal of his claims against them.

III. *DISCUSSION*

A. *Plaintiff's Failure to Oppose Defendants' Motion*

Before turning to the merits of plaintiff's claims, a threshold issue to be addressed is the legal

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 502762 (N.D.N.Y.)
**(Cite as: 2010 WL 502762 (N.D.N.Y.))**

significance, if any, of his failure to oppose defendants' summary judgment motion, and specifically whether that failure automatically entitles defendants to summary judgment dismissing plaintiff's complaint.

This court's rules provide that

[w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown.

N.D.N.Y.L.R. 7.1(b)(3). Undeniably, *pro se* plaintiffs are entitled to some measure of forbearance when defending against summary judgment motions. *See Jemzura v. Public Serv. Comm'n,* 961 F.Supp. 406, 415 (N.D.N.Y.1997) (McAvoy, C.J.). The deference owed to *pro se* litigants, however, does not extend to relieving them of the consequences of Local Rule 7.1(b)(3). *Robinson v. Delgado,* No. 96-CV-169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J. & Hurd, M.J.); *Cotto v. Senkowski,* No. 95-CV-1733, 1997 WL 665551, at *1 (N.D.N.Y. Oct. 23, 1997) (Pooler, J. & Hurd, M.J.); *Wilmer v. Torian,* 980 F.Supp. 106, 106-07 (N.D.N.Y.1997) (Pooler, J. & Hurd, M.J.). Accordingly, absent a showing of good cause defendants' unopposed summary judgment motion should be granted, if determined to be facially meritorious. *See Allen v. Comprehensive Analytical Group, Inc.,* 140 F.Supp.2d 229, 231-32 (N.D.N.Y.2000) (Scullin, C.J.); *Leach v. Dufrain,* 103 F.Supp.2d 542, 545-46 (N.D.N.Y.2000) (Kahn, J.).

*6 It should also be noted that the plaintiff's failure to properly oppose defendants' summary judgment motion is not without further consequences. By failing to submit papers in opposition to their motion, plaintiff has left the facts set forth in defendants' Local Rule 7.1(a)(3) Statements

unchallenged, thus permitting the court to deem facts set forth in the defendants' statement of material facts not in dispute to have been admitted based upon his failure to properly respond to that statement.[FN8] *See Elgamil v. Syracuse Univ.,* No. 99-CV-611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2000) (McCurn, S.J.) (listing cases); *see also Monahan v. New York City Dep't of Corrs.,* 214 F.3d 275, 292 (2d Cir.2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)).[FN9]

> FN8. Local Rule 7.1(a)(3) provides that *"[t]he Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."* *See* N.D.N.Y.L.R. 7.1(a)(3) (emphasis in original).

> FN9. Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

Based upon plaintiff failure to oppose defendants' motion I recommend that the court review the motion for facial sufficiency, accepting defendants' assertions of facts as set forth in their Local Rule 7.1(a)(3) Statement as uncontroverted, and that the motion be granted if determined to be facially meritorious.

*B. Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material", for

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 502762 (N.D.N.Y.)
**(Cite as: 2010 WL 502762 (N.D.N.Y.))**

purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

A party seeking summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

*7 When deciding a summary judgment motion a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the nonmoving party. *See Building Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507-08 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judg-

ment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

*C. Exhaustion of Remedies*

As a threshold, procedural basis for dismissal of his claims related to this incident, in their motion defendants contend that plaintiff's failure to file and pursue to completion, a grievance against Superintendent Ekpe, Sergeant Reneiri, and Deputy Hessel relating to his SHU confinement for seventy-two hours before filing suit, precludes him from asserting any claims arising out of that incident.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104-134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see Woodford v. Ngo,* 548 U.S. 81, 84, 126 S.Ct. 2378, 2382, 165 L.Ed.2d 368 (2006); *Hargrove v. Riley,* No. CV-04-4587, 2007 WL 389003, at *5-6 (E.D.N.Y. Jan.31, 2007). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 992, 152 L.Ed.2d 12 (2002) (citation omitted).

The failure of a prisoner to satisfy the PLRA's exhaustion requirement is not jurisdictional, but instead gives rise to a defense which must affirmatively be raised by a defendant in response to an inmate suit. *Jones v. Block,* 549 U.S. 199, 212, 127 S.Ct. 910, 919, 166 L.Ed.2d 798 (2007). In the event a defendant named in such an action establishes that the inmate plaintiff failed properly to exhaust available remedies prior to commencing the action, his or her complaint is subject to dismissal. *See Pettus v. McCoy,* No. 04-CV-0471, 2006 WL

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 9

Not Reported in F.Supp.2d, 2010 WL 502762 (N.D.N.Y.)
**(Cite as: 2010 WL 502762 (N.D.N.Y.))**

2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford,* 548 U.S. at 94-95, 126 S.Ct. at 2387-88 (holding that the PLRA requires "proper exhaustion" of available remedies). "Proper exhaustion" requires a plaintiff to procedurally exhaust his or her claims by "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95, 126 S.Ct. at 2388; *see also Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir.2007) (citing *Woodford* ).[FN10]

> FN10. While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion "in a substantive sense", an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his or her available administrative remedies within the appropriate grievance protocol in order to satisfy the PLRA. *Macias,* 495 F.3d at 43 (quoting *Johnson v. Testman,* 380 F.3d 691, 697-98 (2d Cir.2004)) (emphasis omitted).

**\*8** New York prison inmates are subject to an Inmate Grievance Program ("IGP") established by the DOCS and recognized as an "available" remedy for purposes of the PLRA. *See Mingues v. Nelson,* No. 96 CV 5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb.20, 2004) (citing *Mojias v. Johnson,* 351 F.3d 606 (2d Cir.2003) and *Snider v. Melindez,* 199 F.3d 108, 112-13 (2d Cir.1999)). The IGP consists of a three-step review process. First, a written grievance is submitted to the IGRC within twenty-one days of the incident.[FN11] 7 N.Y.C.R.R. § 701.5(a). The IGRC, which is comprised of inmates and facility employees, then issues a determination regarding the grievance. 7 N.Y.C.R.R. §§ 701.4(b), 701.5(b). If an appeal is filed, the superintendent of the facility next reviews the IGRC's determination and issues a decision. 7 N.Y.C.R.R. § 701.5(c). The third level of the process affords the inmate the right to appeal the superintendent's ruling to the CORC, which makes the final administrative decision. 7 N.Y.C.R.R. § 701.5(d). Ordinarily, absent

the finding of a basis to excuse non-compliance with this prescribed process, only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to section 1983 in a federal court. *Reyes v. Punzal,* 206 F.Supp.2d 431, 432 (W.D.N.Y.2002) (citing, *inter alia, Sulton v. Greiner,* No. 00 Civ. 0727, 2000 WL 1809284, at *3 (S.D.N.Y. Dec.11, 2000)).

