**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

AROR ARK O'DIAH,

                    Plaintiff,

      v.                               No. 08-CV-941
                                     (TJM/CFH)

MALCOLM R. CULLY; RONALD W.
MOSCICKI; STEPHEN GUTER; D.
RICHARDSON; J. PEPIN; J. HAHN;
MR. & LT. SHAW; K. THOMAS,
Correctional Officer, Cayuga Correctional
Facility; D. SWIERK, Mail Room Clerk,
Lakeview Shock Incarceration Facility,

                    Defendants.[1]

_____

**APPEARANCES:**                       **OF COUNSEL:**

AROR ARK O'DIAH
Plaintiff Pro Se
07-A-2463
Orleans Correctional Facility
3531 Gaines Basin Road
Albion, NY 14411

HON. ERIC T. SCHNEIDERMAN        KRISTEN M. QUARESIMO, ESQ.
Attorney General for the                Assistant Attorney General
  State of New York
Attorney for Defendant
The Capitol
Albany, New York 12224-0341

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

**REPORT-RECOMMENDATION AND ORDER**[2]

_____

    [1] Sixteen other defendants were previously terminated or had the claims against them transferred to other districts. See Dkt. Nos. 51, 61, 73.

    [2] This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

Plaintiff pro se Aror Ark O'Diah ("O'Diah"), an inmate currently in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendants, nine DOCCS employees, violated his constitutional rights under the First and Eighth Amendments. Am. Compl. (Dkt. No. 55). Presently pending are defendants' motion and O'Diah's cross-motion for summary judgment, both pursuant to Fed. R. Civ. P. 56. Dkt. Nos. 84, 87. Both motions are opposed. Dkt. Nos. 87, 88. For the following reasons, it is recommended that (1) defendants' motion be granted, (2) O'Diah's cross-motion be denied, and (3) the complaint be dismissed.

## I. Background

The specific facts of the case are set forth in the Report-Recommendation dated February 28, 2012, familiarity with which is assumed. See Dkt. No. 73. The Court dismissed all of O'Diah's claims except the following: (1) medical indifference against defendants Cully, Thomas, Guter, and Mawhir; (2) retaliation against defendants Pepin, Richardson, Cully, Hahn, Shaw and Swierk; (3) the filing of false misbehavior reports against defendants Pepin, Richardson, Hahn, Shaw and Swierk; and (4) denial of access to courts against defendants Thomas, Hahn, Shaw, Swierk and Moscicki. Id. at 42–43; Dkt. No. 76 (Decision & Order) at 5–6. The facts discussed will be those relevant to the claims herein remaining. Those claims occurred during O'Diah's incarceration at Cayuga Correctional Facility ("Cayuga"), Livingston Correctional Facility ("Livingston"), and Lakeview Shock Correctional Facility ("Lakeview").

## A. Cayuga Correctional Facility

O'Diah was housed at Cayuga until May 9, 2008. Dkt. No. 84-34. O'Diah alleged that on March 7, 2008, defendant Thomas, a correction officer, refused to process his legal mail even though he had received prior authorization from an unnamed sergeant and made subsequent arrangements with an advocate to pick up the legal mail from Cayuga. Am. Compl. ¶ 54. O'Diah alleged that Thomas possessed and withheld his legal mail. Id. ¶ 55. On the same day, Thomas issued a false misbehavior report against him for failing to obey a direct order. Id. ¶ 57. On March 8, O'Diah received the misbehavior report and was sent to keeplock.[3] Id. ¶ 58. While keeplocked, O'Diah was unable to file a motion for his federal suit in the Eastern District of New York and the case was dismissed for a failure to prosecute. Id.

The only evidence in the record concerning an Eastern District of New York case is a court notice informing the parties that a scheduled status conference was canceled. Dkt. No. 87-1 at 123. A search in Westlaw revealed that O'Diah filed six actions making claims stemming from the same nucleus of facts, some of which were frivolous, all of which were consolidated into one docket. O'Diah v. City of New York, No. 08-CV-1646 (SJF)(ARL), 2008 WL 1968303, at *1–2 (E.D.N.Y. Apr. 30, 2008).[4] This 2008 case enjoined O'Diah from filing any future lawsuits in the Eastern District of New York without first obtaining

---

[3] Keeplock is a form of disciplinary confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities." Green v. Bauvi, 46 F.3d 189, 192 (2d Cir. 1995); N.Y. COMP. CODES R. & REGS. tit. 7, § 301.6.

[4] All unpublished opinions cited to by the Court in this Report-Recommendation are, unless otherwise noted, attached to this Recommendation.

leave of court.[5]  Id. at *2.

Thomas attested that he explained to O'Diah the mail would be processed during the three to eleven p.m. shift.  Thomas Decl. (Dkt. No. 84-53) ¶¶ 9–10; Dkt. No. 84-55 at 2.  In any event, Directive #4933 provides that Special Housing Unit ("SHU")[6] inmates cannot receive legal work until seven-two hours after their admission to SHU.  Thomas Decl. ¶ 13; Dkt. No. 84-55 at 2.  O'Diah was a new arrival subjected to Directive #4933.  Thomas Decl. ¶ 14.  Upon hearing this response, O'Diah created a disturbance and Thomas issued him a misbehavior report.  Id. ¶ 11; Dkt. No. 84-54 at 2.  O'Diah was given his legal work in a timely fashion and on March 15, 2008 eventually handed the legal work to his wife, who was his legal advocate.  Thomas Decl. ¶¶ 15–16; Dkt. No. 84-55 at 4 (noting that O'Diah entered SHU on March 5, 2008 and received his legal work on March 8, 2008, a waiting period which complied with Directive # 4933).  In addition, O'Diah's legal papers were also mailed out on March 20, 2008.  Dkt. No. 84-55 at 4.

On March 14, 2008, O'Diah was prescribed neurontin.  Guter Decl. ¶ 11; Dkt. No. 84-22 (Dkt. No. 84-21) at 1.  On March 19, 2008, defendant Guter, a registered nurse, arrived at O'Diah's cell to administer the neurontin, with which O'Diah was unfamiliar.  Am. Compl. ¶ 59; Guter Decl. ¶¶ 1, 12.  O'Diah requested the information insert for the drug, which would

---

[5]  This filing injunction was eventually, and essentially, upheld after remand from the Second Circuit.  See O'Diah v. Port Authority of New York and New Jersey, No. 05-CV-5297 (SJF)(LB), 2012 WL 113551, at *2–3 (E.D.N.Y. Jan. 11, 2012).