> FN11. The IGP supervisor may waive the grievance timeliness requirement due to "mitigating circumstances." 7 N.Y.C.R.R. § 701.6(g)(1)(i)(a)-(b).

While plaintiff has alleged in his complaint that he filed a grievance in March of 2006 regarding his later keeplock confinement and that he has fully exhausted his administrative remedies with respect to the claims now raised, *see* Complaint (Dkt. No. 1) ¶¶ 19, 24, the record discloses that although clearly familiar with the IGP, he did not file any grievance related to his confinement in SHU, which began on March 2, 2006. Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 28-2) ¶ 14. The record establishes that plaintiff filed only two grievances relevant to this action. The first, number RV-8195-06 and dated February 13, 2006, is the grievance complaining of the medical screening procedure for assigning inmates to messhall duty, a grievance which plaintiff claims spawned his three-day confinement to SHU. Reusner Aff. Exh. C (Dkt. No. 28-11). The second grievance, number RV-8291-06 and dated April 20, 2006, raises a variety of complaints but lacks any reference to the superintendent's order on March 2, 2006 that he be taken to the SHU for a seventy-two hour period to allow for investigation of the allegation that he was spreading dangerous rumors, the procedures which followed for escorting and admitting plaintiff into the SHU, or the conditions within the SHU during that seventy-two hour period. Reusner Aff. Exh. M (Dkt. No. 28-21). Indeed, during his deposition plaintiff admitted that he never made any complaint regarding this confinement, explaining that at the time he was trying to get out of Riverview. Crump Tr. (Dkt.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 502762 (N.D.N.Y.)
(Cite as: 2010 WL 502762 (N.D.N.Y.))

Page 10

No. 28-24) pp. 15, 93.

*9 Accordingly, while plaintiff's claims related to his later, Tier II disciplinary proceeding were properly exhausted, all those relating to and/or arising out of his three-day confinement to SHU are subject to dismissal for failure to exhaust available administrative remedies.[FN12]

> FN12. Twenty-one of plaintiff's thirty causes of action, including claims against Epke, Reneiri, Hessel and two John Does, relate to the March 2 through 5, 2006 SHU confinement. Additionally, in that section of the complaint identified by plaintiff as "legal claim" he alleges violation of the Fourth Amendment right to be free from illegal searches and seizures. Complaint (Dkt. No. 1) ¶ 149. The only allegations in the complaint relating to search and seizure are those asserting that when taken to SHU on March 2, 2006 plaintiff was subjected to a strip search and a visual body cavity search and that his personal property was taken at the time of his admission to SHU. See id. at ¶ 46. Accordingly, to the extent that this alleged constitutional violation relates to this search and/or confiscation of his personal property occurring at the time of his admission to SHU on March 2, 2006, it should be dismissed in light of plaintiff's failure to exhaust his administrative remedies with respect to that claim.

D. Retaliation

As was previously noted, in his complaint Crump alleges that his constitutional rights under the First Amendment were violated when, after he pursued his grievance regarding the medical screening procedures for assigning inmates to work in the messhall, he was subjected to harassment and threats, and disciplinary charges were lodged against him. Noting the ease with which such claims can be incanted by a prison inmate, defendants seek dismissal of this cause of action as legally deficient as a matter of law.

When adverse action is taken by prison officials against an inmate, motivated by the inmate's exercise of a right protected under the Constitution, including the free speech provisions of the First Amendment, a cognizable retaliation claim under 42 U.S.C. § 1983 lies. See Franco v. Kelly, 854 F.2d 584, 588-90 (2d Cir.1988). As the Second Circuit has repeatedly cautioned, however, such claims are easily recited and inmates often attribute adverse action, including the issuance of misbehavior reports, to retaliatory animus; courts must therefore approach such claims "with skepticism and particular care." Dawes v. Walker, 239 F.3d 489, 491 (2d Cir.2001), overruled on other grounds, sub. nom Swierkiewicz v. Sorema N.A., 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (citing Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir.1983)); Davis v. Goord, 320 F.3d 346, 352 (2d Cir.2003).

In order to state a prima facie claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action-in other words, that the protected conduct was a substantial or motivating factor in the prison officials' decision to take action against the plaintiff. Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); Dillon v. Morano, 497 F.3d 247, 251 (2d Cir.2007); Dawes, 239 F.3d at 492. If the plaintiff carries this burden, then to avoid liability the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff "even in the absence of the protected conduct." Mount Healthy, 429 U.S. at 287, 97 S.Ct. at 576. If taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone. Graham v. Henderson, 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 11

Not Reported in F.Supp.2d, 2010 WL 502762 (N.D.N.Y.)
(Cite as: 2010 WL 502762 (N.D.N.Y.))

Analysis of retaliation claims thus requires careful consideration of the protected activity in which the inmate plaintiff has engaged, the adverse action taken against him or her, and the evidence tending to link the two. When such claims, which are exceedingly case specific, are alleged in only conclusory fashion and are not supported by evidence establishing the requisite nexus between any protected activity and the adverse action complained of, a defendant is entitled to summary judgment dismissing a plaintiff's retaliation claims. *Flaherty,* 713 F.2d at 13.

### 1. *Confinement to SHU from March 2 Through 5, 2006*

*10 Plaintiff first asserts that Epke's order on March 2, 2006 to subject Crump to SHU confinement was motivated by the filing of his first grievance. The only factual allegation against Sergeant Reneiri in this regard is that following Epke's order, he handcuffed and escorted plaintiff to SHU.