[6]  SHUs exist in all maximum and certain medium security facilities.  The units "consist of single-occupancy cells grouped so as to provide separation from the general population . . . ."  N.Y. COMP. CODES R. & REGS. tit 7, § 300.2(b).  Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required.  Id. at pt. 301.

contain the drug's name, purpose and reported side effects, as well as to see the physician. Am. Compl. ¶ 60; Guter Decl. ¶ 13. O'Diah alleged that when he refused to take the medication, Guter and Thomas, at the direction of Mawhir, forced O'Diah to take the unknown medication. Id. ¶ 61. After taking the medication, O'Diah alleged that he experienced serious intestinal issues including bowel movements, stomach pain, bleeding, and inflammation of his rectum. Id.

Guter affirmed that he told O'Diah he would obtain the requested information from a physician and then O'Diah voluntarily took the medication. Guter Decl. ¶¶ 16–18. Guter explained that he authored the misbehavior report because after he informed O'Diah of the physician's unavailability, O'Diah became verbally abusive and Guter had to seek Thomas's assistance. Guter Decl. ¶¶ 15, 27; Dkt. No. 84-24 at 6, 9.

On March 22, 2008, non-party Hearing Officer Rocker conducted a disciplinary hearing and determined that O'Diah was guilty of creating a disturbance and interference with an employee and not guilty as to harassment and refusing a direct order. Dkt. No. 84-25 at 34. Rocker sentenced O'Diah to two months of keeplock and loss of packages, commissary, and phones but deferred the sentence for three months. Id.

On March 24 and 28 of 2008, O'Diah refused to take his medication. Guter Decl. ¶¶ 23–24; Dkt. No. 84-23 at 1. On April 9, 2008, O'Diah reported to Guter that he was feeling much better and the medication worked well.[7] Guter Decl. ¶ 25; Dkt. No. 84-26 at 1. However, on April 12, 13, and 14, 2008, O'Diah again refused to take the same medication. Guter Decl. ¶ 26; Dkt. No. 84-27 at 1. Thomas and Guter both maintain that they never

---

[7] There is no evidence in the record indicating whether, despite his refusals, O'Diah actually took the medication between March 29 and April 8.

physically forced O'Diah to take the medication.  Thomas Decl. ¶ 27; Guter Decl. ¶¶ 19–20.

## B.  Livingston Correctional Facility

O'Diah was housed at Livingston between May 9, 2008 and June 10, 2008.  Dkt. No. 84-9 at 1.  O'Diah alleged that on May 9, 2008, he could not perform the work required for his job placement because the exposure to cigarette smoke, butts, and ashes aggravated his preexisting medical conditions.[8]  Am. Compl. ¶ 68.  O'Diah suffered from dizziness, headaches, shoulder and back pain, and high blood pressure.  Id.  O'Diah contends that defendant Cully, superintendent of Livingston, was aware of his medical conditions and disregarded them when he placed him in the work program.  Id.; Cully Decl. (Dkt. No. 84-8) ¶ 1.

On May 10, 2008, while working at his placement, O'Diah suffered from irregular and elevated blood pressure, headaches, and increased pain as a result of having to clean up the cigarettes.  Am. Compl. ¶ 69.  On May 19, 2008, O'Diah experienced a severe headache and dizziness, informed an unnamed supervising corrections officer that he was not feeling well, and requested a change in his work placement.  Id. ¶ 70.  O'Diah was instructed to seek a medical excuse instead.  Id.  While pursuing that request, O'Diah claims to have been told by someone in the front office that Cully had placed him in that

---

[8]  In his response to the motion for summary judgment, O'Diah produced a health services memorandum recommending that O'Diah be excused from all programs.  Dkt. No. 87-1 at 72.  However, the recommendation was made at Cayuga and ended on March 5, 2008, at six a.m.  Id.  O'Diah also produced a second program clearance form dated May 9, 2008, which stated that O'Diah was restricted from performing strenuous labor, climbing stairs and ladders, working around machines, and working in the messhall.  Id. at 121.  There was nothing written prohibiting exposure to cigarette smoke, or smoke of any kind.

position as a sanction.  Id.

On May 20, 2008, O'Diah was given a choice between two work programs, though he did not prefer either position because of his health conditions.  Am. Compl. ¶ 72.  O'Diah chose one of the placements, and was then told by an unidentified sergeant that he was going to the other per Cully's authorization.  Id.  The placement resulted in an aggravation of O'Diah's pre-existing medical conditions of severe headaches, dizziness, and depression.  Id.

On June 2, 2008, O'Diah was summoned by medical and told the physician that he was unable to work around excessive amounts of cigarette smoke or cigarette butts and ashes and requested a work excuse.  Am. Compl.  ¶ 74.  Cully allegedly told the Livingston physician that supervisors prohibited him from giving work excuses.  Id.  That same day O'Diah returned to his work assignment where he again began cleaning up the cigarettes, butts, and ashes and began feeling dizzy and developing a headache.  Id.  ¶ 75.  One of the corrections officers ordered O'Diah back to his cell to rest, and further advised him to file a grievance and again request a work program reassignment.  Id.

O'Diah alleged that on June 3, 2008, defendant Richardson, a lieutenant, and defendant Pepin, a correctional officer, issued O'Diah a false misbehavior report at Cully's direction.  Am. Compl. ¶ 78.  However, record evidence shows that Pepin authored the misbehavior report, not Richardson.  Dkt. No. 84-49 at 8.  On June 5, Richardson conducted the disciplinary hearing.  Dkt. No. 84-45 at 2.  Non-party and Correction Officer Brockway[9] testified that on the morning of June 3, 2008, when the inmates began their

_____

[9]  While Brockway did not author the misbehavior report, he witnessed the conduct and testified to it at O'Diah's disciplinary hearing.  Richardson Decl. (Dkt. No. 84-46) ¶ 13;

placements, O'Diah immediately approached his desk, left an envelope, stated that Brockway and Pepin needed to read the letter in the envelope, then walked away. Dkt. No. 84-45 at 10. Brockway read O'Diah's letter, which grieved about O'Diah's health and how O'Diah could not perform certain jobs. Id. Brockway gave O'Diah his assignment to empty the cigarette butts from the cans in the compound and O'Diah responded that he would sue Brockway if he was injured from the work. Id. Brockway felt threatened and testified that correction officers are typically notified of an inmate's medical restrictions by the infirmary, not the inmate. Id. O'Diah never told Brockway that he had major reactions to cigarette smoke. Id.