It is well recognized that the filing of a grievance is protected conduct, and can thus satisfy the first prong of a retaliation claim. *Graham,* 89 F.3d at 80. Plaintiff has therefore sufficiently alleged that he engaged in constitutionally protected conduct. Additionally, after the filing of his grievance plaintiff was undeniably subjected to adverse action, in the form of confinement to SHU, and he has therefore also established the adverse action element of his retaliation claim. *See Gill v. Pidlypchak,* 389 F.3d 379, 384 (2d Cir.2004).

Plaintiff's claim fails, however, because he has failed to provide anything but conclusory allegations that the grievance was a substantial or motivating factor behind Epke's actions. To the contrary, Superintendent Epke explains that following his denial of plaintiff's grievance on February 28, 2006, there were allegations that plaintiff was spreading rumors among the other inmates that the workers in the messhall were contagious and that the food they prepared was poisoned, contaminated, and otherwise unsafe to eat. Epke Decl. (Dkt. No. 28-5) ¶ 8. Legitimately concerned that if those reports proved

true plaintiff's unchecked rumors would disturb the prison environment by discouraging inmates from eating in the messhall, Superintendent Epke determined that is was necessary that plaintiff be removed from the general population while the allegations against him could be investigated. *Id.* Accordingly, plaintiff was held in SHU for only seventy-two hours and thereafter released to his previous housing unit and cubicle. Based upon these facts, no reasonable factfinder could conclude that plaintiff's grievance was the motivating factor for his placement in SHU.

With respect to plaintiff's claim against Sergeant Reneiri for his involvement, plaintiff has failed to allege any facts suggesting that he did anything but comply with a direct order issued by the superintendent which, even plaintiff acknowledged, defendant Reneiri was required to do. Crump. Tr. (Dkt. No. 28-25) p. 64. Accordingly, there is nothing but a conclusory allegation that Sergeant Reneiri acted in retaliation, to support plaintiff's retaliation claim against him, and no basis exists for a finding that his actions were taken for any other reason than a direct order from his superintendent.

As noted by defendants, the Second Circuit "ha[s] established a 'presumption that a prison official's acts to maintain order are done for a proper purpose.' " *Hynes v. Squillace,* 143 F.3d at 657 (quoting *Rivera v. Senkowski,* 62 F.3d 80,86 (2d Cir.1995)). Accordingly, even if plaintiff had established that the filing of his first grievance was a motivating factor in the superintendent's decision to send him to SHU, the court further finds the defendants have established that in light of plaintiff's alleged dissemination of rumors, the same action would have been taken regardless of the filing of that grievance in order to allow for an investigation and maintain order in the facility. For these reasons, I conclude that defendants are entitled to summary judgment on this portion of plaintiff's retaliation claims.

### 2. *False Misbehavior Report*

*11 Plaintiff's retaliation claims against C.O.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 502762 (N.D.N.Y.)
(Cite as: 2010 WL 502762 (N.D.N.Y.))

Sears and Lieutenant McNally are premised upon issuance of the March 11, 2006 misbehavior report and the subsequent disciplinary hearing. As defendants point out, plaintiff's theory in this regard is inconsistent, if not contradictory. Plaintiff appears to allege that defendant Sears' actions were in retaliation for *not* filing a grievance or civil complaint against the superintendent for sending Crump to the SHU. *See* Complaint (Dkt. No. 1) ¶¶ 59-64, 141; *see also* Crump Tr. (Dkt. No. 28-24) pp. 102-104. With regard to defendant McNally, plaintiff alleges in his complaint that he imposed disciplinary sanctions based upon Sears' false misbehavior report, in retaliation for Crump's filing of the first grievance ( *see id.* at ¶ 145), but later testified at his deposition that "Lieutenant McNally and Sears are the ones that retaliated against me for not filing the grievance, a complaint [against Epke]" (Crump Tr. (Dkt. No. 28-24) p. 104). Putting aside these contradictions, and assuming without deciding that plaintiff has alleged that he engaged in constitutionally protected conduct giving rise the alleged retaliation by defendants Sears and McNally, his claims are subject to dismissal because he has failed to allege, let alone adduce, any facts supporting an inference of a retaliatory motive.

In cases involving allegations of retaliation based on the filing of allegedly false misbehavior reports, "[t]he difficulty lies in establishing a retaliatory motive." *Barclay v. New York,* 477 F.Supp.2d 546, 558 (N.D.N.Y.2007). Mere conclusory allegations of such retaliatory motivation will not suffice to survive a summary judgment motion; to establish retaliatory animus, which ordinarily must be shown circumstantially since direct evidence of such motivation is typically lacking, a plaintiff may cite such factors as "temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." *Id.* (citations omitted); *see also Rivera v. Goord,* 119 F.Supp.2d 327, 339 (S.D.N.Y.2000).

The only evidence offered by the plaintiff which could potentially support the finding of a nexus between the protected activity alleged in his complaint and the subsequent misbehavior report is the inference that might be drawn by the timing of his first grievance filed on February 13, 2006 and the misbehavior report issued in March 11, 2006. It is true such an inference, flowing from a closeness in proximity between protected activity and the issuance of a misbehavior report, can sometimes suffice to defeat a summary judgment motion seeking dismissal of a retaliation claim. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (citing *Flaherty,* 713 F.2d at 14). In many circumstances, however, this alone is insufficient to avoid summary judgment. *Williams v. Goord,* 111 F.Supp.2d 280, 290 (S.D.N.Y.2000) (citing *Ayers v. Stewart,* 1996 WL 346049, at *1 (2d Cir.1999)); *see also Ethier v. City of Cohoes,* No. 1:02 Civ. 1584, 2006 WL 1007780, *7 (N.D.N.Y. April 18, 2006).