Pepin attested that the program committee assigned O'Diah to empty cans of cigarette butts in the facility. Pepin Decl. (Dkt. No. 84-41) ¶¶ 1, 9. Pepin maintains that no one directed him to author the misbehavior report and that O'Diah never informed him that he was sensitive to cigarette smoke. Id. ¶¶ 15, 19–20.

Non-party and Nurse Rinders testified that O'Diah's medical records mentioned nothing about O'Diah's intolerance to cigarette smoke or O'Diah having an issue with blood pressure correlating to cigarette smoke. Dkt. No. 84-45 at 14–15. Rinders saw O'Diah on May 29 because O'Diah was experiencing urinary pain and his blood pressure was slightly elevated, which could have been caused by the urinary tract infection.[10] Id. at 16. Subsequent to that diagnosis, O'Diah attended additional follow-up appointments. Id. O'Diah's blood pressure returned to normal approximately four days later on June 2, 2008.

Dkt. No. 84-50 at 10–13.

[10] O'Diah submitted evidence with his response showing that he in fact, experienced urinary problems. Dkt. No. 87-1 at 94.

Id.

Richardson determined that O'Diah was guilty of refusing a direct order and making threats. Dkt. No. 84-45 at 17. Richardson invoked O'Diah's deferred sentence and in addition, sentenced O'Diah to thirty-days of keeplock. Id.

### C. Lakeview Shock Correctional Facility

O'Diah was housed at Lakeview between June 10, 2008 and October 1, 2008. Dkt. No. 84-34 at 1. O'Diah alleged that on June 11, 2008, defendant Hahn, a correction officer, issued O'Diah a misbehavior report for receiving unauthorized postage stamps from his cell mate. Am. Compl. ¶ 87. This resulted in the dismissal of his Article 78 petition.[11] Id. ¶¶ 87–88, 90.

O'Diah demanded the return of the funds he applied to be disbursed for his postage prior to his transfer to Lakeview. Am. Compl. ¶ 91. According to O'Diah, Moscicki and Cully denied that there was ever funds available. Id. O'Diah filed a grievance which resulted in a disposition that he was owed a refund. Id. O'Diah alleged that on June 17, 2008, Hahn and defendant Shaw, a lieutenant, issued O'Diah a false misbehavior report for exchanging stamps with his cell mate. Id. ¶ 92. O'Diah alleged he provided Hahn, Shaw, and Swierk his legal mail at various times in June 2008, but Moscicki directed them not to send it out. Id. ¶¶ 89–90.

Hahn explained that he issued O'Diah the misbehavior report because O'Diah received stamps from Inmate Carter, which constituted an unauthorized exchange in violation of

---

[11] N.Y. Civil Practice Law and Rules Art. 78 establishes the procedure for judicial review of the actions and inactions of state and local government agencies and officials.

DOCCS Rule 113.15.[12]  Hahn Decl. (Dkt. No. 84-28) ¶¶ 1, 8–9, 13; Misbehavior Report

dated June 11, 2008 (Dkt. No. 84-13) at 4; Dkt. No. 84-52 at 4.  Shaw conducted the

disciplinary hearing for the June 11 misbehavior report.  Shaw Decl. (Dkt. No. 54-51) ¶¶ 1,

10; Dkt. No. 84-52.  O'Diah was not provided with stamps when he first arrived at Lakeview

but he wanted to send a letter.  Misbehavior Report dated June 11, 2008 at 4; Hahn Decl. ¶

7; Shaw Decl. ¶ 7.  O'Diah admitted to procuring a stamp from Inmate Carter.  Hahn Decl. ¶

10; Shaw Decl. ¶¶ 8–9.  Shaw found O'Diah guilty and sentenced O'Diah to thirty-days of

keeplock.  Dkt. No. 84-52 at 5.

Hahn attested that Swierk and Moscicki were not involved in the June 11 misbehavior

report.  Hahn Decl. ¶ 14.  Hahn did not issue the misbehavior report in order to prevent

O'Diah from serving court papers.  Id. ¶ 15.  Rather, Hahn attested that the court papers at

issue were related to an Article 78 petition.  Id. ¶¶ 16–19; Dkt. No. 84-31.  O'Diah filed a

verified Article 78 petition on April 21, 2008 in the Cayuga County Supreme Court, and was

required to serve respondents with the necessary pleadings by June 26, 2008.  Dkt. Nos.

84-56 at 1, 84-57 at 2.  That petition was dismissed because, first, O'Diah failed to serve

the original pleadings to respondents, and second, the court would have dismissed the

petition for failure to state a claim.  Dkt. No. 84-57 at 2–3.  Shaw insists that he did not

direct any DOCCS employee to write the misbehavior report, nor did he author it himself.

Shaw Decl. ¶¶ 11, 15.  The misbehavior report shows that Hahn authored it.  Misbehavior

Report dated June 11, 2008 at 4.

---

[12]  According to the June 11, 2008 misbehavior report, Rule 113.15 directs that an "[i]nmate shall not purchase, sell, loan, give[,] or exchange personally owned articles without authorization."  Dkt. No. 84-30 at 4.

Defendant Superintendent Moscicki attested that he never contacted or supervised DOCCS employees of other facilities. Moscicki Decl. (Dkt. No. 84-33) ¶ 8. He maintains that he never directed anyone to author any misbehavior report against O'Diah or was involved in the postage stamp matter. Id. ¶¶ 11, 21, 27.

O'Diah contends that on August 8, 2008, defendant Swierk, a senior mail clerk, was instructed by Hahn, Moscicki, and Cully, to falsely charge O'Diah with correspondence violations. Am. Compl. ¶ 94; Swierk Decl. (Dkt. No. 84-5) ¶ 1. The hearing occurred on August 13 and O'Diah was found not guilty of the charges. Id. ¶ 94.