*12 In this instance, temporal proximity is the only fact that might give rise to a determination by a reasonable factfinder that the misbehavior report was issued in retaliation for protected activity. Although Crump denies shouting a warning to the inmates "horseplaying" in the bathroom, he admits being in the area of the bathroom door, that he did not immediately produce his identification when requested by C.O. Sears, and that he protested when ordered to do so, denying any wrongdoing. Indeed, the disciplinary hearing conducted by Lieutenant McNally plaintiff pleaded guilty to one of the three charges against him, again admitting his presence in the vicinity of the disturbance, and that he did not immediately comply with defendant Sears' order but tried to provide an explanation. Defendant McNally stated that his determination of guilt was based on the report issued by defendant Sears and his finding that plaintiff's inmate witnesses lacked credibility, and it was made in the context of plaintiff's admissions. Plaintiff does not allege any facts, and there is no evidence in the record, that either C.O. Sears or Lieutenant McNally was even aware of his messhall medical procedures grievance, let alone motivated by that grievance to take adverse action against the plaintiff. Additionally,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 502762 (N.D.N.Y.)
(Cite as: 2010 WL 502762 (N.D.N.Y.))

plaintiff has provided no evidence regarding his prior disciplinary history. Given the totality of these circumstances, no reasonable factfinder could conclude that the misbehavior report and resulting findings of guilt after the Tier II disciplinary hearing were prompted by retaliatory animus. I therefore recommend dismissal of this remaining portion of plaintiff's retaliation claim.

### E. Harassment

Though not specifically addressed by defendants in their motion, plaintiff's complaint also generally asserts that he was harassed by defendants; no specific factual allegations are provided, and plaintiff's complaint, though including a great deal of detail on other matters, is vague as to the identity of those corrections workers who are alleged to have participated in the harassment. *See, e.g.,* Complaint (Dkt. No. 1) ¶¶ 58-59. According to plaintiff the harassment consisted of being pulled aside to isolated areas and prodded by corrections officers to file a civil complaint against superintendent Epke, targeted for random searches, assigned to the messhall (an apparently less desirable position than he had as a program aide), and called out by corrections officers by name. Crump Tr. (Dkt. No. 28-24) pp. 14, 32, 34, 51 and 73. Liberally construed, plaintiff's allegations of harassment are, at best, an attempt to state a violation of his Eighth Amendment right to be free from cruel and unusual punishment. His complaint, however, fails to allege any conduct that would warrant Eighth Amendment protection.

42 U.S.C. § 1983 is not designed to rectify harassment or verbal abuse. *See Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986); *Gill v. Hoadley,* 261 F.Supp.2d 113, 129 (N.D.N.Y.2003); *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998); *Alnutt v. Cleary,* 913 F.Supp. 160, 165-66 (W.D.N.Y.1996) (citations omitted). Thus, mere allegations of verbal abuse do not rise to the level of a constitutional violation, and are not cognizable under 42 U.S.C. § 1983. *See Moncrieffe v. Witbeck,* No. 97-CV-253, 2000 WL 949457, at *3

(N.D.N.Y. June 29, 2000) (Mordue, J.) (allegations that corrections officer laughed at inmate not actionable under section 1983) (citation omitted); *Carpio v. Walker,* No. Civ.A.95CV1502, 1997 WL 642543, at *6 (N.D.N.Y. Oct.15, 1997) (Pooler, J. & DiBianco, M.J.) ("[v]erbal harassment alone, unaccompanied by any injury, no matter how inappropriate, unprofessional, or reprehensible it might seem, does not rise to the level of an Eighth Amendment violation").

*13 There are no allegations that plaintiff suffered from the infliction of any physical injury or pain as a result of defendants' harassing conduct. Plaintiff testified at his deposition that no physical force was used against him. Crump Tr. (Dkt. No. 28-25) at p. 42-43. When asked to identify physical injuries sustained as a result of the alleged harassment by prison workers, plaintiff testified at his deposition that he was "freezing for two days [in SHU], starving, they put me in a cold cell so you get proportional rationale meals." *Id.* at p. 105. The record is clear that plaintiff does not claim to have suffered any physical injury as a result of the alleged harassment. Plaintiff has therefore failed to meet the threshold requirement for an Eighth Amendment violation of showing the "unnecessary and wanton infliction of pain" by prison officials. *Whitley v. Albers,* 475 U.S. 312, 319, 196 S.Ct. 1078, 1084, 89 L.Ed.2d 251, ---- (1986). Consequently, I find plaintiff has failed to establish any facts that would support an Eighth Amendment violation.

### F. Due Process

Another component of plaintiff's complaint focuses upon his contention that his right to procedural due process was abridged in connection with his three-day SHU confinement and his later disciplinary hearing. In their motion, defendants assert that plaintiff's claim fails at the outset, in light of his inability to prove the deprivation of a protected liberty interest.

To successfully state a claim under 42 U.S.C. § 1983 for the denial of procedural due process

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 502762 (N.D.N.Y.)
**(Cite as: 2010 WL 502762 (N.D.N.Y.))**

arising out of a disciplinary hearing, a plaintiff must show that he or she 1) possessed an actual liberty interest, and 2) was deprived of that interest without being afforded sufficient procedural safeguards. *See Tellier v. Fields,* 280 F.3d 69, 79-80 (2d Cir.2000) (citations omitted); *Hynes,* 143 F.3d at 658; *Bedoya v. Coughlin,* 91 F.3d 349, 351-52 (2d Cir.1996).

*1. Liberty Interest*
   Addressing first plaintiff's seventy-two hour confinement in SHU, restrictive confinement for administrative reasons generally does not implicate a constitutionally protected liberty interest. *Jones v. Artuz,* No. 93 Civ. 8784, 1994 WL 721362, at *2 (S.D.N.Y.1994) (citing *Russell v. Coughlin,* 910 F.2d 75, 77 (2d Cir.1990)). Notwithstanding this general rule, a state may by regulation create a constitutionally protected liberty interest if the language employed is unmistakably mandatory. *McMillan v. Scully,* No. 85 Civ. 7280, 1986 WL 7543, at *3 (S.D.N.Y. June 30, 1986) (citing *Hewitt v. Helms,* 459 U.S. 460, 471, 103 S.Ct. 864, 871, 74 L.Ed.2d 675(1972), *overruled in part by, Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418) (1985)).

   Here, the record reveals plaintiff was confined to SHU for seventy-two hours for administrative reasons in order to maintain order in the facility while the allegation that he was spreading rumors was investigated.[FN13] Under the applicable DOCS regulations when an inmate is assigned involuntarily to SHU for administrative reasons, a hearing must be conducted within fourteen days of the inmate's admission. 7 N.Y.C.R.R. § 301.4(a). Plaintiff was released from SHU in considerably less than fourteen days, before the expiration of the period within which a hearing to determine the propriety of the segregation was even required. Under these circumstances, the controlling regulation does create a protected liberty interest, and his seventy-two hour confinement cannot support a procedural due process claim. *See Malik v. Miller,* 679 F.Supp. 268, 269 (W.D.N.Y.1988) (summary judgment

granted dismissing procedural due process claim arising out of administrative confinement for five days pending a disciplinary hearing).