Swierk attested that she never spoke with O'Diah and Cully was not the superintendent at Lakeview at the time she authored the misbehavior report. Swierk Decl. ¶¶ 5, 7. On August 5, 2008, Swierk found mail labeled as "legal" but was actually being sent to O'Diah's wife. Id. ¶ 8. Swierk believed that Directives #4421 and #4422 prohibited such mailings. Id. ¶ 9; see, e.g., Directive #4421 (Dkt. No. 84-7) at 1 ("[Privileged correspondence are benefitted by] allowances of limited free postage and advances of inmate funds for postage."). However, Swierk conceded that the charges were dismissed. Id. ¶ 10.

### D. Personal Involvement

Defendants Richardson, Pepin, Hahn, Shaw, Swierk, Moscicki, Thomas, and Guter attested that Cully did not order them to issue a false misbehavior report. Richardson Decl. ¶¶ 3–4; Pepin Decl. ¶¶ 3–4; Hahn Decl. ¶¶ 3–4; Shaw Decl. ¶¶ 3–4; Swierk Decl. ¶¶ 6–7; Moscicki Decl. ¶¶ 3–4; Thomas Decl. ¶¶ 5, 7; Guter Decl. ¶¶ 8–9. Defendants Hahn, Shaw, Swierk, Thomas, and Guter attested that Cully was not their supervisor as the defendants

did not work at Livingston.  Hahn Decl. ¶ 5; Shaw Decl. ¶ 6; Swierk Decl. ¶ 7; Thomas Decl. ¶ 8; Guter Decl. ¶ 9.  Only Richardson and Pepin worked at the same facility as Cully.  Richardson Decl. ¶ 1; Pepin Decl. ¶ 1.

In addition, Thomas attested that Cully never instructed him to do anything with O'Diah's mail.  Thomas Decl. ¶ 7.  Thomas and Guter both maintain that Cully never told them to force O'Diah to take any medication.  Thomas Decl. ¶¶ 23–24; Guter Decl. ¶¶ 3–4, 9, 20.  Guter also attested that a superintendent would not prescribe, dispense, or order the taking of medication.  Guter Decl. ¶ 10.  Richardson maintains that he never issued any misbehavior report against O'Diah.  Richardson Decl. ¶¶ 3–4, 9–10.

Cully maintains that he did not order Thomas, Hahn, Shaw, Swierk, Moscicki, Richardson, Pepin, or Guter to author false misbehavior reports against O'Diah in retaliation for complaints and grievances filed and did not contact or supervise DOCCS employees of other facilities.  Cully Decl. ¶¶ 1, 3–4, 8.  Cully never spoke with O'Diah.  Id. ¶ 5.  Cully attested that DOCCS records indicated that O'Diah was cleared for the work program and nothing in O'Diah's record prevented the assignment of work involving exposure to respiratory agents.  Id. ¶ 11; Dkt. No. 84-10 at 1.


## II.  Motion for Summary Judgment

O'Diah contends that his Eighth Amendment rights were violated when he was forced to (1) work in a placement which exposed him to cigarettes, aggravating his prior health conditions, and (2) take an unknown medication.  O'Diah also contends that his First Amendment rights were violated because (1) false and retaliatory misbehavior reports were

12

issued against him and (2) his access to courts was impeded.

Defendants contend that O'Diah's complaint must be dismissed because (1) O'Diah's allegations did not meet federal pleading requirements, (2) defendants Cully and Moscicki were not personally involved in any of the claims, (3) O'Diah's claims are without merit, and (4) in the alternative, defendants are entitled to a qualified immunity defense. Defs.' Mem. of Law (Dkt. No. 84-1) at 2.


## A.  Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary

13

judgment.  <u>Gallo v. Prudential Residential Servs.</u> 22 F.3d 1219, 1223–24 (2d Cir. 1994);

<u>Graham v. Lewinski</u>, 848 F.2d 342, 344 (2d Cir. 1988).

When, as here, a party seeks judgment against a pro se litigant, a court must afford the

non-movant special solicitude.  <u>See</u> <u>Triestman v. Fed. Bureau of Prisons</u>, 470 F.3d 471,

477 (2d Cir. 2006).  As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se
> litigant is entitled to "special solicitude," . . . that a pro se litigant's
> submissions must be construed "liberally,". . . and that such
> submissions must be read to raise the strongest arguments that
> they "suggest," . . . .  At the same time, our cases have also
> indicated that we cannot read into pro se submissions claims
> that are not "consistent" with the pro se litigant's allegations, . . .
> or arguments that the submissions themselves do not "suggest,"
> . . . that we should not "excuse frivolous or vexatious filings by
> pro se litigants," . . . and that pro se status "does not exempt a
> party from compliance with relevant rules of procedural and
> substantive law . . . ."

<u>Id.</u> (citations and footnote omitted); <u>see</u> <u>also</u> <u>Sealed Plaintiff v. Sealed Defendant #1</u>, 537

F.3d 185, 191–92 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded

district courts that 'when [a] plaintiff proceeds pro se, . . . a court is obliged to construe his

pleadings liberally.'" (citations omitted)).  However, the mere existence of some alleged

factual dispute between the parties will not defeat an otherwise properly supported motion;

the requirement is that there be no genuine issue of material fact.  <u>Anderson</u>, 477 U.S. at

247–48.

When considering cross-motions for summary judgment, a court "must evaluate each

party's motion on its own merits, taking care in each instance to draw all reasonable

inferences against the party whose motion is under consideration."  <u>Hotel Employees &</u>

<u>Rest. Employees Union, Local 100 of N.Y. Dep't of Parks & Recreation</u>, 311 F.3d 534, 543

(2d Cir. 2002) (quoting <u>Heublein, Inc. v. United States</u>, 996 F.2d 1455, 1461 (2d Cir. 1993)). "[N]either side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it . . . [and] a district court is not required to grant judgment as a matter of law for one side or the other." <u>Heublein, Inc. v. United States</u>, 996 F.2d at 1461.