> FN13. "Administrative segregation admission results from a determination by the facility that the inmates' presence in general population would pose a threat to the safety and security of the facility." 7 N.Y.C.R.R. § 301.4(b).

   **\*14** Turning to the plaintiff's disciplinary confinement in keeplock, the Second Circuit has interpreted the Supreme Court's decision in *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), to mean that "a prisoner's restricted confinement within a prison does not give rise to a liberty interest, warranting procedural due process protection, unless the conditions 'impose[ ] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Sealey,* 197 F.3d at 583 (quoting *Sandin,* 515 U.S. at 484, 115 S.Ct. 2293, 132 L.Ed.2d 418). Atypicality in a *Sandin* inquiry is normally a question of law.[FN14] *Colon v. Howard,* 215 F.3d 227, 230-31 (2d Cir.2000); *Sealey,* 197 F.3d at 585. When determining whether a plaintiff possesses a liberty interest, district courts must examine the specific circumstances of confinement, including analysis of both the length and conditions of confinement. *See Sealey,* 197 F.3d at 586; *Arce v. Walker,* 139 F.3d 329, 335-36 (2d Cir.1998); *Brooks v. DiFasi,* 112 F.3d 46, 48-49 (2d Cir.1997); *see also Williams v. Goord,* 111 F.Supp.2d 280, 289 (S.D.N.Y.2000) (citations omitted) (SHU confinement in New York generally does not impose atypical and significant hardship because it remains within the normal range of prison custody).

> FN14. In cases where there is factual dispute concerning the conditions or duration of confinement, however, it may nonetheless be appropriate to submit those disputes to a jury for resolution. *Colon,* 215 F.3d at 230-31; *Sealey,* 197 F.3d at 585.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 502762 (N.D.N.Y.)
**(Cite as: 2010 WL 502762 (N.D.N.Y.))**

While not the only factor to be considered, the duration of a disciplinary confinement remains significant under *Sandin*.[FN15] *Colon,* 215 F.3d at 231. Specifically, while under certain circumstances confinement of less than 101 days could be shown to meet the atypicality standard under *Sandin* (*see id.* at 232 n. 5), the Second Circuit generally takes the position that SHU confinement under ordinary conditions of more than 305 days rises to the level of atypicality, whereas normal SHU confinement of 101 days or less does not. *Id.* at 231-32 (305 days of SHU confinement constitutes an atypical and sufficient departure).[FN16]

> FN15. Segregation for a period of thirty days was found by the Supreme Court in *Sandin* not to impose a significant hardship on an inmate. 515 U.S. at 485-86, 115 S.Ct. at 2301. In explaining its reasoning, the Court found that the disciplinary confinement failed to present "a dramatic departure from the basic conditions" of an inmate's normal sentence. *Id.*

> FN16. In fact, in *Colon* a Second Circuit panel split markedly on whether or not adoption of a 180-day "bright line" test for examining SHU confinement would be appropriate and helpful in resolving these types of cases. 215 F.3d at 232-34 (Newman, C.J.), 235-37 (Walker, C.J. and Sack, C.J., concurring in part).

Plaintiff's thirty-day keeplock confinement, without more, is patently insufficient to state a protectable liberty interest. *Rodriguez v. McGinnis,* 1 F.Supp.2d 244, 248 (S.D.N.Y.1998) ("[T]he decisions of the Second Circuit are unanimous that keeplock ... confinement of 30 days or less in New York prisons is not 'atypical or significant hardship' under *Sandin.* ") (quoting *Williams v. Keane,* No. 95 Civ. 0379(JGX)(AJP), 1997 WL 527677, at *6 (S.D.N.Y. Aug. 25, 1997)).[FN17] Accordingly, the court finds that dismissal on this basis alone is appropriate.

> FN17. To the extent that plaintiff alleges a liberty interest in his assignment as a program aide relative to his apparent objection to having been temporarily assigned to the messhall after his disciplinary confinement, his claim must fail. It is well recognized that inmates do not have a protected interest to participate in prison programs. *Thompson v. LaClair,* No. 9:08-CV-37, 2008 WL 191212 at *4 (N.D.N.Y. Jan.22, 2008) (Scullin, S.J.) (citing *Boothe v. Hammock,* 605 F.2d 661, 664 (2d Cir.1979)).

*2. Procedural Protections*

Even assuming that plaintiff were able to prove the deprivation of a cognizable liberty interest, his procedural due process claim would nonetheless fail because, based on the record now before the court, it is clear he was afforded ample due process. The procedural protections to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are both modest and well-established, the contours of the required protections having been articulated in *Wolff v. Mc-Donnell,* 418 U.S. 539, 563-67, 94 S.Ct. 2963, 2978-80, 41 L.Ed.2d 935 (1974). Under *Wolff,* the constitutionally mandated due process requirements include 1) written notice of the charges; 2) the opportunity to appear at a disciplinary hearing and present witnesses and evidence, subject to legitimate safety and penological concerns; 3) a written statement by the hearing officer explaining his or her decision and the reasons for the action being taken; and 4) in some circumstances, the right to assistance in preparing a defense. *Wolff,* 418 U.S. at 564-70, 94 S.Ct. at 2978-83. In order to pass muster under the Fourteenth Amendment, a hearing officer's disciplinary determination must garner the support of at least "some evidence".[FN18] *Superintendent v. Hill,* 472 U.S. 445, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985).

> FN18. The "some evidence" standard under *Hill* has been described as considerably

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 16

Not Reported in F.Supp.2d, 2010 WL 502762 (N.D.N.Y.)
(Cite as: 2010 WL 502762 (N.D.N.Y.))

tolerant. *See Friedl v. City of New York,* 210 F.3d 79, 85 (2d Cir.2000). To be sure, the Fourteenth Amendment requires that at least some "reliable evidence" be contained in the record supporting the hearing officer's determination. *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004) (*quoting, inter alia, Luna v. Pico,* 356 F.3d 356, 488 (2d Cir.2004)). Based upon the court's review of the hearing transcript, and in particular plaintiff's admissions during the hearing, I conclude that no reasonable factfinder could determine that the hearing officer's conclusion was not based upon "some evidence".