## B. Sufficiency of the Pleading

Defendants argue that the balance of O'Diah's amended complaint should be dismissed because it failed to meet Fed. R. Civ. P. 12(b)(6)'s plausibility pleading standard. Defs.' Mem. of Law at 4–6.  Rule 12(b)(6) tests "the formal sufficiency of the plaintiff's statement of a claim for relief <u>without</u> resolving a contest regarding its substantive merits." <u>Global Network Comm'ns, Inc. v. City of New York</u>, 458 F.3d 150, 155 (2d Cir. 2006).  This rule and standard were already applied to O'Diah's remaining claims.  <u>See</u> Dkt. Nos. 66, 73, 76.  Because defendants' motion for summary judgment addresses the merit of O'Diah's surviving claims, a second plausibility review of those claims would be futile.

Accordingly, defendants' motion on this ground should be denied.

## C. Personal Involvement

"'[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" <u>Wright v. Smith</u>, 21 F.3d 496, 501 (2d Cir. 1994) (quoting <u>Moffitt v. Town of Brookfield</u>, 950 F.2d 880, 885 (2d Cir. 1991)).  Thus, supervisory officials may not be held liable merely because they held a position of authority.

Id.; Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996). However, supervisory personnel may

be considered "personally involved" if:

> (1) [T]he defendant participated directly in the alleged
> constitutional violation;
>
> (2) the defendant, after being informed of the violation through a
> report or appeal, failed to remedy the wrong;
>
> (3) the defendant created a policy or custom under which
> unconstitutional practices occurred, or allowed the continuance
> of such a policy or custom;
>
> (4) the defendant was grossly negligent in supervising
> subordinates who committed the wrongful acts; or
>
> (5) the defendant exhibited deliberate indifference to the rights of
> inmates by failing to act on information indicating that
> unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Williams v. Smith, 781 F.2d 319,

323-24 (2d Cir. 1986)).[13]

In this case, superintendents Cully and Moscicki must be dismissed from this action

because of their lack of personal involvement. O'Diah alleged that Cully acted with

deliberate indifference and retaliatory intent by mandating O'Diah to remain in a dangerous

work environment after O'Diah complained to medical staff and filed a grievance. O'Diah

further alleged that Cully directed subordinates to issue him a false misbehavior report. As

---

[13] Various courts in the Second Circuit have postulated how, if at all, the Iqbal
decision affected the five Colon factors which were traditionally used to determine
personal involvement. Pearce v. Estate of Longo, 766 F. Supp. 2d 367, 376 (N.D.N.Y.
2011), rev'd in part on other grounds sub nom., Pearce v. Labella, 473 F. App'x 16 (2d Cir.
2012) (recognizing that several district courts in the Second Circuit have debated Iqbal's
impact on the five Colon factors); Kleehammer v. Monroe Cnty., 743 F. Supp. 2d 175
(W.D.N.Y. 2010) (holding that "[o]nly the first and part of the third Colon categories pass
Iqbal's muster . . . ."); D'Olimpio v. Crisafi, 718 F. Supp. 2d 340, 347 (S.D.N.Y. 2010)
(disagreeing that Iqbal eliminated Colon's personal involvement standard).

for Moscicki, O'Diah alleged that Moscicki intentionally failed to send out his legal mail.

Despite O'Diah's conclusory allegations, record evidence does not show how Cully or Moscicki either directly participated in the alleged constitutional violations or were informed of both the alleged constitutional violations and O'Diah's health problems. O'Diah cannot attempt to establish personal involvement based on the supervisory role of these defendants. Wright, 21 F.3d at 501 (holding that a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement). In particular, other defendants corroborated Cully's position that he had no knowledge of O'Diah's intolerance of cigarette smoke or ever ordered subordinates, those within and outside of his own facility, to issue false misbehavior reports. Hahn also attested that Moscicki was not involved in the postage stamp matter that allegedly prevented O'Diah from sending mail. Therefore, beyond O'Diah's conclusory allegations, there is nothing in the record refuting Cully's and Moscicki's corroborated declarations that they were not directly involved in the claims alleged or had knowledge of the alleged constitutional violations.

To the extent O'Diah contends that the defendants failed to properly investigate his grievances, as the defendants noted, such claims must fail. Defs.' Mem. of Law at 26. Merely writing letters and grievances to a defendant is insufficient to establish notice and personal involvement. Smart v. Goord, 441 F. Supp. 2d 631, 643 (S.D.N.Y. 2006) ("Commissioner . . . cannot be held liable on the sole basis that he did not act in response to letters of protest sent by [plaintiff] . . . ."). Similarly, receipt of a letter or grievance, without personally investigating or acting on the letter or grievance, is insufficient to establish personal involvement. See, e.g., Rivera v. Fischer, 655 F. Supp. 2d 235, 238 (W.D.N.Y.2009) (citing cases); Bodie v. Morgenthau, 342 F. Supp. 2d 193, 203 (S.D.N.Y.

2004) ("While mere receipt of a letter from a prisoner is insufficient to establish individual liability . . . [p]ersonal involvement will be found . . . where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint.").  O'Diah does not specifically articulate how and whether each defendant received and responded to O'Diah's grievances, which is insufficient to establish personal involvement.  See Bodie, 342 F. Supp. 2d at 203(citations omitted) (finding personal involvement only where a supervisory official received, reviewed, and responded to a prisoner's complaint); Johnson v. Wright, 234 F. Supp. 2d 352, 363 (S.D.N.Y. 2002) ("[I]f mere receipt of a letter or similar complaint were enough, without more, to constitute personal involvement, it would result in liability merely for being a supervisor, which is contrary to the black-letter law that § 1983 does not impose respondeat superior liability.") (citations omitted).  Furthermore, O'Diah did not allege, nor does the record reflect, that Cully or Moscicki created unconstitutional policies or were grossly negligent in supervising subordinates.  As such, O'Diah has failed to establish their personal involvement.

Accordingly, defendants' motion on this ground should be granted.


### D.  First Amendment

#### i.  Retaliation

To state an actionable claim for retaliation under the First Amendment, a prisoner must establish by a preponderance of the evidence that:  (1) the speech or conduct at issue was protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected speech and the adverse action.  Gill v.

Pidlypchak, 389 F.3d 379, 380 (2d Cir. 2004) (internal quotation marks and citation omitted); Tafari v. McCarthy, 714 F. Supp. 2d 317, 347 (N.D.N.Y. 2010). In the prison context, "adverse action" is objectively defined as conduct "that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights." Davis v. Goord, 320 F.3d 346, 353 (2d Cir. 2003). "[A]dverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone." Jackson v. Onondaga Cnty., 549 F. Supp. 2d 204, 215 (N.D.N.Y. 2008).