**\*15** The record establishes that plaintiff received a copy of the misbehavior report setting forth the charges against him in advance of the hearing. Reusner Aff. Exh. H (Dkt. No. 28-16) p. 1. A disciplinary hearing was conducted, and was recorded. *See generally id.* At the commencement of the hearing the plaintiff confirmed that he was aware of and understood the charges against him. Plaintiff was permitted to give an oral statement, as well as to offer testimony from his own witnesses. *See generally id.* At the close of the hearing, when asked if he had any objections to the procedure followed, plaintiff responded that he did not. *Id.* at 7. In addition, after announcing his disposition the hearing officer advised plaintiff of his right of appeal. Reusner Aff. Exh. H (Dkt. No. 28-16) p. 8. Plaintiff later sought review by the superintendent, and the hearing officer's determination was upheld on appeal. Reusner Aff. Exh. J (Dkt. No. 28-18). The hearing officer's finding of guilt on two of the charges was based upon admissions made by plaintiff during the hearing as well as the misbehavior report. As to the third charge, plaintiff pleaded guilty. The hearing officer's determination was therefore supported by some evidence, thereby meeting the minimum requirements of the Fourteenth Amendment. The procedures that were provided to plaintiff thus were adequate to afford plaintiff the minimal process to which he was entitled.

Plaintiff also asserts that when presiding over his Tier II disciplinary proceeding, Lieutenant McNally was not impartial. To be sure, bias on the part of a disciplinary hearing officer can support a claim of procedural due process deprivation under the Fourteenth Amendment. *Davidson v. Capuano,* No. 78 Civ. 5724, 1988 WL 68189, at \*8 (S.D.N.Y. June 16, 1988) (citing *McCann v. Coughlin,* 698 F.2d 112, 122 (2d Cir.1983)). Here again, the inquiry focuses on whether plaintiff was afforded basic due process. *See Wright v. Conway,* 584 F.Supp.2d 604, 609 (W.D.N.Y.2009).

Plaintiff has alleged no facts that would lead a reasonable factfinder to conclude that Lieutenant McNally was biased in conducting the hearing. There is no allegation of any special relationship between C.O. Sears, the author of the misbehavior report, and McNally, and, as previously noted, there is no evidence that defendant McNally was even aware of plaintiff's initial grievance. To the contrary, for the reasons explained above, the undisputed evidence shows that Lieutenant McNally fairly conducted the hearing, and that plaintiff was provided more than sufficient due process with respect the disciplinary proceeding.

To the extent that plaintiff's claim of McNally's bias implicates an insufficient basis for his finding, I have already concluded that the evidence of plaintiff's guilt more than meets the some evidence standard. "[A] plaintiff armed with nothing more than conclusory allegations of bias and prejudgment should not be able to defeat a well-supported motion for summary judgment." *Francis v. Coughlin,* 891 F.2d 43, 37 (2d Cir.1989). Accordingly, plaintiff's bare allegations, without evidentiary support, are insufficient to establish a claim of hearing officer bias sufficient to withstand defendants' motion for summary judgment.[FN19] *Id.*

> FN19. In his complaint, plaintiff generally alleges in the section entitled "legal claim" that he seeks redress for violation of his

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 502762 (N.D.N.Y.)
(Cite as: 2010 WL 502762 (N.D.N.Y.))

Sixth Amendment rights, among other things. That constitutional amendment provides the right to a fair trial in all criminal prosecutions. *See* U.S. CONST. AMEND. VII. Presumably, plaintiff asserts the Sixth Amendment in relation to his disciplinary hearing. However, "prison disciplinary hearings are not treated as 'criminal' for the purposes of the Sixth Amendment." *Sash v. Zenk,* 439 F.3d 61, 63 (2d Cir.), *cert. denied,* 549 U.S. 920, 127 S.Ct. 277, 166 L.Ed.2d 212, S.Ct. 277 (2006); *see also Wolff,* 418 U.S. at 570, 94 S.Ct. at 2981-82. As a result, plaintiff's Sixth Amendment claim should be dismissed.

**\*16** In light of the lack of evidence in the record demonstrating that plaintiff's procedural due process rights were violated during the course of his disciplinary hearing, I recommend dismissal of these claims.[FN20]

> FN20. Any procedural due process claim premised upon the claimed loss of his personal property while in SHU is also subject to dismissal. The alleged destruction or loss of plaintiff's personal property will not support a claim redressable under § 1983 if "adequate state post-deprivation remedies are available." *Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). The Second Circuit has held New York's post-deprivations remedies adequate to preclude a prisoner's due process claim for lost personal property. *Love v. Coughlin,* 714 F.2d 207, 208-09 (2d Cir.1983).

**G. *Claims Against Deputy Superintendent Hessel***
Although not specifically addressed by defendants, there is a separate and independent basis for dismissal of plaintiff's claims against Deputy Superintendent Hessel. The only allegations in the complaint against Hessel are found in plaintiff's twenty-fifth cause of action, alleging deprivation of liberty without due process of law in relation to

plaintiff's seventy-two hour confinement in SHU. Complaint (Dkt. No. 1) ¶ 137. The complaint otherwise lacks factual allegations detailing Hessel's involvement in this occurrence, and it therefore appears that the claim is premised solely upon Hessel's role as deputy superintendent.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). A supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor; there is no *respondeat superior* liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501. Vague and conclusory allegations that a supervisor has failed to train or properly monitor the actions of subordinate employees will not suffice to establish the requisite personal involvement and support a finding of liability. *Pettus v. Morgenthau,* 554 F.3d 293, 300 (2d Cir.2009) ("To the extent that [a] complaint attempts to assert a failure-to-supervise claim ... [that claim is insufficient where] it lacks any hint that [the supervisor] acted with deliberate indifference to the possibility that his subordinates would violate [plaintiff's] constitutional rights.").