"Types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." Barclay v. New York, 477 F. Supp. 2d 546, 588 (N.D.N.Y. 2007) (citations omitted).

> There is no bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship, so courts judge the permissible inferences that can be drawn from temporal proximity in the context of particular cases. However, courts have found that six and eight month gaps between the protected conduct and adverse action were sufficient, while in other circumstances three months was considered too long.

Burton v. Lynch, 664 F. Supp. 2d 349, 367 (S.D.N.Y. 2009) (internal quotation marks and citations omitted).

Courts must view retaliation claims with care and skepticism to avoid judicial intrusion into matters of prison administration. Jackson, 549 F. Supp. 2d at 214–15. Therefore, conclusory allegations alone are insufficient. Id. at 214 (citing Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir. 1983) (explaining that "claim[s] supported by specific and detailed

factual allegations . . . ought usually be pursued with full discovery.")).  If the plaintiff establishes these elements, the burden shifts to the defendants to show by a preponderance of the evidence that they would have taken the same action against the plaintiff absent his exercising of the protected conduct.  Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996).

### ii.  False Misbehavior Reports

An inmate has a right not to be deprived of a liberty interest without due process. However, a "prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest."  Freeman v. Rideout, 808 F.2d 949, 951 (2d Cir. 1986)).  "There must be more, such as retaliation against the prisoner for exercising a constitutional right."  Boddie v. Schnieder, 105 F.3d 857, 862 (2d Cir.1997) (citing Franco v. Kelly, 854 F.2d 584, 588-90 (2d Cir. 1988)).

O'Diah's work assignment claims against Pepin and Richardson are without merit. O'Diah contends that his First Amendment rights were violated when Pepin and Richardson issued him a false misbehavior report in retaliation for complaining about his work placement in June 2008.  Inmates are not entitled to any rights to his job assignment.  Gill v. Mooney, 824 F.2d 192, 194 (2d Cir. 1987) (citations omitted).  However, inmates are entitled to lodge written grievances and verbal complaints, thus, O'Diah has satisfied the first prong of the analysis as both his verbal complaint to supervisor and informal written grievance to Brock constitute protected speech.  Brewer v. Kamas, 533 F. Supp. 2d 318,

328–29 (W.D.N.Y. 2008) (citations omitted) (stating that both written and verbal grievances to a correctional officer constitute protected activity). Furthermore, thirty-days of keeplock may deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights to file such complaints. Gill v. Pidlypchak, 389 F.3d at 382 (noting that the imposition of keeplock constitutes adverse action). However, the causation requirement cannot be established. While Pepin issued the report shortly after O'Diah complained about his job placement, the issuance of the report was motivated by O'Diah's threats and failure to obey orders in violation of facility rules, which indicated that the report was issued for a proper purpose. Dkt. No. 84-49 at 8. Moreover, Richardson did not issue the report but only conducted the disciplinary hearing concerning the misbehavior report. Because O'Diah failed to satisfy the required three-prong test, O'Diah's retaliation claims against Pepin and Richardson should be dismissed.

O'Diah's retaliation claims against Hahn and Shaw are without also merit. O'Diah alleged that Hahn and Shaw issued him a false misbehavior report in retaliation for submitting a grievance and receiving a reimbursement of money. It is undisputed that filing grievances is a constitutionally protected activity. Davis, 320 F.3d at 352–53. Further, O'Diah was sentenced to keeplock confinement, which constitutes adverse action. Gill v. Pidlypchak, 389 F.3d at 382. While there is temporal proximity between the filing of the grievance and the issuance of the report, there is nothing else in the record to support causation. The misbehavior report charged O'Diah with exchanging property with another inmate, to which O'Diah conceded. This represents a violation of facility rules. Therefore, the report would have been issued because of a rules violation, even if O'Diah did not file a grievance. Hynes v. Squillace, 143 F.3d 653, 657 (2d Cir. 1998) ("defendants had met their

burden of showing that they would have disciplined the plaintiff even in the absence of the protected conduct because it was undisputed that the inmate plaintiff had in fact committed the prohibited conduct for which he had been cited in a misbehavior report." (alterations and citations omitted)).  Therefore, O'Diah has failed to establish retaliation claims against Hahn and Shaw.

Lastly, O'Diah's retaliation claim against Swierk is also without merit.  O'Diah contends that Swierk issued him a false misbehavior report in retaliation for submitting a grievance about reimbursement.  As indicated, filing grievances is a constitutionally protected activity.  Further, the issuance of a misbehavior report constituted adverse action.  Cusamano v. Sobek, 604 F. Supp. 2d 416, 434 (N.D.N.Y. 2009).  Moreover, Swierk firmly believed that O'Diah's manner of labeling his mail violated Directives #4421 and #4422 and would have issued the report regardless of O'Diah's grievance.  As Swierk's intent indicated authoring the report for proper purposes, namely a facility rules violation because O'Diah labeled his mail as "legal" when O'Diah's wife was the intended recipient of the mail.  Thus, O'Diah has also failed to satisfy the three-prong test against Swierk.

Accordingly, defendants' motion on this claim should be granted.


### iii.  Access to Courts

"Interference with legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution."  Davis v. Goord, 320 F.3d 346, 351 (2d Cir. 2003).  In order to state a claim for denial of access to the courts, including those premised on interference with legal mail,

a plaintiff must allege "that a defendant caused 'actual injury,' i.e. took or was responsible for actions that 'hindered [a plaintiff's] efforts to pursue a legal claim.'" Id. (citing Monsky v. Moraghan, 127 F.3d 243, 247 (2d Cir. 1997) (quoting Lewis v. Casey, 518 U.S. 343, 351 (1996)).  Such injury must affect "a nonfrivolous legal claim [which] had been frustrated or was being impeded due to the actions of prison officials."  Warburton v. Underwood, 2 F. Supp. 2d 306, 312 (W.D.N.Y. 1998) (citations omitted); Shine v. Hofman, 548 F. Supp. 2d 112, 117–18 (D. Vt. 2008) (explaining that actual injury "is not satisfied by just any type of frustrated legal claim because the Constitution guarantees only the tools that inmates need in order to attack their sentences . . . and . . . challenge the conditions of their confinement.") (internal quotation marks and citations omitted).