Culpability on the part of a supervisory official for a civil rights violation can, however, be established in one of several ways, including when that individual 1) has directly participated in the challenged conduct; 2) after learning of the violation through a report or appeal, has failed to remedy the wrong; 3) created or allowed to continue a policy or custom under which unconstitutional practices oc-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 502762 (N.D.N.Y.)
**(Cite as: 2010 WL 502762 (N.D.N.Y.))**

curred; 4) was grossly negligent in managing the subordinates who caused the unlawful event; or 5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty,* 490 F.3d 143, 152-53 (2d Cir.2007), *rev'd on other grounds, sub nom., Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 2931(2009); *see also, Richardson,* 347 F.3d at 435; *Wright,* 21 F.3d at 501; *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986).

**\*17** During his deposition plaintiff clarified that he seeks to hold defendant Hessel liable for his confinement in SHU because "he's the deputy of the jail [,and] he has full knowledge ...." Crump. Tr. (Dkt. No. 28-24) p. 45; *see also, id.* at pp. 100-101. Plaintiff acknowledges that Hessel never spoke to him, and did not order that he be placed in the SHU. Crump. Tr. (Dkt. No. 28-24) p. 101. "[M]ere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim." *Richardson,* 347 F.3d at 435 (citations omitted). Accordingly, plaintiff's claims against Deputy Superintendent Hessel should be dismissed. *see, e.g., Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987) (dismissal appropriate where plaintiff does no more than allege that defendant was in charge of prison); *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985) (same).

*H. Violation of State Law*
In addition to setting forth constitutional claims, plaintiff's complaint asserts that his SHU confinement violated New York Correction Law §§ 112, 137(5) and 138(4) and various regulations of the DOCS.[FN21] To the extent that plaintiff attempts to state a claim under 42 U.S.C. § 1983 for the alleged violation of these provisions, such a claim fails as a matter of law.

> FN21. New York Correction Law § 112 generally relates to the duties of the commissioner of the DOCS relating to correctional facilities. *See* N.Y. Correct. Law § 112. In general, section 137(5) prohibits degrading treatment of inmates. *See id.* at §

137(5). Section 138(4) provides that "[i]nmates shall not be disciplined for making written or oral statements, demands, or requests involving a change of institutional conditions, policies, rules, regulations, or laws affecting an institution." *See id.* at § 138(4). Plaintiff also generally alleges violation of 7 N.Y.C.R.R. "Sections 250-300 et. seg." Complaint (Dkt. No. 1) ¶ 98.

To state a valid claim under section 1983, "a plaintiff must allege that (1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." *Snider v. Dylag,* 188 F.3d 51, 53 (2d Cir.1999) (citing *Dwares v. City of New York,* 985 F.2d 94, 98 (2d Cir.1993)). "A violation of a state law or regulation, in and of itself, does not give rise to liability under 42 U.S.C. § 1983." *Cusamano v. Sobek,* 604 F.Supp.2d 416, 482 (N.D.N.Y.2009) (Suddaby, J.) (collecting cases). "Furthermore, the violation of a DOCS Directive, alone, is not even a violation of a New York State Law or regulation (much less of 42 U.S.C. § 1983)." *Cabassa v. Gummerson,* 01-CV-1039, 2008 WL 4416411, at \*6 n. 24 (N.D.N.Y. Sept.24, 2008) (Hurd, J.) (internal quotation marks and citation omitted). This is so because the DOCS directives merely provide a system which the DOCS Commissioner has established to assist him or her in exercising discretion, which he or she retains despite any violation of those directives. *Id.*

Plaintiff's claims relating to state laws and regulations should, therefore, be dismissed.

*J. Immunity*
Lastly, in support of their motion defendants assert that plaintiff's claims against them are barred by the immunity provided under the Eleventh Amendment as well as the doctrine of qualified immunity, and that his state law claims are precluded by New York Correction Law § 24.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 502762 (N.D.N.Y.)
**(Cite as: 2010 WL 502762 (N.D.N.Y.))**

### 1. *Eleventh Amendment*

The Eleventh Amendment protects a state against suits brought in federal court by citizens of that state, regardless of the nature of the relief sought. *Alabama v. Pugh,* 438 U.S. 781, 782, 98 S.Ct. 3057, 3057-58, 57 L.Ed.2d 1114 (1978). This absolute immunity which states enjoy under the Eleventh Amendment extends both to state agencies, and in favor of state officials sued for damages in their official capacities when the essence of the claim involved seeks recovery from the state as the real party in interest.[FN22] *Richards v. State of New York Appellate Division, Second Dep't,* 597 F.Supp. 689, 691 (E.D.N.Y.1984), *aff'd* 767 F.2d 998 (2d Cir.1985) (citing *Pugh* and *Cory v. White,* 457 U.S. 85, 89-91, 102 S.Ct. 2325, 2328-29, 72 L.Ed.2d 694 (1982)). To the extent that a state official is sued for damages in his or her official capacity, the official is entitled to invoke the Eleventh Amendment immunity belonging to the state.[FN23] *Kentucky v. Graham,* 473 U.S. 159, 169, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985); *Hafer v. Melo,* 502 U.S. 21, 26, 112 S.Ct. 358, 361, 116 L.Ed.2d 301 (1991).

> FN22. In a broader sense, this portion of defendants' motion implicates the sovereign immunity enjoyed by the State. In *Northern Ins. Co. of New York v. Chatham County* the Supreme Court reaffirmed that the sovereign immunity enjoyed by the states is deeply rooted, having been recognized in this country even prior to ratification of the Constitution, and is neither dependent upon nor defined by the Eleventh Amendment. 547 U.S. 189,193, 126 S.Ct. 1689, 1693, 164 L.Ed.2d 367,---- (2006).

> FN23. By contrast, the Eleventh Amendment does not establish a barrier against suits seeking to impose individual or personal liability on state officials under section 1983. *See Hafer,* 502 U.S. at 30-31, 112 S.Ct. at 364-65.