O'Diah has failed to establish an access to courts claim.  O'Diah alleges that he lost a federal case for failure to prosecute because Thomas improperly prevented him from filing necessary court documents.  First, the record shows that O'Diah's mail was timely sent and delivered to O'Diah's legal advocate.  Second, O'Diah provided no evidence showing how Thomas's actions caused him to lose the lawsuit.  In fact, O'Diah's federal case was dismissed not for failure to prosecute, but for O'Diah's numerous frivolous filings in the Eastern District of New York.  It cannot be said that O'Diah's suit was non-frivolous when the federal court was compelled to deem his cause of action meritless and enjoin him from filing another action based on the same nucleus of facts.  Warburton, 2 F. Supp. 2d at 312.

Moreover, Thomas maintains that he did not tamper with O'Diah's legal mail.  Even assuming the contrary, "an isolated incident of mail tampering is usually insufficient to establish a constitutional violation . . . [r]ather, the inmate must show that prison officials regularly and unjustifiably interfered with the . . . legal mail."  Davis, 320 F.3d at 351

(internal quotation marks and citations omitted).  Here, there is nothing in the record supporting a regular and unjustifiable practice of censoring inmates' legal mail at Cayuga, where Thomas worked.  Thus, even viewing the facts in the light most favorable to O'Diah, O'Diah's access to courts claim against Thomas is without merit and should be denied.

The same holds true for O'Diah's remaining claim.  Since the Article 78 petition filed at Cayuga County Court was dismissed for failure to state claim, O'Diah's contentions against Hahn, Shaw, Swierk and Moscicki must also fail as O'Diah did not sustain any actual injury. Davis, 320 F.3d at 351.

Accordingly, defendants' motion on these claims should be granted.


### E.  Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual punishment."  U.S. CONST. amend. VIII.  Eighth Amendment obligations include the duty to protect prisoners from other known harms.  Farmer v. Brennan, 511 U.S. 825, 829 (1970); Matthews v. Armitage, 36 F. Supp. 2d 121, 124 (N.D.N.Y. 1999) (citations omitted).  It also includes the provision of medical care.  Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994).  The test for a § 1983 claim is twofold.  First, the prisoner must show that the condition to which he was exposed was sufficiently serious.  Farmer, 511 U.S. at 834. Second, the prisoner must show that the prison official demonstrated deliberate indifference by having knowledge of the risk and failing to take measures to avoid the harm.  Id.

"'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to

state a cognizable claim.  <u>Smith v. Carpenter</u>, 316 F.3d 178, 184 (2d Cir. 2003) (quoting

<u>Hudson v. McMillian</u>, 503 U.S. 1, 9 (1992)).  Because there is no distinct litmus test, a

serious medical condition is determined by factors such as "(1) whether a reasonable doctor

or patient would perceive the medical need in question as 'important and worthy of

comment or treatment,' (2) whether the medical condition significantly affects daily

activities, and (3) the existence of chronic and substantial pain."  <u>Brock v. Wright</u>, 315 F.3d

158, 162–63 (2d Cir. 2003) (<u>citing</u> <u>Chance v. Armstrong</u>, 143 F.3d 698, 702 (2d Cir. 1998)).

The severity of the denial of care should also be judged within the context of the

surrounding facts and circumstances of the case.  <u>Smith</u>, 316 F.3d at 185.

Deliberate indifference requires the prisoner "to prove that the prison official knew of

and disregarded the prisoner's serious medical needs."  <u>Chance v. Armstrong</u>, 143 F.3d

698,  702 (2d Cir. 1998).  "[P]rison officials who actually knew of a substantial risk to inmate

health or safety may be found free from liability if they responded reasonably to the risk,

even if the harm ultimately was not averted."  <u>Farmer</u>, 511 U.S. at 844.  Thus, prison

officials must be "intentionally denying or delaying access to medical care or intentionally

interfering with the treatment once prescribed."  <u>Estelle v. Gamble</u>, 429 U.S. 97, 104 (1976).

"Mere disagreement over proper treatment does not create a constitutional claim" as long

as the treatment was adequate.  <u>Chance</u>, 143 F.3d at 703.  Hence, "disagreements over

medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the

need for specialists . . . are not adequate grounds for a section 1983 claim."  <u>Sonds v. St.</u>

<u>Barnabas Hosp. Corr. Health Servs.</u>, 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001).

### i. Exposure to Environmental Tobacco Smoke ("ETS")

To satisfy the objective prong and establish a serious illness or injury resulting from exposure to ETS, "a plaintiff must show that he himself is being exposed to unreasonably high levels of ETS." Warren v. Keane, 196 F.3d 330, 333 (2d Cir. 1999) (citing Helling v. McKinney, 509 U.S. 25, 35 (1993)) (internal quotation marks omitted); Gill v. Smith, 283 F. Supp. 2d 763, 766 (N.D.N.Y. 2003) (citing Helling v. McKinney). Not only must the exposure actually cause the inmate potential harm but "society [must] consider[] the risk . . . to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." Id. (quoting Helling, 509 U.S. at 35–36). Subjectively, a plaintiff must demonstrate that the defendant "knew of and disregarded an excessive risk to inmate health or safety." Colon v. Drew, 335 F. App'x 86, 87–88 (2d Cir. 2009) (alterations and citations omitted). Additionally, the court must assess "the prison authorities' current attitudes and conduct," towards the environment, evaluating whether "prison authorities are ignoring the possible dangers posed by exposure to ETS." Helling, 509 U.S. at 36–37.