**\*18** It is unclear whether plaintiffs' claims are alleged against defendants in their individual or of-

ficial capacities, or both. To the extent that plaintiff asserts his claims against defendants in their official capacities, plaintiff's damage claims are in reality claims against the State of New York, thus exemplifying those against which the Eleventh Amendment protects. As a result, they are subject to dismissal. *Daisernia v. State of New York,* 582 F.Supp. 792, 798-99 (N.D.N.Y.1984) (McCurn, J.). I therefore recommend that this portion of defendants' motion be granted, and plaintiff's damage claim against the defendants in their capacities as state officials be dismissed

### 2. *New York Correction Law § 24*

By statute, New York invests state employees, including correctional workers, with immunity from suits requiring them to personally answer state law claims for damages based on activities falling within the scope of the statute, providing that

> 1. [n]o civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of [the Department of Correctional Services], in his personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.

> 2. Any claim for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties of any officer or employee of [the Department of Correctional Services] shall be brought and maintained in the court of claims as a claim against the state.

N.Y. Correct. Law § 24; *see also Ierardi v. Sysco,* 119 F.3d 183, 186-87 (2d Cir.1997).[FN24] Section 24 thus precludes claims against corrections officers brought against them in any court in their personal capacities arising out of the discharge of their duties. *Baker v. Coughlin,* 77 F.3d 12, 14-15 (2d Cir.1996). In *Haywood v. Drown,* --- U.S. ----, 129 S.Ct. 2108, 173 L.Ed.2d 920 (2009), the Su-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 20

Not Reported in F.Supp.2d, 2010 WL 502762 (N.D.N.Y.)
**(Cite as: 2010 WL 502762 (N.D.N.Y.))**

preme Court recently held this provision unconstitutional to the extent it precludes inmates from pursuing § 1983 actions. In the wake of *Haywood,* one court in this district has observed that "[a] claim brought pursuant to state law does not implicate the Supremacy Clause, and therefore, the *Haywood* decision does not affect the question of whether this Court has proper jurisdiction to hear [a] pendent state law claim." *May v. Donneli,* 9:06-cv-437, 2009 WL 3049613, at * 5 (N.D.N.Y. Sept.18, 2009) (Sharpe, J. & Treece, M.J.). In that case, because the acts of the corrections officers, which were alleged to have violated New York Correction Law § 610, clearly fell within the scope of their employment, the court found that it lacked jurisdiction to hear such pendent state law claims. *See id.*

> FN24. To be sure, the immunity afforded under section 24 is by no means absolute; actions taken by corrections workers occurring during the course of their employment but wholly outside of their scope of employment, for example, lack the protection of that section. The circumstances presented in *Ierardi,* for example, involving a claim of sexual harassment made by a special education teacher employed by the DOCS against a corrections officer assigned to the same facility, serves aptly to illustrate the type of situation in which section 24 would not afford protection. *Ierardi,* 119 F.3d at 188-89.

In this case plaintiff's pendent state law claims, alleging violations of the New York Correction Law and the DOCS regulations, as well as common law negligence, indisputably arise from actions taken by the defendants in their roles as corrections employees, including the determinations to administratively confine plaintiff to SHU, to issue a misbehavior report, the conduct of the disciplinary hearing, and the determination that plaintiff was guilty of the charges alleged. While they may allege constitutional deprivations and actions exceeding the scope of a corrections officer's authority, these

types of claims have consistently been treated as giving rise to immunity from suit for pendent state law claims against corrections officers in their individual capacities, whether in state or federal court. *See, e.g. Baker,* 77 F.3d at 15-16; *Parker v. Fogg,* No. 85-CV-177, 1994 WL 49696, at *9 (N.D.N.Y. Feb.17, 1994) (McCurn, S.J.). *Cepeda v. Coughlin,* 128 A.D.2d 995, 996-97, 513 N.Y.S.2d 528, 530 (3d Dep't 1987) (holding Correction Law section 24 applicable to actions against corrections officers for allegedly using excessive force when returning inmates to their cells during a disturbance), *lv. denied,* 70 N.Y.2d 602, 518 N.Y.S.2d 1024, 512 N.E.2d 550 (1987). For this reason, I find that plaintiff's state law claims are precluded by section 24, and recommend that they be dismissed.[FN25, FN26]

> FN25. In any event, even if I were to conclude that those state law claims were not precluded, I would recommend that the court not exercise pendent jurisdiction of such claims, "pursuant to 28 U.S.C. § 1367, which authorizes a federal court to decline supplemental jurisdiction over a state claim if all of the claims over which the court had original jurisdiction were dismissed." *Stephenson v. Albany County Policymakers,* Civ. No. 6:09-CV-326, 2009 WL 2922805, at *2 (N.D.N.Y. Aug.14, 2009) (Kahn, J. & Treece, M.J.) (citing 28 U.S.C. § 1367(c)(3)).

> FN26. In light of the foregoing, I have declined to address defendants' assertion of qualified immunity as further grounds for dismissal of the complaint.

## IV. *SUMMARY AND RECOMMENDATION*

**\*19** At the heart of plaintiff's complaint is the claim that he was retaliated against for filing a grievance complaining that inmates assigned to work in the messhall did not receive adequate advance medical screening. Out of this arises thirty causes of action alleging violations of various constitutional provisions as well as New York State

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 502762 (N.D.N.Y.)
**(Cite as: 2010 WL 502762 (N.D.N.Y.))**

Correction Law, the DOCS regulations and common law tort claims. Having failed to exhaust his administrative remedies regarding his seventy-two hour SHU confinement, I recommend that all of plaintiff's claims relating to that event be dismissed on this procedural basis. With respect to his claims of retaliation and those relating to alleged violations of his right to due process, I have concluded that no reasonable factfinder could determine that plaintiff's constitutional rights were violated and therefore recommend dismissal of these claims on the merits. Additionally, plaintiff has not alleged personal involvement on the part of defendant Hessel, thus failing to provide a basis for a finding of liability against him. To the extent that Crump has named defendants in their official capacities, I recommend dismissal based upon the sovereign immunity afforded by the Eleventh Amendment. Finally, because violations of state law and regulations do not state a claim under section 1983, and in any event, plaintiff's claims are precluded by New York Correction Law § 24, I recommend dismissal of all of plaintiff's claims that are premised upon violation of state law. Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 28) be GRANTED, and that plaintiff's complaint in this action be DISMISSED in all respects.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this Report and Recommendation upon the parties in accordance with this court's local rules.

N.D.N.Y.,2010.
Crump v. Ekpe
Not Reported in F.Supp.2d, 2010 WL 502762 (N.D.N.Y.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.