In this case, O'Diah has failed to establish either prong of an Eighth Amendment claim based on ETS exposure. "[Courts have] granted summary judgment for the defendant because the plaintiff failed to provide any evidence about the level of smoke in the facility, the degree of exposure, or any medical problems associated with exposure to ETS." Gill v. Smith, 283 F. Supp. 2d at 767 (citing inter alia, Davidson v. Coughlin, 920 F. Supp. 305, 309 (N.D.N.Y. 1996); LaCroix v. Williams, No. 97-CV-790E(F), 2000 WL 1375737 (W.D.N.Y. Sept. 21, 2000) (holding that even though plaintiff was housed in a poorly ventilated twenty-two-bed dormitory with twenty-one smokers, the lack of documentation to support the alleged resulting medical issues was insufficient to craft an Eighth Amendment

claim)). Viewing the facts in the light most favorable to the plaintiff, O'Diah contends that he was exposed to ETS on May 9, 2008, May 10, 2008, and June 2, 2008. O'Diah claims that the resulting harm materialized into dizziness, headaches, shoulder and back pain, and elevated blood pressure. However, O'Diah provided no evidence, and the record does not reflect otherwise, to show the level of smoke or degree of exposure around the cans containing cigarette butts, or how O'Diah's medical problems were associated with ETS exposure. In fact, O'Diah's medical records contain no reference to a sensitivity to ETS or to him experiencing the complications articulated above. The only time medical records show any of these symptoms was when O'Diah's blood pressure increased, presumably due to an urinary tract infection. Thus, O'Diah has failed to establish the first prong.

O'Diah has also failed to establish the second prong of this Eighth Amendment claim. There is nothing in the record supporting O'Diah's conclusory allegations that Pepin knew of O'Diah's sensitivity to cigarette smoke. Rinders testified at a hearing that nothing in O'Diah's medical records indicated such information and O'Diah did not proffer an explanation for the lack of medical documentation involving ETS. Thus, none of O'Diah's alleged sensitivities were available to DOCCS in determining appropriate work placement if such information was contained in O'Diah's records. DOCCS would have provided work accommodations. As O'Diah's ETS problems were not documented, prison authorities cannot be said to have ignored the dangers of ETS exposure. Dkt. No. 84-45 at 10. Thus, O'Diah has also failed to show that Pepin knew of and disregarded an excessive risk to his health or safety. As such, no genuine issue of material fact exists for O'Diah's ETS claim and the claim should be denied.

Accordingly, defendants' motion on this ground should be granted.

27

### ii. Forced Medication

Mere disagreement over treatment does not amount to a constitutional claim as long as the treatment is adequate. Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir. 1998) (citation omitted). A defendant who acted reasonably with regard to an inmate's health risk is not liable under the Eighth Amendment. Salahuddin v. Goord, 467 F.3d 279–80 (2d Cir. 2006). Under New York common law, an adult is entitled to refuse medication except in the narrow circumstances of when the adult "presents a danger to himself or other members of society or engages in dangerous or potentially destructive conduct within the institution." Kulak v. City of New York, 88 F.3d 63, 74 (2d Cir. 1996).

Here, O'Diah has also failed to establish a medical indifference claim based on forced medication. The medical record shows that after O'Diah's pleas of refusing neurontin, O'Diah eventually and voluntarily took the medication upon Guter's assurance that his requested information would be obtained. Further, O'Diah's refusals to take neurontin were respected, which belies O'Diah's claims of being forced to take medication. Thus, O'Diah's medical record refutes his claims of forced medication. Moreover, Guter and Thomas both attested that they did not physically touch O'Diah during the course of administering the medicine and O'Diah did not oppose this in response. Even though O'Diah disagreed with the proper treatment prescribed, the prescription was reasonable as O'Diah indicated that he felt better after taking it. Furthermore, to the extent there was a delay in treatment, that can only be attributed to O'Diah and his decision to take the medication intermittently over a one-month period. Thus, despite O'Diah's conclusory allegations, the record is devoid of any evidence suggesting that the prescribed medication was inadequate or O'Diah was forced to take any medication. No genuine issue of material fact exists with regard to this

28

claim.

Accordingly, defendants' motion on this ground should be granted.

### iii. Mawhir

To the extent that O'Diah alleged non-party Mawhir directed Guter and Thomas to force medication on O'Diah, as recognized in the Report-Recommendation dated February 28, 2012, such a claim is meritless. Dkt. No. 73 at 42. As previously discussed, this claim cannot stand as no record evidence shows that O'Diah was forced to take medication. Further, nothing in the record even suggests that Mawhir ordered or directed anyone to force O'Diah to take any medication. Accordingly, any liberally construed claims alleged against Mawhir must, as a matter of law, fail for the aforementioned reasons.

Moreover, where a defendant has not been served with process within 120 days of the filing of the complaint, the complaint must be dismissed without prejudice as to that defendant or the court must order "service be made within a specified time." FED. R. CIV. P. 4(m). If, however, the plaintiff demonstrates good cause for service failures, the Court must also extend the time to serve. Id. Additionally, the Second Circuit has held that "district courts have discretion to grant extensions even in the absence of good cause." Zapata v. City of New York, 502 F.3d 192, 196 (2d Cir. 2007). Here, more than 120 days have passed since O'Diah filed his complaint. O'Diah has also failed to provide any reasons constituting good cause for failing to serve or add Mawhir as a defendant.

Accordingly, to the extent the previous Report and Recommendation recognized potential claims against Mawhir, such claims would fail as a matter of law and including

Mawhir in the case would be futile.

## F. Qualified Immunity

Defendants claim that even if O'Diah's constitutional claims are substantiated, they are nevertheless entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Aiken v. Nixon, 236 F. Supp. 2d 211, 229–30 (N.D.N.Y. 2002) (McAvoy, J.), aff'd, 80 F. App'x 146 (2d Cir. 2003). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified . . . immunity might still be available . . . if it was objectively reasonable for the public official to believe that his acts did not violate those rights." Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991); Magnotti v. Kuntz, 918 F.2d 364, 367 (2d Cir. 1990) (internal citations omitted)).

A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. Saucier v. Katz, 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. Aiken, 236 F. Supp. 2d at 230. Here, the second prong of the inquiry need not be addressed with respect to O'Diah's First and Eighth Amendment claims because, as discussed supra, it has not been shown that defendants violated O'Diah's First and Eighth Amendment rights.

Accordingly, it is recommended, in the alternative, that defendants' motion on this

ground be granted and O'Diah's complaint be dismissed.

### III. O'Diah's Cross-Motion

For the reasons discussed above, O'Diah's cross-motion for summary judgment should be denied in all respects.

### IV. Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that:

1. Defendants' motion for summary judgment (Dkt. No. 84) be **GRANTED** as to all claims and all defendants and the complaint be **DISMISSED** with prejudice; AND

2. O'Diah's cross-motion for summary judgment (Dkt. No. 87) be **DENIED**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).


Dated:  March 26, 2013
          Albany, New York

Christian F. Hummel
U.S. Magistrate Judge